JENNER & BLOCK LLP
Andrew J. Thomas (SBN 159533)
ajthomas@jenner.com
Farnaz M. Alemi (SBN 255836)
falemi@jenner.com
Kirsten C. Jackson (SBN 265952)
kjackson@jenner.com
633 West Fifth Street, Suite 3600
Los Angeles, CA 90071
Telephone: (213) 239-5100
Facsimile: (213) 239-5199

Attorneys for Plaintiffs
WARNER BROS. ENTERTAINMENT
INC., NEW LINE CINEMA LLC, NEW
LINE PRODUCTIONS, INC., METRO-
GOLDWYN-MAYER STUDIOS INC.,
and THE SAUL ZAENTZ COMPANY

COPY

FILED

12 NOV -7 PM 2:44

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WARNER BROS. ENTERTAINMENT INC., a Delaware corporation; NEW LINE CINEMA LLC, a Delaware limited liability company; NEW LINE PRODUCTIONS, INC., a California corporation; METRO-GOLDWYN-MAYER STUDIOS INC., a Delaware corporation; and THE SAUL ZAENTZ COMPANY, a Delaware corporation, <br><br> Plaintiffs, <br><br> v. <br><br> THE GLOBAL ASYLUM INC. (aka The Asylum), a California corporation, <br><br> Defendant. | Case No. CV12-09547 PSG (CWx) <br><br> **COMPLAINT FOR:** <br><br> **[1] TRADEMARK INFRINGEMENT [15 U.S.C. § 1114]** <br><br> **[2] FALSE DESIGNATION OF ORIGIN [15 U.S.C. § 1125]** <br><br> **[3] TRADEMARK DILUTION [15 U.S.C. § 1125]** <br><br> **[4] FALSE ADVERTISING [15 U.S.C. § 1125]** <br><br> **[5] COMMON LAW UNFAIR COMPETITION** <br><br> **[6] VIOLATION OF CAL. BUS. & PROF. CODE § 17200** <br><br> **[7] VIOLATION OF CAL. BUS. & PROF. CODE § 17500** <br><br> **[8] VIOLATION OF CAL. BUS. & PROF. CODE § 17247** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs Warner Bros. Entertainment Inc. ("Warner Bros."), New Line Cinema LLC, New Line Productions, Inc. (together with New Line Cinema LLC, "New Line"), Metro-Goldwyn-Mayer Studios Inc. ("MGM"), and The Saul Zaentz Company d/b/a Middle-Earth Enterprises ("SZC" ) bring this action against defendant The Global Asylum Inc. ("The Asylum") for injunctive relief and damages and allege as follows:

## NATURE OF THE ACTION

1.      This action arises out of defendant The Asylum's knowing and willful infringement of Plaintiffs' rights with respect to the beloved, world-famous novels *The Hobbit* and *The Lord of the Rings* trilogy by J.R.R. Tolkien, the Academy Award-winning, blockbuster motion picture trilogy *The Lord of the Rings*, and a series of three soon-to-be released motion pictures based on the Tolkien novel *The Hobbit* (the "*Hobbit* Films").  In a deliberate effort to profit from consumer confusion, The Asylum is advertising and promoting for sale a low-budget knockoff DVD titled *Age of the Hobbits* (the "Infringing DVD").

2.      Plaintiffs own the exclusive rights to produce and distribute motion pictures based on the classic literary works of Professor J.R.R. Tolkien entitled *The Lord of the Rings*, *The Two Towers*, and *The Return of the King* (known as the "*Lord of the Rings* trilogy") and *The Hobbit*, fantasy stories that follow the adventures of fictional creatures called "Hobbits."  The events in *The Hobbit* and *The Lord of the Rings* trilogy take place during a time that the books refer to as the "Third Age" of Middle-earth, and result in the passing of the Third Age into the Fourth Age.  Tolkien's novel *The Hobbit* is one of the bestselling books of all time, and people throughout the world associate the fanciful term and title "Hobbit" with Tolkien's works and with the imaginary world of Middle-earth that he created.

