1 | JENNER & BLOCK LLP
Andrew J. Thomas (SBN 159533)
2 | ajthomas@jenner.com
Farnaz M. Alemi (SBN 255836)
3 | falemi@jenner.com
Kirsten C. Jackson (SBN 265952)
4 | kjackson@jenner.com
633 West Fifth Street, Suite 3600
5 | Los Angeles, CA 90071
Telephone: (213) 239-5100
6 | Facsimile: (213) 239-5199

7 | Attorneys for Plaintiffs
WARNER BROS. ENTERTAINMENT
8 | INC., NEW LINE CINEMA LLC, NEW
LINE PRODUCTIONS, INC., METRO-
9 | GOLDWYN-MAYER STUDIOS INC., and
THE SAUL ZAENTZ COMPANY

10

11 | **UNITED STATES DISTRICT COURT**

12 | **CENTRAL DISTRICT OF CALIFORNIA**

13

| | |
|---|---|
| WARNER BROS. ENTERTAINMENT INC., a Delaware corporation; NEW LINE CINEMA LLC, a Delaware limited liability company; NEW LINE PRODUCTIONS, INC., a California corporation; METRO-GOLDWYN-MAYER STUDIOS INC., a Delaware corporation; and THE SAUL ZAENTZ COMPANY, a Delaware corporation, | Case No. 2:12-cv-09547-PSG-CW |
| Plaintiffs, | **DECLARATION OF ANDREW J. THOMAS IN SUPPORT OF PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: ENTRY OF PRELIMINARY INJUNCTION** |
| v. | |
| THE GLOBAL ASYLUM INC. (aka The Asylum), a California corporation, | Date:       To Be Determined<br>Time:       To Be Determined<br>Courtroom:  790 – Roybal Building |
| Defendant. | Honorable Philip S. Gutierrez |

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# DECLARATION OF ANDREW J. THOMAS

I, Andrew J. Thomas, declare as follows:

1. I am an attorney admitted to practice in the State of California and am a member of the bar of this Court. I am a partner with the law firm of Jenner & Block LLP, counsel for Plaintiffs Warner Bros. Entertainment Inc. ("Warner Bros."), New Line Cinema LLC, New Line Productions, Inc. (together with New Line Cinema LLC, "New Line"), Metro-Goldwyn-Mayer Studios Inc. ("MGM"), and The Saul Zaentz Company ("SZC") (collectively, "Plaintiffs") in this action. Except as otherwise indicated, if called to testify, I would and could testify with personal knowledge as to all of the following.

## Plaintiffs' *Lord of the Rings* and *Hobbit* Films

2. Pursuant to licenses, plaintiffs New Line and Warner Bros. will imminently release the motion picture *The Hobbit: An Unexpected Journey* (the "*Hobbit* Movie") in theaters across the United States on December 14, 2012. The *Hobbit* Film is the first of three movies based on the J.R.R. Tolkien novel *The Hobbit*. I am informed that the other two films in the series – *The Hobbit: The Desolation of Smaug* and *The Hobbit: There and Back Again* – will be released theatrically in 2013 and 2014. These three films (collectively, the "Hobbit Films") are prequels to the *Lord of the Rings* trilogy of motion pictures previously produced and distributed by New Line.

3. The *Lord of the Rings* film trilogy consists of three feature-length, live-action, fantasy adventure motion pictures based on *The Lord of the Rings* novels, all directed by Peter Jackson – *The Lord of the Rings: The Fellowship of the Ring*, released theatrically in December 2001; *The Lord of the Rings: The Two Towers*, released theatrically in December 2002; and *The Lord of the Rings: The Return of the King*, released theatrically in December 2003. The *Lord of the Rings* film trilogy received widespread praise for its innovative computerized special effects. Considered to be one of the largest and most ambitious motion picture

-2-

1    projects ever undertaken, the *Lord of the Rings* film series took eight years to

2    produce.  I am informed that since at least 2001, New Line has continuously used a

3    distinctive title design in promoting and advertising the *Lord of the Rings* films.

