SCOTT A. MEEHAN, ESQ. Sbn #139314
malibupictures@earthlink.net
23852 Pacific Coast Highway, #299
Malibu, California 90265
(310) 317-0717
(310) 317-0917 fax

Attorney for Respondent
The Global Asylum, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WARNER BROS. ENTERTAINMENT INC., a Delaware corporation; NEW LINE CINEMA LLC, a Delaware limited liability company; NEW LINE PRODUCTIONS, INC., a California corporation; METRO-GOLDWYN-MAYER STUDIOS INC., a Delaware corporation; and THE SAUL ZAENTZ COMPANY, a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>THE GLOBAL ASYLUM INC. (aka The Asylum), a California corporation,<br><br>Defendant. | Case No. 2:12-cv-09547-PSG-CW<br><br>DEFENDANT THE GLOBAL ASYLUM, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: ENTRY OF PRELIMINARY INJUNCTION<br><br>DECLARATION OF SCOTT A. MEEHAN (filed under separate cover); and<br><br>DECLARATION OF PAUL BALES (filed under a separate cover) |

1

MEMO OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' TRO

TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ... 2
II.  FACTS ... 3
III. PLAINTIFFS' DELAY UNDERCUTS CLAIM OF IRREPARABLE INJURY ... 6
IV.  FIRST AMENDMENT PRINCIPLES PROVIDE AN ABSOLUTE DEFENSE TO PLAINTIFFS' CLAIMS ... 7
     A. The *Rogers* two-prong test applies to protect Asylum's First Amendment rights. ... 7
        1. Applying the first prong of *Rogers:* Asylum's use of "Hobbits" has artistic relevance to the content of the film. ... 8
        2. Applying the second prong in *Rogers:* Asylum's Film does not "explicitly mislead" as to source or content. ... 9
     B. Plaintiffs' argument that the *Rogers* test does not apply because the titles are confusingly similar is incorrect. ... 10
V.   ASYLUM'S USE OF "HOBBITS" IN THE TITLE OF ITS FILM IS ALSO PROTECTED AS FAIR USE ... 11

# TABLE OF AUTHORITIES

**CASES:**

| | |
|---|---|
| *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Group,* 886 F.2d 490 (2d Cir. 1989) | 10 |
| *Dita, Inc. v. Mendez,* 2010 U.S. Dist. LEXIS 135856 (C.D. Cal. Dec. 14, 2010) | 11 |
| *Estate of Hemingway v. Random House, Inc.* 23 N.Y.2d 341, 296 N.Y.S.2d 771, 780, 244 N.E.2d 250, 260 (1968) | 9 |
| *E.S.S. Entertainment 2000 v. Rock Star Videos* 547 F.3d 1095 (9th Cir. 2008) | 7-10 |
| *Kobel v. Suburban Lines, Inc.,* 731 F.2d 1076 (3rd Cir. 1984) | 6 |
| *Mattel, Inc. v. MCA Records, Inc.* 296 F.3d 894 (9th Cir. 2002) | 8 |
| *Miller v. California Pacific Medical Center,* 991 F.2d 536, (9th Cir. 1993) | 6 |
| *New Kids on the Block v. News America Publishing, Inc.* 971 F.2d 302 (9th Cir. 1992) | 11-12 |
| *Oakland Tribune, Inc. v. Chronicle Pub. Co.,* 762 F.2d 1374 (9th Cir. 1985). | 6 |
| *Rebelution, LLC v. Perez,* 732 F.Supp.2d 883 (N.D. Cal. 2010) | 11 |
| *Rogers v. Grimaldi,* 875 F.2d 994 (2nd Cir. 1988) | 2, 7-10 |
| *Roxbury Entertainment v. Penthouse Media Group* 669 F.Supp.2d 1170 (C.D.Cal. 2009) | 7 |
| *Soweco, Inc. v. Shell Oil Co.,* 617 F.2d 1178 (5th Cir. 1980) | 12 |
| *Toho Co. Ltd. v. William Morrow & Co., Inc.,* 33 F.Supp.2d 1206 (C.D. Cal. 1998) | 11 |

**STATUTES:**

| | |
|---|---|
| 15 U.S.C. §1115(b)(4). | |
| 15 U.S.C. §1125 | 7 |

I.