3.      Plaintiff New Line created, distributed and owns copyright interests in the enormously successful *The Lord of the Rings* film trilogy, which grossed

-2-

COMPLAINT

$3 billion at box offices worldwide and won 17 Academy Awards. Plaintiffs are creating and will soon distribute three additional films based on Tolkien's *The Hobbit* novel – *The Hobbit: An Unexpected Journey*, *The Hobbit: The Desolation of Smaug*, and *The Hobbit: There and Back Again*. All three films are being directed, co-written, and produced by Academy Award-winning filmmaker Peter Jackson, who also directed the *Lord of the Rings* motion picture trilogy. All of these titles contain the fanciful term "Hobbit," and Plaintiffs have used and continue to use marks associated with that fanciful term, including "HOBBIT" and "THE HOBBIT" to brand the films and related licensed merchandise. The films have been the subject of extensive pre-release publicity and millions of consumers are awaiting the December 14, 2012 release of the first film.

4.    Plaintiff SZC owns the worldwide trademark and merchandising rights in the names of characters, places, events, and things in Tolkien's books *The Hobbit* and the *Lord of the Rings* trilogy. Plaintiffs SZC, New Line, and Warner Bros. have collaborated for many years in licensing others to use trademarks and service marks derived from *The Hobbit* and the *Lord of the Rings* trilogy. Plaintiff SZC also owns exclusive rights to the famous registered trademarks "HOBBIT" and "THE HOBBIT" for use on and in association with various entertainment products and services, including DVDs, computer games, video games, board games, figurines, posters, as well as other goods and services. Not only is the HOBBIT mark central to the content, promotion and advertising of *The Lord of the Rings* and *The Hobbit* films, Plaintiffs and their related companies also have used the HOBBIT mark on a wide variety of goods and services in connection with their highly successful worldwide merchandising programs.

5.    The Asylum is in the business of producing low-budget knockoffs (which it calls "mockbusters") of major motion pictures, which The Asylum markets to the public at or around the time the major studio film that it is knocking off is playing in theaters. In this case, The Asylum has been and is promoting and

advertising its low-budget film using the confusingly similar and misleading title *Age of the Hobbits,* in an intentional and willful attempt (i) to trade on the popularity and goodwill associated with the Tolkien novels, the extraordinarily successful *Lord of The Rings* film trilogy, and the famous HOBBIT mark, (ii) to free-ride on the worldwide advertising campaign in connection with the forthcoming *Hobbit* Films, and (iii) to divert customers and potential customers away from the *Hobbit* Films.

6.     The Asylum's advertising for its low-budget knockoff also has been and is confusingly similar to advertising for and images from the Plaintiffs' copyrighted films and trademarked products, including the font and style in which the titles appear and the overall look and feel of the images depicted in the artwork and packaging.  According to its own website, The Asylum intends to release its knockoff movie *Age of the Hobbits* on December 11, 2012 – only three days prior to the December 14, 2012 theatrical release date for the first of the *Hobbit* Films, *The Hobbit: An Unexpected Journey.*

## JURISDICTION AND VENUE

7.     This is a civil action against The Asylum for trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114, false designation of origin and false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), trademark dilution under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), and violations of California statutory and common law.

8.     This Court has subject matter jurisdiction over this matter pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338 in that it involves an action arising under the federal Lanham Act.

9.     Defendant The Asylum is subject to personal jurisdiction in the State of California because it is a California corporation that has its main office in Burbank, California, and because it conducts substantial business operations in this judicial district.

COMPLAINT

10.    Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and (c) and 28 U.S.C. § 1400(a) because Plaintiffs' claims arise in this judicial district and defendant The Asylum may be found in this judicial district and is subject to personal jurisdiction in this judicial district.

## THE PARTIES

11.    Plaintiff Warner Bros. is a Delaware corporation with its principal place of business at 4000 Warner Boulevard, Burbank, California.  Warner Bros. is an internationally-known motion picture studio which produces and distributes motion pictures in the United States and around the world.  Examples of films produced and distributed globally by Warner Bros. and its subsidiary companies include the well-known and highly successful *Dark Knight*, *Harry Potter*, and *Sherlock Holmes* film franchises.  Together with New Line, Warner Bros. owns exclusive rights to distribute the *Hobbit Films* in the United States and, together with New Line and MGM, owns the exclusive rights to distribute the *Hobbit* Films in various territories around the world.