4    This distinctive title design is shown below and in <u>Exhibit 1</u> and is comprised of an

5    all-capital-letters title with slender, reflective gold characters and pronounced

6    serifs:

7

8

9

10

11

12

13



14

15

16

17

18

19

20

21

22

23

24    Attached as <u>Exhibit 2</u> is a true and correct copy of New Line Productions, Inc.'s

25    promotional advertisement for the Lord of the Rings trilogy.

26        4.    I am informed that New Line extensively promoted the *Lord of the*

27    *Rings* motion picture trilogy using artwork that included images of mythical battle

28    scenes featuring swords, spears, arrows and flying banners, distant mountains,

Declaration Of Andrew J. Thomas In Support of
Plaintiffs' Application for Temporary Restraining Order

fantastic flying creatures, and cloaked and hooded figures holding illuminated objects.  Two famous images from this marketing campaign are shown below and in <u>Exhibit 3</u>:

 

5.      Based on publicly available information, I am informed that the first film of the trilogy, *The Lord of the Rings: The Fellowship of the Ring*, has had theatrical grosses of approximately $315 million in the United States and over $871 million worldwide.  I am further informed that *The Lord of the Rings: The Fellowship of the Ring* received four Golden Globe nominations, including for Best Picture Drama and Best Director, and 13 Academy Award nominations, including nominations for Best Picture and Best Supporting Actor, and received four Academy Awards.

6.      I am informed that the second film of the trilogy, *The Lord of the Rings: The Two Towers*, has had theatrical grosses of approximately $341 million in the United States and over $926 million worldwide.  *The Lord of the Rings: The Two Towers* received two Golden Globe nominations, including for Best Picture Drama and Best Director, and six Academy Award nominations, including a

-4-

1  nomination for Best Picture, and received two Academy Awards

2       7.      I am informed that the third and final film of the trilogy, *The Lord of*

3  *the Rings: The Return of the King*, has had theatrical grosses of approximately

4  $377 million in the United States and more than $1 billion worldwide.  *The Lord of*

5  *the Rings: The Return of the King* received four Golden Globe nominations and

6  four awards, including for Best Picture (Drama), Best Director, Best Original

7  Score and Best Original Song.  *The Lord of the Rings: The Return of the King*

8  received 11 Academy Award nominations and 11 Academy Awards, including in

9  the categories of Best Picture, Best Director and Best Adapted Screenplay.

10      8.      Attached as Exhibits 4 and 5, respectively, are copies of printouts

11 from the public Internet websites www.boxofficemojo.com and www.oscars.org,

12 describing the box office success and Academy Award and Golden Globe

13 nominations and wins for the *Lord of the Rings* films.

14      9.      Numerous news reports have featured, discussed or reported on the

15 development and production of the *Hobbit* Films.  Attached as Exhibit 6 are true

16 and correct copies of examples of this extensive media coverage, including articles

17 from *Variety*, *The Hollywood Reporter*, *Entertainment Weekly*, *The New York*

18 *Times*, *The Los Angeles Times*, and *The Wall Street Journal*.

19      10.     To promote the *Hobbit* Film, I am informed that Warner Bros. is using

20 the same distinctive title design from the *Lord of the Rings* film franchise in the

21 promotion and advertising for the new *Hobbit* Films franchise.  This distinctive

22 title design is comprised of an all-capital-letters title with slender, reflective gold

23 characters and pronounced serifs, which links the new *Hobbit* Films franchise with

24 its highly-successful predecessor franchise, *The Lord of the Rings*:

25

26

27

28

Declaration Of Andrew J. Thomas In Support of
Plaintiffs' Application for Temporary Restraining Order



Attached as <u>Exhibit 7</u> is a true and correct copy of one of the posters for *The Hobbit* available on Warner Bros.' official movie website.