PRELIMINARY STATEMENT

Defendant The Global Asylum, Inc. ("Asylum") announced the making of its film "*Age of the Hobbits*" back in February of 2012. In August of this year, it announced to the public its upcoming release date of December 11, 2012. Fully aware of these facts, Plaintiffs have waited until Thanksgiving weekend, two weeks before the release date to suddenly seek emergency injunctive relief. By their inaction to date, they appear to be unfazed by the advertising, marketing and promotion of the film. Further, they are

Plaintiffs, sophisticated players in the motion picture business, are fully aware of the time windows for duplication and delivery required for a retail, sell-through release of a motion picture on DVD has passed. As such, they are well-aware that by waiting until after the DVDs have entered the stream of commerce, it will be impossible to pull this film from store shelves at this late date. Plaintiffs delay speaks volumes about their true concerns; in particular the lack of irreparable harm.

As far as the merits to Plaintiffs' claims, this is not a case about "confusingly similar titles" as alleged by Plaintiffs. Indeed, no one could be confused between the title of Defendant's film *Age of the Hobbits* and Plaintiffs' film *The Hobbit: An Unexpected Journey*. Instead, this is a case about a trademarked term, "Hobbit," contained within a film title. As such, applying the test set forth in *Rogers v. Grimaldi*, 875 F.2d 994 (2nd Cir. 1988) dictates that Defendant's use is protected by the First Amendment.

However, even if Defendant's film titled does not pass muster under the *Rogers* standard, the use of the term "Hobbits" is also protected under the doctrine of fair use. Specifically, the term "Hobbits" has a meaning beyond its source-identifying function because Hobbits are also the common name given to the recently discovered human sub-species, *Homo Floresiensis*. Accordingly, since Defendant's film title refers to *Homo Floresiensis* and not Plaintiffs' fantasy characters, Defendant's usage is

protected as fair use.

## II.
## FACTS

In 2003, archaeologists digging in the jungles of Indonesia discovered the skeleton of a diminutive human species with the Latin name of *Homo Floresiensis*. Declaration of Scott A. Meehan ("Meehan Decl."), Exhibits 1 and 2. The species was immediately dubbed "Hobbits." *Id.* Indeed, the most well-respected television series on matters of science, "Nova," has repeatedly aired its hour-long documentary about *Homo Floresiensis* referring to them as "Hobbits." Meehan Decl., para. 4. If one Googles "Hobbits" and "archaeology," dozens of articles come up with the term "Hobbits" in the title referencing *Homo Floresiensis*. not Plaintiffs' fantasy characters. Meehan Decl., para. 5.

In February of 2012, at the Berlin Film Festival, Defendant announced the production and release of its film *Age of the Hobbits*. Declaration of Paul Bales ("Bales Decl."), para. 2. Unlike Plaintiffs' movie, Defendant's film is not a knockoff of Tolkien's fantasy characters set in the English countryside (referred to as "Middle Earth"), but is a story about the "real" Hobbits--*Homo Floresiensis*-set in the Indonesian jungles of their origin. *Id.* Indeed, the artwork features pre-history humans clashing in a jungle. *Id.*

In August of 2012, Defendant announced the release date of *Age of the Hobbits* as December 11, 2012, on its website. Bales Decl., para. 4.

On August 31, 2012, Plaintiffs' counsel, Michael Grow, sent a 7-page letter to Defendant protesting the marketing and advertising for "Age of the Hobbits." Meehan Decl., para. 6.

On September 14, 2012, Scott Meehan, counsel for Defendant, contacted Plaintiffs' counsel and promised to change the artwork, title treatment, and include a disclaimer. Meehan Decl., para. 7. However, Mr. Meehan informed Plaintiff's

1  counsel in no uncertain terms that the term "Hobbits" would stay in the title because it
2  accurately described the subject matter of the film, that is, *Homo Floresiensis*, and
3  further such usage was protected as "fair use." *Id.*

4  On September 20, 2012, new artwork featuring a more distinctive title
5  treatment, pre-historic man in a jungle setting as well as a disclaimer immediately
6  below the title informing the public that this was not Tolkien's Hobbits was presented
7  to Plaintiffs' counsel. Meehan Decl., para. 8. A true and correct copy of the artwork is
8  attached to Bales Decl. as Exhibit 1. Mr. Meehan informed Plaintiffs' counsel that
9  they were amenable to further changes to the artwork, title treatment, and disclaimer.
10  Meehan Decl., para. 8 However, Counsel for Defendant told him in no uncertain terms
11  that the term "Hobbits" would remain in the title. *Id.* However, Mr. Meehan never
12  heard back from Mr. Grow.