12.    Plaintiff New Line Cinema LLC is a Delaware limited liability company, with its principal place of business at 116 North Robertson Blvd., Los Angeles, California, and is a wholly owned subsidiary of Warner Bros.  Plaintiff New Line Productions, Inc. is a California corporation, with its principal place of business at 116 North Robertson Blvd., Los Angeles, California, and is a wholly owned subsidiary of New Line Cinema LLC.  New Line Cinema LLC (together with New Line Productions, Inc., "New Line") is an internationally-known motion picture studio which produces motion pictures in the United States and around the world.  New Line produced and distributed the highly successful *Lord of the Rings* motion picture franchise, as well as numerous other well-known and highly successful films.  Together with Warner Bros., New Line owns the exclusive rights to distribute the *Hobbit Films* in the United States and, together with Warner Bros. and MGM, owns the exclusive rights to distribute the *Hobbit* Films in various

territories around the world.

13.   Plaintiff MGM is a Delaware corporation, with its principal place of business at 245 N. Beverly Drive, Beverly Hills, California.  MGM is an internationally-known motion picture studio which produces and distributes motion pictures in the United States and around the world.  Examples of films produced and distributed globally by MGM include the well-known and highly-successful *Rocky*, *Pink Panther*, and *James Bond* film franchises.  Together with New Line and Warner Bros., MGM owns the exclusive rights to distribute the *Hobbit* Films in various territories around the world.

14.   Plaintiff SZC is a Delaware corporation, with its principal place of business at 2600 Tenth Street, Berkeley, California.  SZC owns the exclusive worldwide motion picture and merchandising rights for the J.R.R. Tolkien books *The Hobbit* and the *Lord of the Rings* trilogy, as well as the exclusive trademark rights in the names of characters, places, events and things in these books, including the HOBBIT mark.  SZC has registered the HOBBIT mark and related marks with the United States Patent and Trademark Office and in many other countries.  It has licensed exclusive motion picture rights in the *Lord of the Rings* trilogy to New Line and exclusive motion picture rights in *The Hobbit* novel to New Line and MGM.

15.   Plaintiffs are informed and believe, and on that basis allege, that defendant The Asylum is a California corporation having its principal place of business at 72 East Palm Avenue, Burbank, California.

### *THE HOBBIT* AND *THE LORD OF THE RINGS* NOVELS

16.   *The Hobbit* is a fantasy novel by Professor J.R.R. Tolkien, first published in the 1930s.  It was an instant success and remains highly popular to this day, with an estimated 100 million copies sold in more than 40 languages.

17.   The *Lord of the Rings* trilogy is a three-volume fantasy novel also written by J.R.R. Tolkien and published in the 1950s.  The sequel to *The Hobbit*,

-6-

the *Lord of the Rings* trilogy comprises three individual volumes entitled *The Fellowship of the Ring*, *The Two Towers*, and *The Return of the King*.  Tolkien's classic *The Lord of the Rings* trilogy has become one of the best-selling novels ever written, with over 150 million copies sold worldwide.

18.    *The Hobbit* and the *Lord of the Rings* trilogy are referred to in this Complaint collectively as the "Tolkien Works."  The Tolkien Works are among the most well-known, popular and beloved series of literary works of all time.  Each of the Tolkien Works became enormously popular soon after publication, each is currently in print in the United States, and each has been in print continuously since its initial publication date.  More than 60 printings of *The Hobbit* and more than 50 printings of the *Lord of the Rings* trilogy have been published.  More than 45 million copies of the Tolkien Works have been sold in the United States alone.

19.    The term "Hobbit" was created by Professor Tolkien to describe the fanciful characters first featured in his novel *The Hobbit* and later in the *Lord of the Rings* trilogy.  The leading (and title) character of *The Hobbit* is a Hobbit named Bilbo Baggins.  The leading character of *The Lord of the Rings* trilogy is a Hobbit named Frodo Baggins, the nephew of Bilbo Baggins.