**Asylum and Its "Mockbuster" Films**

11.     Defendant The Global Asylum Inc. ("Asylum") is a film production company based in Burbank, California, whose business model is based on confusing and misleading consumers.  According to its Internet website (www.theasylum.cc), Asylum touts itself as a producer of so-called "mockbusters" – films that it describes as "similar to big studio films, only cheaper."  As David Rimawi, one of Asylum's owners, explained in an interview with an online magazine:  "We go after the tent poles – the big studio titles – for the most part. Those have the most audience awareness and interest, and it's unlikely that the release date will change."  Attached as  <u>Exhibit 8</u>  is a true and correct copy of "How to Make a Mockbuster (in Five Easy Steps)," dated August 26, 2011, available at http://www.zoominfo.com/CachedPage/?archive_id=0&page_id=5708780586&page_url=//www.adultswim.com/blog/interviews/how-to-make-a-mockbuster.html&page_last_updated=2012-02-07T06:34:51&firstName=David&lastName=Rimawi.

12.     Asylum states on its website that it produces 10 to 15 such films a year.  Attached as <u>Exhibit 9</u> is a print-out from the homepage of Asylum's website making this claim, http://www.theasylum.cc/index.php, (last visited November 20, 2012).  An August 14, 2009 article in *Variety* magazine states that Asylum spends on average between $100,000 to $1 million per film it produces.  At page 1, the

-6-

1   article states that production for each film lasts three to four months.  Attached as

2   Exhibit 10 is a true and correct copy of this *Variety* article, titled "Asylum's

3   'mockbusters' turn profit."  A number of news articles confirm that Asylum holds

4   itself out to the public as being in the business of producing cheap knock-off

5   imitations of major studio motion pictures.  Attached as Exhibit 11 are true and

6   correct copies of news articles referring to Asylum's practice of releasing

7   "mockbuster" films.

8          13.     Despite the "mockbuster" label, these low-budget films do not mock,

9   parody or otherwise comment upon the theatrical motion pictures they imitate.

10  Instead, the films are intended to piggy-back on the publicity of the major studio

11  films, through Asylum's intentional use of confusingly similar titles, artwork, and

12  release dates to mislead consumers into believing the films are popular, big-budget

13  releases.  Examples of films produced and distributed by Asylum – all timed to

14  coincide with major studio theatrical releases – include *Transmorphers* [studio

15  release: *Transformers*], *Sunday School Musical* [studio release: *High School*

16  *Musical*], *The Da Vinci Treasure* [studio release: *The Da Vinci Code*]*, The Day*

17  *The Earth Stopped* [studio release: *The Day The Earth Stood Still*], *Snakes On A*

18  *Train* [studio release: *Snakes On A Plane*], and *American Battleship* [studio

19  release: *Battleship*].  A chart listing several of Asylum's recent film titles, derived

20  from information on the Asylum website, is attached as Exhibit 12.

21         14.     Online reviews for Asylum movies are replete with complaints from

22  irritated consumers who were misled into purchasing Asylum's movies instead of

23  big-budget studio productions.  According to various postings on Amazon.com, the

24  release of these "mockbusters" has led to significant consumer confusion and

25  disgust.  Attached as Exhibit 13 are copies of printouts from Amazon.com

26  demonstrating consumer dissatisfaction with purchases of various films produced

27  by Asylum, including the following:

28

Declaration Of Andrew J. Thomas In Support of
Plaintiffs' Application for Temporary Restraining Order

a. Comment from a purchaser of Asylum's *Abraham Lincoln v. Zombies* on September 27, 2012, available at http://www.amazon.com/review/R3RWBNHMGGA7HO/ref=cm_cr_ pr_perm?ie=UTF8&ASIN=B00872IL6I&linkCode=&nodeID=&tag= ("You see Abraham Lincoln Vampire Slayer on TV then see Abraham Lincoln vs. The Zombies on Amazon Prime.  Not thinking or reading clearly, I ordered the wrong movie…. Definitely not worth the price charged to watch it.").