13  Over four (4) weeks later, on October 19, 2012, Mr. Meehan was
14  contacted by Plaintiffs new counsel, AJ Thomas. Meehan Decl., para. 9. Again, Mr.
15  Meehan made the same offer to Mr. Thomas, that Defendant would consider changes
16  to the artwork, title treatment, and disclaimer to remove any possible confusion. *Id.*
17  However, Mr. Meehan informed Mr. Thomas that "Hobbits" would remain in the title
18  as legally-recognized fair use based on the reference to *Homo Floresiensis. Id.* Like
19  its prior counsel, Mr. Thomas said he would check with his client and get back to him.
20  *Id.* However, like prior counsel, Mr. Thomas never came back to Mr. Meehan with
21  any requested changes at any time. *Id.*

22  Except as set forth above, there was not nor has there ever been any
23  negotiations or discussions between the parties prior to the filing of the lawsuit.
24  Meehan Decl., para. 10.

25  On November 7, 2012, Plaintiffs filed the subject lawsuit.

26  On November 12, Mr. Meehan contacted Mr. Thomas and informed him
27  that some foreign distributors had requested to change the title of the subject film to
28  *Clash of the Empires*. Meehan Decl., para. 11. Mr. Meehan asked him if his clients

would object to the use of that title for the subject film. *Id.* Mr. Thomas responded that there would not be any objection to the use of that title. *Id.* Mr. Thomas inquired as to whether Asylum would change the title on all versions. *Id.* Mr. Meehan responded that his client would not be doing that. *Id.* Mr. Meehan renewed his offer to consider any changes except the use of the term "hobbits" (*i.e.* artwork, title treatment and/or disclaimer). *Id.* Again, Mr. Thomas did not request any such changes. *Id.*

At no time did Mr. Thomas make any complaint about the imminent release date of the subject film until the afternoon before the Thanksgiving weekend by a telephonic voicemail message. Meehan Decl., para. 12.

On and before November 19, 2012, Asylum duplicated 7468 DVD copies and 407 blu-ray discs of *Age of the Hobbits* and delivered them to various distributors. Bales Decl., para.5. In addition, master elements of *Age of the Hobbits* were delivered to various other distributors who will do their own duplication. *Id.* Most of those distributors will then deliver the DVDs and blu-ray discs to various retail outlets throughout the United States. *Id.* I am also informed that it has or will appear on one video-on-demand service. *Id.* However, the only direct relationship Defendant maintains with end-use distributors is Blockbuster for which there are only approximately 2100 units. *Id.* In other words, except for the 2100 units at Blockbuster, the DVDs are in the stream of commerce outside of our possession, custody or control. *Id.* Except for sales on our website, there are no other outlets for distribution of *Age of the Hobbits* planned in the foreseeable future. *Id.*

Plaintiffs attempt to paint Asylum's business model as releasing confusingly similar titles in order to trick consumers into buying their movies. Defendants have released over 150 films and only approximately 10% could be labeled as "mockbusters." Bales Decl., para. 6. "Mockbusters" are low-budget, tongue-in-cheek parodies of big budget films. *Id.* More to the point however, *Age of the Hobbits* is not a so-called "mockbuster" because, among other reasons, the title is not in any way similar to *The Hobbit: An Unexpected Journey*. *Id.* A mockbuster title for

Plaintiffs' film would be something like *The Hobbit: The Never-Ending Journey*. With respect to the allegation of "tricking" customers, such would not be a sustainable business model because a "tricked" consumer would discover his/her mistake and return the DVD to the store he bought or rented it from. Indeed, "mockbusters" have a return rate which is actually lower than non-"mockbusters." *Id.*

### III.
### PLAINTIFFS' DELAY UNDERCUTS CLAIM OF IRREPARABLE INJURY

A plaintiff's unexplained delay in seeking injunctive relief implies a lack of urgency or irreparable harm. *Miller v. California Pacific Medical Center*, 991 F.2d 536, 544 (9th Cir. 1993)("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm.")(citing *Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985).