20.    Because of the enormous and enduring popularity enjoyed by the Tolkien Works, the fanciful term "Hobbit" has become widely known among the consuming public to indicate the distinctive fantasy characters created by Professor Tolkien as portrayed in the Tolkien Works and in the *Lord of the Rings* and *Hobbit* motion pictures.  Substantial goodwill has developed in the term "Hobbit" as referring to the characters in the Tolkien Works, the *Lord of the Rings* films, and the *Hobbit* Films and, furthermore, to the goods and services offered by Plaintiffs and their predecessors in connection with the those books and films.  The marks THE HOBBIT and HOBBIT, alone or in combination with other words (collectively, the "HOBBIT Marks") are inherently distinctive and are inextricably connected to the Tolkien Works, to the *Lord of the Rings* and *Hobbit* films, and to

the goods and services offered by SZC and/or its licensees related to the Tolkien Works as well as the *Lord of the Rings* and *Hobbit* films.

21. For more than 30 years, SZC and its predecessors have held the right to use and license others to use marks derived from the Tolkien Works including, without limitation, the titles of each of the Tolkien Works and the names and visual representations of the characters, places, objects, and events described in the Tolkien Works, including without limitation the HOBBIT Marks. SZC also holds exclusive, worldwide theatrical motion picture and live stage production rights in and to the Tolkien Works, as well as the right to sell merchandise and provide services in connection with such film and stage productions and to license others to do so as well.

## LICENSING OF THE HOBBIT MARKS

22. Beginning in at least the mid-1970s, SZC established, and has continued to maintain, successful worldwide licensing programs to promote merchandise and other goods and services based on the Tolkien Works, as well as on the films and stage adaptations thereof produced or licensed by SZC. As part of this program, SZC and its licensees have aggressively promoted the HOBBIT Marks through numerous channels of trade. SZC has used, and licensed others to use, the HOBBIT Marks in connection with a wide variety of commercial goods and services.

23. In addition to its substantial common law rights, SZC is the lawful owner of numerous registrations and applications for the HOBBIT Marks, in connection with various goods and services. Among other things, these goods and services include DVDs, video games, computer game software, and pre-recorded CD-ROMs featuring fantasy games, board games, lithographic prints, fantasy films and music.

24. Among other federal trademark registrations, SZC owns Registration No. 2,949,370 for THE HOBBIT (issued on May 10, 2005), Registration

-8-

COMPLAINT

No. 1,230,026 for HOBBIT (issued on March 8, 1983), Registration No. 2,897,941 for HOBBIT (issued on October 26, 2004), and Registration No. 2,976,573 for HOBBIT (issued on July 26, 2005). These registrations all are valid, subsisting, and incontestable. SZC also owns Registration No. 3,245,235 for THE HOBBIT (issued on May 22, 2007), Registration No. 3,938,229 for THE HOBBIT (issued on March 29, 2011), Registration No. 3,981,769 for THE HOBBIT (issued on June 21, 2011), and Registration No. 4,187,873 for THE HOBBIT: AN UNEXPECTED JOURNEY (issued on August 7, 2012). These registrations all are valid and subsisting. True and correct copies of these trademark registrations and related records, as printed out from the website of the United State Patent and Trademark Office, are attached hereto as **Exhibit A** and incorporated by reference.

25. In addition, SZC has applied to register the titles of each of the three *Hobbit* Films on an intent-to-use basis in Class 9 for, among other things, pre-recorded DVDs featuring fantasy films, fantasy games and/or cartoons, and in Class 41 for entertainment services, in connection with providing online electronic games and interactive videogames over the Internet. In February 2012, the Trademark Office issued Notices of Allowance for THE HOBBIT: AN UNEXPECTED JOURNEY (Serial Nos. 85350515 and 85350688) and Notices of Allowance for THE HOBBIT: THERE AND BACK AGAIN (Serial Nos. 85348202 and 85348380). SZC has a pending application to register the third title THE HOBBIT: THE DESOLATION OF SMAUG (Serial No. 85736834).

## THE *LORD OF THE RINGS* FILMS

26. Pursuant to licenses from SZC, New Line and its affiliates (now subsidiaries of Warner Bros.) developed, produced, and distributed the *Lord of the Rings* motion picture trilogy.