b. Comment from a purchaser of Asylum's *John Carter of Mars* on March 12, 2012, available at http://www.amazon.co.uk/review/R1P212HHU7ENP7/ref=cm_cr_pr_ perm?ie=UTF8&ASIN=B006OLP626&linkCode=&nodeID=&tag= ("I thought I was buying the Disney version.  Why this cut should have been offered at the same time Disney's version was coming out I can only attribute to a scam.").

c. Comment from a purchaser of Asylum's *Battle of Los Angeles* on June 23, 2011, available at http://www.amazon.com/review/R26GRAGBSO13R2/ref=cm_cr_pr_ perm?ie=UTF8&ASIN=B004C3J76Y&linkCode=&nodeID=&tag= ("Do I actually HAVE to give this movie a single star?  I accidentally added this movie to my DVD rental cue instead of *Battle: Los Angeles* and took me 20 min into my flight and 10 min into the movie to realize the monumental mistake I made.").

d. Comment from a purchaser of Asylum's *Sherlock Holmes* on January 29, 2011, available at http://www.amazon.com/review/R1202GSY1I8EU/ref=cm_cr_pr_per m?ie=UTF8&ASIN=B002VJ0576&linkCode=&nodeID=&tag= ("This in all likelihood is the worst movie I have seen.  It looks like it was made in a high school video project; the effects are cheesy and low-budget.  This has nothing to do with Sherlock Holmes and appears to have been created just to exploit the success of Robert Downey's movie.  Dreadful.").

e. Comment from a purchaser of Asylum's *Sherlock Holmes* on March 20, 2010, available at http://www.amazon.com/review/R1ZAHWY8VE4VRY/ref=cm_cr_pr _perm?ie=UTF8&ASIN=B002VJ0576&linkCode=&nodeID=&tag= ("To be honest, I thought I had picked up the Downey version of SH … Shame on Asylum for making a buck on fools like me…. I've definitely been punked.").

f. Comment from a purchaser of Asylum's *Snakes on a Train* on August 2008, available at http://www.amazon.com/review/R6XSVC8KBMT0/ref=cm_cr_pr_pe rm?ie=UTF8&ASIN=B000OYC77G&linkCode=&nodeID=&tag= ("This movie was horrible.  I can't believe they made the 2nd movie.  'Snakes On A Plane' was an excellent movie.  But, this one was just awful.  I can't believe this movie was such a hit that they made the 2nd movie.  Recommend 'Snakes On A Plane' but NOT this one.").

15.   Asylum has posted on its own website evidence of the consumer confusion it has created, in the form of a December 2011 message that it ridiculed as "hate mail":  "I don't know a single person that runs to the video store to buy an Asylum release.  In fact, most people I know only rent your films by mistake thinking they are the big-budget films you rip off.  Is that your marketing strategy or something?"  Attached as Exhibit 14 is a true and correct copy of a printout from the website www.theasylum.cc, containing this statement.

16.   Beginning in or about August 2012, Asylum began to advertise on its website its forthcoming feature-length film *Age of the Hobbits.* Asylum also has advertised this film on Netflix.com, and has made it available for pre-order – at a cost of $12.99 for both DVD and Blu-ray versions – on various retail websites, including Amazon.com and Bestbuy.com.  In describing the Infringing DVD, these advertisements evoke the world of *The Hobbit* and *The Lord of the Rings* books and films with references to dragons, an "ancient age," and "small, peace-loving Hobbits."  Attached as Exhibit 15 are true and correct copies of printouts from the websites Asylum, Amazon.com, and Bestbuy.com.