The complained-of advertising and marketing for *Age of the Hobbits* has been on-going and admittedly known by Plaintiffs since no later than August of this year. More importantly, the "release date" of December 11, 2012, has also been known by Plaintiffs since August as acknowledged in their letter of August 31, 2012 ("The Asylum has timed the release of its film to coincide with New Line's release..."). Other than sending a letter in August and filing a lawsuit in November, there has been no diligence whatsoever by Plaintiffs. Such lack of action proves the lack of urgency or irreparable harm.

"[T]he district court may legitimately think it suspicious that the party who asks to preserve the status quo through interim relief has allowed the status quo to change through unexplained delay." *Miller*, 762 F. 2d at 1377 (ciitng *Kobel v. Suburban Lines, Inc.*, 731 F.2d 1076, 1092 n. 27 (3rd Cir. 1984).

With respect to the release of Defendant's film on December 11, 2012, the status quo has already changed. If anyone was knowledgeable in the ways of

domestic distribution of a motion picture, it is Plaintiffs. Plaintiffs know that a street date of December 11, 2012, requires duplication and delivery at least three weeks in advance to meet that date. Such date was November 19, 2012. Suspiciously and without any explanation, Plaintiffs waited until two (2) days *after* the three-week window closed. As set forth in the Declaration of Paul Bales, the vast majority of DVDs are now outside the possession, custody or control of Defendant with no practical means to retrieve the DVDs prior to December 11, 2012, if at all.

## IV.
## FIRST AMENDMENT PRINCIPLES PROVIDE AN ABSOLUTE DEFENSE TO PLAINTIFFS' CLAIMS

A. The *Rogers* two-prong test applies to protect Asylum's First Amendment rights.

Trademarks are protected by federal law under the Lanham Act. Section 43(a) of the Lanham Act creates a civil cause of action against any person who identifies his product in such a way that it is likely to cause consumer confusion regarding the product when it "...is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person..." 15 U.S.C.§1125.

The First Amendment can provide a complete defense to Lanham Act claims involving artistic works. *E.S.S. Entertainment 2000, Inc. v. Rock Star Videos, Inc.* 547 F.3d 1095, 1101 (9th Cir. 2008). It is well established that films are entitled to First Amendment protection. *Roxbury Entertainment v. Penthouse Media Group* 669 F.Supp.2d 1170, 1175 (C.D.Cal. 2009).

Movie titles also warrant First Amendment protection. *See Rogers v. Grimaldi*, 875 F.2d 994, 998 ("the expressive elements of titles requires more protection than the labeling of ordinary commercial products." (Fn. omitted)). When First Amendment concerns are at stake, the Lanham Act must be construed narrowly.

1  *Rogers v. Grimaldi*, 875 F.2d 994, 998 ("Because overextension of Lanham Act
2  restrictions in the area of titles might intrude on First Amendment values, we must
3  construe the Act narrowly to avoid such a conflict.").

4  In *Rogers*, the famous dancer Ginger Rogers brought suit alleging
5  Lanham Act violations against the producers of a film titled, "Ginger and Fred," which
6  was not about Ms. Rogers nor endorsed by her. While evoking the fame of the dance
7  team of Fred Astaire and Ginger Rogers, the film was actually about two fictitious
8  cabaret performers who imitated the famous dance couple. The Second Circuit ruled
9  that the use of Ms. Rogers famous name in the film title was not a violation of the
10 Lanham Act because of the defendants' First Amendment rights. *Id.* at 999. In
11 particular, if a name used in a title has some "minimal artistic relevance" to the context
12 of the film and the title does not otherwise "explicitly mislead[s] as the source or
13 content of the work," it is protected expression. *Id.* (emphasis added).

14 The Ninth Circuit has adopted the *Rogers* two-prong test to apply First
15 Amendment protections in trademark infringement cases. *Mattel, Inc. v. MCA
16 Records, Inc.* 296 F.3d 894, 902 (9th Cir. 2002)(hereafter "*MCA*")("We agree with the
17 Second Circuit's analysis and adopt the *Rogers* standard as our own.").