27. The *Lord of the Rings* film trilogy received widespread praise for its innovative computerized special effects. Considered to be one of the largest and most ambitious motion picture projects ever undertaken, the *Lord of the Rings* film

-9-

COMPLAINT

series took eight years to produce.

28.    New Line has spent more than $150 million advertising the *Lord of the Rings* films worldwide.  Since at least 2001, New Line has continuously used a distinctive title design in promoting and advertising *The Lord of the Rings* films and merchandise.  This distinctive title design is shown below and is comprised of an "ALL CAPS" title with reflective gold characters and pronounced serifs:



29.    The Lord of the Rings film trilogy consists of three live action, fantasy adventure motion pictures based on *The Lord of the Rings* novels, all directed by Peter Jackson – *The Lord of the Rings: The Fellowship of the Ring*, released theatrically in December 2001; *The Lord of the Rings: The Two Towers*, released theatrically in December 2002; and *The Lord of the Rings: The Return of the King*, released theatrically in December 2003.  Like the books, the New Line *Lord of the Rings* film trilogy features leading Hobbit characters, including Bilbo Baggins (the title character from *The Hobbit*) and his nephew, Frodo Baggins.

30.    The *Lord of the Rings* film trilogy has been one of the most acclaimed and successful film series of all time.  Each film in the *Lord of the Rings* series is among the all-time top grossing motion pictures in the United States and abroad.

31.    The first film of the trilogy, *The Lord of the Rings: The Fellowship of the Ring*, has had theatrical grosses of approximately $315 million in the United States and over $871 million worldwide.  *The Lord of the Rings: The Fellowship of the Ring* received four Golden Globe nominations, including for Best Picture

-10-

COMPLAINT

Drama and Best Director, and 13 Academy Award nominations, including nominations for Best Picture and Best Supporting Actor, and received four Academy Awards.

32.     The second film of the trilogy, *The Lord of the Rings: The Two Towers*, has had theatrical grosses of approximately $341 million in the United States and over $926 million worldwide. *The Lord of the Rings: The Two Towers* received two Golden Globe nominations, including for Best Picture Drama and Best Director, and six Academy Award nominations, including a nomination for Best Picture, and received two Academy Awards.

33.     The third and final film of the trilogy, *The Lord of the Rings: The Return of the King*, has had theatrical grosses of approximately $377 million in the United States and more than $1 billion worldwide. *The Lord of the Rings: The Return of the King* received four Golden Globe nominations and four awards, including for Best Picture (Drama), Best Director, Best Original Score and Best Original Song. *The Lord of the Rings: The Return of the King* received 11 Academy Award nominations and 11 Academy Awards, including in the categories of Best Picture, Best Director and Best Adapted Screenplay.

## THE *HOBBIT* FILMS

34.     The *Hobbit* Films are a soon-to-be-released film trilogy consisting of three fantasy adventure films based on J.R.R. Tolkien's novel *The Hobbit*. Directed by Peter Jackson, the *Hobbit* Films are the much-anticipated prequels to the *Lord of the Rings* motion picture franchise. As in the *Hobbit* novel, the protagonist of the *Hobbit* Films is another Hobbit by the name of Bilbo Baggins. The first film in the trilogy – *The Hobbit: An Unexpected Journey* – is scheduled to be released in theaters in the United States on December 14, 2012.

35.     Pursuant to a license from SZC, Warner Bros. will license and distribute the famous HOBBIT Marks on a wide variety of merchandise sold in the United States that is related to the upcoming *Hobbit* motion picture trilogy,

-11-

COMPLAINT

including DVDs, computer game software, video game software, lithographs, board games, figurines, and other goods.

36.    In anticipation of the *Hobbit* Films' theatrical release, Warner Bros. under license from SZC, has invested significant time, effort and money in promoting and marketing the first of the *Hobbit* Films in the United States and around the world using the registered HOBBIT Marks.

37.    Warner Bros. has used the same distinctive title design from the *Lord of the Rings* film franchise in the promotion and advertising for the new *Hobbit* Films franchise.  This distinctive title design is comprised of an "ALL CAPS" title with slender, reflective gold characters and pronounced serifs, which links the new *Hobbit* Films franchise with its highly-successful predecessor:



38.    Among other promotional efforts, Warner Bros. has launched an Internet website devoted to promoting the first of the *Hobbit* Films (www.thehobbit.com).  The website, which is accessible worldwide, includes a synopsis of the film's story, movie trailers, and a gallery of images from the film. The HOBBIT Marks and the distinctive title design are featured prominently on the website.