17.   Based on news reports, Asylum filmed its movie *Age of the Hobbits* in or around July 2012 near Kampot and Kep, Cambodia – long after Warner Bros. had begun its extensive, worldwide efforts to promote the *Hobbit* Film.  The budget for the *Age of the Hobbits* film reportedly was about $500,000.  Based on descriptions of the film on Asylum's website, its *Age of the Hobbits* movie does not mock, parody or comment in any way upon the *Lord of the Rings* films, the *Hobbit* Films, the Tolkien Works on which those films are based, or any of the characters in those works.  Asylum's website states that the film *Age of the Hobbits* will be released on December 11, 2012.  Attached as Exhibit 16 are true and correct copies of printouts from Asylum's website, www.theasylum.cc, containing this information.

18.     I am informed that in or about July 2012 Asylum caused the following description to appear on the Netflix website to promote the upcoming release of its film *Age of the Hobbits* (emphasis added):  "In an ancient age, an enslaved hero escapes his bonds and begins a dangerous quest to claim an enchanted dagger that will free his people.  **This 'mockbuster' is based on a reimagined version of J.R.R. Tolkien's mythical universe.**"  Attached as Exhibit 17 is a true and correct copy of a printout from the website GateWorld, which reports on the Netflix promotional language.

19.     Asylum subsequently, provided the following description of its film *Age of the Hobbits* on its own website, making repeated use of the term and trademark "Hobbit":

> In an age long ago, the last village of clever, peace loving **Hobbits** is attached and enslaved by the Java Men, komodo-worshiping, dragon riding cannibals.  Now the young **Hobbit** Goben, along with his father and sister, must seek help from the "giants" (human hunters) to find the Javas' lair and rescue the last surviving **Hobbits**, Goben's mother among them.  In their quest to destroy the Javas, the heroic partnership of humans and **Hobbits** will transform both species forever.

Attached as Exhibit 18 is a copy of a printout from the cached description of the film *Age of the Hobbits* as of November 4, 2012, available at Asylum's website, http://www.theasylum.cc/index.php.

20.     In October 2012, my law firm was engaged by New Line, Warner Bros., MGM and SZC as litigation counsel in connection with those companies' assertion of potential claims for trademark infringement, trademark dilution and unfair competition against Asylum based on its film *Age of the Hobbits*.  At that time, Asylum was advertising its film *Age of the Hobbits* on Netflix.com using the artwork shown below and depicted in Exhibit 19, which is a true and correct copy of a printout of the website Netflix.com as of October 1, 2012.

Declaration Of Andrew J. Thomas In Support of
Plaintiffs' Application for Temporary Restraining Order



**Attempts To Resolve Plaintiffs' Dispute With Asylum**

21.    On October 19, 2012, I spoke by telephone with Scott Meehan, counsel for Asylum, regarding the *Age of the Hobbits* film.  We discussed whether Asylum would be willing to make changes to the title, title design, artwork and promotional materials of the film.  In a further conversation on October 22, 2012, Mr. Meehan stated that Asylum might be willing to make changes to its title design, artwork and promotional materials, but did not agree to remove the word "Hobbit" from the title of Asylum's film.

22.    During that conversation, Mr. Meehan stated that Asylum would assert a First Amendment defense to any trademark claim based on *Age of the Hobbits* film and stated that Asylum's use of the term "Hobbits" was a fair use because it referred to a pre-human species discovered by archaeologists in Indonesia, which some scientists have referred to as "Hobbits."

23.    Numerous reputable news articles describing the discovery of this pre-human species – called *Homo Floresiensis* after the Indonesian island of Flores, where the remains were discovered in 203 – demonstrate that some scientists nick-named these early hominid creatures "Hobbits" as a reference to the fanciful

-11-

1   creatures in the novels *The Hobbit* and *The Lord of the Rings*.  creatures.  For

2   example, in an article titled "Hobbit-Like Human Ancestor Found in Asia,"

3   *National Geographic News*, Oct. 27, 2004, the author noted that "[n]amed *Homo*

4   *floresiensis,* after the island on which it was found, the tiny human has also been

5   dubbed by dig workers as the "hobbit," after the tiny creatures from the *Lord of the*

6   *Rings* books."  Attached as Exhibit 20 is a true and correct copy of the article,

7   available at http://news.nationalgeographic.com/news/pf/57396290.html.