18 1. <u>Applying the first prong of *Rogers*: Asylum's use of "Hobbits" has
19 artistic relevance to the content of the film.</u>

20 The first prong of the *Rogers* test requires only that the title pass "the
21 appropriately low threshold of *minimal* artistic relevance" to the content of the film.
22 *Rogers*, 875 F.2d at 999 (emphasis added). In other words, any connection between
23 content and title satisfies this test.. *See E.S.S. Entertainment 200 v. Rock Star Videos*
24 547 F.3d 1095, 1100 (9th Cir. 2008)("the level of relevance [between title and content]
25 merely must be above zero.").

26 In *Rock Star Videos*, a video game maker's use of a strip club's
27 trademarked logo was entitled to First Amendment protection even though the video
28 game was not primarily "about" the club, and was instead "about," at most, the club's

8
MEMO OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' TRO

neighborhood. *Id.* at 1100. "In this context, we conclude that to include a strip club that is similar to the look and feel to the Play Pen does indeed have at least 'some artistic relevance.'" *Id.* at 1100.

In the case at hand, Plaintiffs cannot dispute that the diminutive characters in the film are referenced as "Hobbits." As such, the first prong is satisfied.

### 2. Applying the second prong in *Rogers:* Asylum's Film does not "explicitly mislead" as to source or content.

The second prong of the *Rogers'* test provides that the title must not explicitly mislead as to source or content. *Rogers*, 875 F.2d at 1000 ("Where a title with at least some artistic relevance to the work is not explicitly misleading as to the content of the work, it is not false advertising under the Lanham Act."). Indeed, the *Rogers* Court recognized that, unlike ordinary commercial products, "most consumers are well aware that they cannot judge a book solely by its title any more than by its cover." *Id.*

The *Rogers* Court conceded that most members of the public would be mislead by the title "Ginger and Fred" and believe that Ginger Rogers and Fred Astaire had some involvement in the film or that the film was about them. *Rogers*, 875 F.2d at 1001. However, the Court ruled that "To the extent that there is a risk that the title will mislead some consumers as to what the work is about, that risk is outweighed by the danger that suppressing an artistically relevant though ambiguous title will unduly restrict expression." *Id. Cf. Estate of Hemingway v. Random House, Inc.* 23 N.Y.2d 341, 350, 296 N.Y.S.2d 771, 780, 244 N.E.2d 250, 260 (1968)(holding that estate of Ernest Hemingway had no cause of action for "palming off" or "unfair competition" against author of biographical memoir entitled "Papa Hemingway.").

Indeed, the *Rogers* court not only recognized a likelihood of confusion, it acknowledged actual confusion in the marketplace, noting plaintiff's evidence of a survey report, does not meet the threshold of the second prong as being *"explicitly*

misleading." *Id.* at 1001. (Emphasis added). "The mere use of a trademark alone cannot suffice to make such use explicitly misleading." *E.S.S. Entertainment 2000 v. Rock Star Videos* 547 F.3d 1095 (9th Cir. 2008) (citing *MCA*, 296 F.3d at 902).

There is nothing about the title "Age of the Hobbits" which "explicitly misleads" the public as to its source. The Film makes no affirmative statement to suggest that such Film is "authorized" or endorsed by Plaintiffs. Defendant even went one step further and added a disclaimer immediately below the title: "They're not Tolkien's Hobbits...They're real." Accordingly, the second prong of the *Rogers'* test is also satisfied.

B. <u>Plaintiffs' argument that the *Rogers* test does not apply because the titles are confusingly similar is incorrect.</u>

Plaintiffs argue that "Because the title of Asylum's Infringing DVD is confusingly similar to Plaintiffs' *Hobbit* Film title...any attempt by Asylum to assert a First Amendment defense pursuant to *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), must fail." Plaintiffs' Application, page 21, ll. 14-17. Plaintiffs correctly point out that the *Rogers* test does not apply to "misleading titles that are confusingly similar to other titles" citing *Rogers*, 875 F.2d at 999.