39.    Warner Bros. also has promoted the *Hobbit* Films through various social media, including a Facebook page devoted to the first film (www.facebook.com/TheHobbitMovie), a Twitter page devoted to the *Hobbit* Films (@TheHobbitMovie), and a "Hobbit Movies" smartphone application ("app") available for free through iTunes.  The fanciful HOBBIT Marks and the distinctive title design are featured prominently on the Facebook page, the

-12-

smartphone app, and in images posted on the official *HobbitMovie* Twitter page.

40.     Warner Bros. has released three theatrical trailers for the first of the *Hobbit* Films – in December 2011, June 2012, and September 2012 – each of which has been viewed by audiences in thousands of theaters across the United States.  These trailers also have been distributed through iTunes, YouTube, Facebook, and the *Hobbit* movie website and have been viewed by millions of consumers.  In addition, Warner Bros. has produced and will continue to produce numerous print and television advertisements to run through and after the theatrical release, all of which will contain the distinctive HOBBIT Marks and distinctive title design.

41.     Numerous magazines, newspapers, and Internet websites have reported on the development and production of the *Hobbit* Films using the HOBBIT Marks to refer to the *Hobbit* motion pictures produced by New Line and Warner Bros.

42.     As a result of enduring popularity of the Tolkien Works, the extraordinary critical and commercial success of the *Lord of the Rings* film franchise, the longstanding and widespread use of the HOBBIT Marks in commerce, Warner Bros.' extensive marketing efforts with respect to the upcoming *Hobbit* Films, and the resulting worldwide media coverage of those films, the fanciful and distinctive HOBBIT Marks also have acquired substantial secondary meaning with respect to the titles of the forthcoming *Hobbit* Films.

### THE ASYLUM'S INFRINGING DVD

43.     The Asylum is a film production company whose business model is based on confusing and misleading consumers.  On its Internet website (www.theasylum.cc), The Asylum touts itself as a producer of so-called "mockbusters" – knockoff films that it describes as "similar to big studio films, only cheaper."  Despite the "mockbuster" label, these low-budget films do not

mock, parody or otherwise comment upon the theatrical motion pictures they imitate. Instead, the films are intended to piggy-back on the publicity of the major studio films, through The Asylum's intentional use of confusingly similar titles, artwork, and release dates to mislead consumers into believing the films are popular, big-budget releases. Examples of films produced and distributed by The Asylum – all timed to coincide with major studio theatrical releases – include *Transmorphers* [studio release: *Transformers*], *Sunday School Musical* [studio release: *High School Musical*], *The Da Vinci Treasure* [studio release: *The Da Vinci Code*], *The Day The Earth Stopped* [studio release: *The Day The Earth Stood Still*], *Snakes On A Train* [studio release: *Snakes On A Plane*], and *American Battleship* [studio release: *Battleship*].

44.     The Asylum's business strategy of creating knockoff imitations of major motion pictures and releasing them on DVD and video-on-demand at the same time as the studio theatrical release is intended to and does confuse consumers as to the source or origin of The Asylum's productions by causing consumers to believe they are the same as or associated with contemporaneously released blockbuster films from major motion picture studios. Reviews for The Asylum movies are replete with complaints from irritated consumers who were misled into purchasing their movies instead of big budget studio productions.

45.     By way of example, on September 27, 2012, a consumer purchased The Asylum's *Abraham Lincoln vs. Zombies* on Amazon.com believing it was the recent 20th Century Fox theatrical release *Abraham Lincoln: Vampire Hunter*. The consumer complained on Amazon's Customer Review page: "You see Abraham Lincoln Vampire Slayer on TV then see Abraham Lincoln vs. The Zombies on Amazon Prime. Not thinking or reading clearly, I ordered the wrong movie…. Definitely not worth the price charged to watch it."