8   Similarly, in an article titled "Were 'Hobbits' Human?," *Smithsonian Magazine*,

9   July 2008, the author noted that after discovering the first of this subspecies, the

10  scientists "named her *Homo floresiensis* and nicknamed her the "Hobbit," after the

11  diminutive villagers from J.R.R. Tolkien's *Lord of the Rings* trilogy."  Attached as

12  Exhibit 21  is a true and correct copy of the article, available at

13  http://www.smithsonianmag.com/history-archaeology/migration-hobbits.html.

14      24.    In approximately late October 2012, Asylum modified the artwork

15  used to promote its film *Age of the Hobbits*, both on its website and on

16  Netflix.com.  This Alternate Artwork is shown below, and a printout from

17  Asylum's website displaying the Alternate Artwork, located at

18  http://www.theasylum.cc/index.php, is attached as Exhibit 22.

19

20

21

22

23

24

25

26

27

28

Declaration Of Andrew J. Thomas In Support of
Plaintiffs' Application for Temporary Restraining Order

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15      25.     On November 7, 2012, Plaintiffs filed and served the Complaint in
16 this action.  Following the filing of the Complaint, I had another telephone
17 conversation with Asylum's counsel, Scott Meehan, in which he stated that some
18 of Asylum's licensees were considering distributing the Asylum film using the
19 alternative title *Clash of the Empires* in unspecified overseas territories, and asked
20 whether Plaintiffs objected to that title.  We also discussed whether Asylum would
21 agree to change the title for all purposes, including in the United States, but Mr.
22 Meehan stated that Asylum would not agree to do so.

23      26.     It appears that Asylum recently removed all references to Hobbits
24 from the description of *Age of the Hobbits* on its website, which now reads: "In an
25 ancient age, the peace-loving tribe is enslaved by a race of flesh-eating
26 dragonriders.  The young tribesman Goben must join forces with their neighbor
27 giants, the humans, to free his people and vanquish their enemies."  *See* Exhibit 22.

28

-13-

27.     On November 21, 2012, I attempted to reach Mr. Meehan by telephone and left a voicemail message asking whether Asylum would agree to postpone the release of its film *Age of the Hobbits* until the parties could brief a motion for preliminary injunction on regular notice, in view of the fact that the Court did not have any open hearing dates until January 2013.  In that message, and in an email message that afternoon, I provided notice to Mr. Meehan that Plaintiffs intended to file this Application for a Temporary Restraining Order, and that Plaintiffs would propose that the Court allow Asylum until November 28 to respond to the Application.  A true and correct copy of my November 21, 2012 email message to Mr. Meehan is attached as Exhibit 23.  I had not received any response from Mr. Meehan by the time these papers were filed.

I declare under the penalty of perjury under the law of the United States of America that the foregoing is true and correct.  Executed on November 21, 2012, at Los Angeles, California.

Andrew J. Thomas

-14-

27.     On November 21, 2012, I attempted to reach Mr. Meehan by telephone and left a voicemail message asking whether Asylum would agree to postpone the release of its film *Age of the Hobbits* until the parties could brief a motion for preliminary injunction on regular notice, in view of the fact that the Court did not have any open hearing dates until January 2013.  In that message, and in an email message that afternoon, I provided notice to Mr. Meehan that Plaintiffs intended to file this Application for a Temporary Restraining Order, and that Plaintiffs would propose that the Court allow Asylum until November 28 to respond to the Application.  A true and correct copy of my November 21, 2012 email message to Mr. Meehan is attached as Exhibit 23.  I had not received any response from Mr. Meehan by the time these papers were filed.

I declare under the penalty of perjury under the law of the United States of America that the foregoing is true and correct.  Executed on November 21, 2012, at Los Angeles, California.

Andrew J. Thomas

-14-

Declaration Of Andrew J. Thomas In Support of
Plaintiffs' Application for Temporary Restraining Order