The problem with Plaintiffs' argument is that the titles are not confusingly similar. This Court can recognize as a matter of law that the Defendant's film title *Age of the Hobbits* is not confusingly similar to Plaintiffs film title *The Hobbit: An Unexpected Journey*.

In support of its argument, Plaintiffs cite *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Group*, 886 F.2d 490 (2d Cir. 1989). However, the court in *Cliffs Notes* makes no finding that the titles were confusingly similar, only that the covers were similar.. *Id.* at 496 ("Moreover, even for those few readers who might be slightly confused by the cover..."). Indeed, the court reversed the lower court's preliminary injunction, allowing the release of a book titled "Spy Notes" with the

nearly identical cover art employed by the publishers of Cliffs Notes.

Two other cases cited by Plaintiffs, *Rebelution, LLC v. Perez*, 732 F.Supp.2d 883 (N.D. Cal. 2010) and *Toho Co. Ltd. v. William Morrow & Co., Inc.*, 33 F.Supp.2d 1206 (C.D. Cal. 1998), were cases of completely identical titles, "Rebelution" versus "Rebelution" and "Godzilla" versus "Godzilla," respectively. The case at hand is clearly distinguishable in that the subject title completely dissimilar to the Plaintiff's title.

The remaining case cited by Plaintiffs, *Dita, Inc. v. Mendez*, 2010 U.S. Dist. LEXIS 135856 (C.D. Cal. Dec. 14, 2010) was not a case about confusingly similar titles at all. Further, the court did not even address the confusingly-similar-titles exception to the *Rogers* test.

This is not a case of confusingly similar titles. Instead, this is a case where a single trademarked term, "Hobbit," appears in the title of an allegedly infringing film title. In such an instance, the *Rogers* test applies.

## V.
## ASYLUM'S USE OF "HOBBITS' IN THE TITLE OF ITS FILM IS ALSO PROTECTED AS FAIR USE

While the First Amendment defense warranted under the *Rogers'* two-prong test provides a complete defense, Defendants use of the term "Hobbits" to refer to *Homo Floresiensis* also provides a complete defense under the doctrine of fair use.

A trademark holder will be denied protection if his trademark becomes generic, i.e. if it does not relate exclusively to the trademark owner's product. *New Kids on the Block v. News America Publishing, Inc.* 971 F.2d 302, 306 (9th Cir. 1992). It is far more convenient, for example to ask your local pharmacist for 'aspirin'—once a trademark—than to remember or pronounce 'salicylic acid.' *Id.* at fn. 4. When a trademark comes to describe a class of goods rather than an individual product, the courts will hold as a matter of law that use of that mark does not imply

sponsorship or endorsement of the product by the original holder. *New Kids on the block*, 971 F.2d at 306.

The term "Hobbits" no longer relates exclusively to Plaintiffs' product. Now it is the common term used to describe *Homo Floresiensis*. Accordingly, Plaintiffs' mark has become generic and should no longer be afforded protection.

Use of a trademark "to describe the goods or services of [a] party, or their geographic origin." 15 U.S.C. §1115(b)(4). The "fair-use" defense, in essence forbids a trademark registrant to appropriate a descriptive term for his exclusive use and so prevent others from accurately describing a characteristic of their goods. *New Kids on the Block v. News America Publishing, Inc.*, 971 F.2d 302, 306 (9th Cir. 1992)(citing *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1185 (5th Cir. 1980).

In the case at hand, the use of the term "Hobbits" is used to reference the human sub-species *Homo Floresiensis*.

As pointed out by Justice Kozinski in *New Kids on the Block*, even when there are subtitiute terms available, sometimes using a trademarked term is the best way to describe a thing: "For example, one might refer to 'the two-time world champions' or 'the professional basketball team from Chicago,' but it's far simpler (and more likely to be understood) to refer to the Chicago Bulls." *Id.* Likewise, it is both simpler and more likely to be understood to use the term "Hobbits" instead of *Homo Floresiensis*.

Accordingly, Defendant's title *Age of the Hobbits* is also protected under the doctrine of fair use.

DATED: November 27, 2012                    SCOTT A. MEEHAN, ESQ.

By: /s/ Scott A. Meehan
Scott A. Meehan
Attorney for Defendant The Global Asylum, Inc.