46.     Similarly, on June 23, 2011, a consumer was confused into purchasing The Asylum's *Battle of Los Angeles* instead of Columbia Pictures' theatrical

-14-

motion picture *Battle: Los Angeles.* According to the consumer: "Do I actually HAVE to give this movie a single star? I accidently added this movie to my DVD rental queue instead of Battle: Los Angeles and took me 20 min into my flight and 10 min into the movie to realize the monumental mistake I made."

47. As a further example, consumers of The Asylum's *Sherlock Holmes* complained that they had been duped into thinking they had purchased Warner Bros' blockbuster by the same name. On January 29, 2011, one consumer wrote: "This in all likelihood is the worst movie I have ever seen. It looks like it was made in a high school video project; the effects are cheesy and low-budget. This has nothing to do with Sherlock Holmes and appears to have been created just to exploit the success of Robert Downey's movie. Dreadful." On March 20, 2010, another consumer complained: "To be honest, I thought I had picked up the Downey version for SH…. Shame on Asylum for making a buck on fools like me … I've definitely been punked!"

48. Indeed, The Asylum has proudly posted on its own website evidence of the consumer confusion it has created, in the form of a December 2011 message that it ridiculed as "hate mail": "I don't know a single person that runs to the video store to buy an Asylum release. In fact, most people I know only rent your films by mistake thinking they are the big-budget films you rip off. Is that your marketing strategy or something?"

49. On information and belief, based on statements on The Asylum's website, The Asylum filmed the Infringing DVD *Age of the Hobbits* during July and August 2012 near Kampot and Kep, Cambodia – long after Warner Bros. and New Line had begun their extensive, worldwide efforts to promote the *Hobbit* Films as described herein. The budget for the knockoff *Age of the Hobbits* film reportedly was less than $2 million.

50. Beginning in or about August 2012, The Asylum began to advertise on its website the new low-budget, straight-to-DVD *Age of the Hobbits.* The

-15-

Asylum also has advertised the Infringing DVD on Netflix.com, and made the Infringing DVD available for pre-order on various retail websites, including Amazon.com and Bestbuy.com. In describing the Infringing DVD, these misleading advertisements evoke the world of *The Hobbit* and *The Lord of the Rings* books and films with references to dragons, an "ancient age," and "small, peace-loving Hobbits." The Asylum's advertising campaign has caused and will cause the HOBBIT Marks to lose their distinctiveness and tarnish their value.

51. As further evidence of The Asylum's intent to mislead and confuse consumers into believing there is a connection or association between the Infringing DVD and the *Hobbit* Films and the Tolkien Works, Plaintiffs are informed and believe that in or about July 2012 The Asylum caused the following description to appear on the Netflix website to promote the upcoming release of the Infringing DVD: "*In an ancient age, an enslaved hero escapes his bonds and begins a dangerous quest to claim an enchanted dagger that will free his people. This 'mockbuster' is based on a reimagined version of J.R.R. Tolkien's mythical universe.*"

52. Based on descriptions of the film on The Asylum's website, its *Age of the Hobbits* film does not mock, parody or comment in any way upon the *Lord of the Rings* films, the *Hobbit* Films, the Tolkien Works on which those films are based, or any of the characters therein. Instead, as shown below, The Asylum has been and is using the famous HOBBIT Marks commercially in the title of its film solely for the purpose of creating consumer confusion and capitalizing on the multi-million dollar worldwide marketing campaign for Plaintiffs' highly-anticipated *Hobbit* Films:

-16-



**The Asylum's Infringing DVD**

53.    The Asylum has marketed its Infringing DVD – *Age of the Hobbits* – using a title and title design that is confusingly similar to the title and distinctive title design used in connection with the first of Plaintiffs' *Hobbit* Films.  Not only has The Asylum made prominent use of the famous, registered HOBBIT Marks in the title of the Infringing DVD, it also has employed a slender, gold, stylized serif font in all-capital letters that is confusingly similar to the distinctive title design used to promote both the *Lord of the Rings* films and the *Hobbit* Films:

    

**Plaintiffs' Title Design**        **The Asylum's Title Design**

54.    In addition to its use of a confusingly similar and misleading title and title design, The Asylum has promoted its Infringing DVD in a manner that is confusingly similar in look and feel to advertisements for and images from the

-17-

COMPLAINT