## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 12 - 9547 PSG (CWx) | Date | December 10, 2012 |
|---|---|---|---|
| Title | *Warner Brothers Entertainment, et al. v. The Global Asylum, Inc.* | | |

| Present: | The Honorable Philip S. Gutierrez, United States District Judge |
|---|---|

| Wendy K. Hernandez | Not Present | n/a |
|---|---|---|
| Deputy Clerk | Court Reporter | Tape No. |

| Attorneys Present for Plaintiff(s): | Attorneys Present for Defendant(s): |
|---|---|
| Andrew J. Thomas<br>Farnaz M. Alemi | Scott A. Meehan |

**Proceedings:** **(In Chambers): Order GRANTING Plaintiffs' Ex Parte Application for a Temporary Restraining Order**

Before the Court is Plaintiffs' ex parte application for a temporary restraining order ("TRO") enjoining the scheduled December 11, 2012 release of Defendant's film, "Age of Hobbits." *See* Dkt. # 9. The Court heard oral arguments on the matter on November 7, 2012. After considering the arguments in support of and opposition to the application, the Court GRANTS Plaintiffs' application.

I.    Background

Plaintiffs Warner Brothers Entertainment, Inc. ("Warner Brothers"), New Line Cinema, LLC ("New Line"), Metro-Goldwyn-Mayer Studios, Inc. ("MGM"), and The Saul Zaentz Company ("SZC" and, collectively, "Plaintiffs") own the exclusive rights to produce and distribute films based on J.R.R. Tolkien's ("Tolkien") novels "The Hobbit" and "The Lord of the Rings" (collectively, "the Tolkien Works"). *Drotos Decl.* ¶¶ 7-18. SZC also owns various trademarks in the Tolkien Works, which include trademarks in various uses of the word "Hobbit" ("the Hobbit Marks"). *Id.* ¶ 6. New Line owns licenses to produce films of the Tolkien Works and produces such films in association with Warner Brothers and MGM (collectively with New Line, "the Studios"). *Id.* ¶¶ 17-18. The Studios have already produced three films based on the Tolkien Works: "The Lord of the Rings Trilogy." *Id.* ¶ 17; *Thomas Decl.* ¶¶ 3-7. The Studios will soon distribute three additional films, which are based on the novel "The Hobbit." *Drotos Decl.* ¶ 18. The first of the films, "The Hobbit: An Unexpected Journey," is scheduled for release on December 14, 2012. *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12 - 9547 PSG (CWx) | Date | December 10, 2012 |
|---|---|---|---|
| Title | *Warner Brothers Entertainment, et al. v. The Global Asylum, Inc.* | | |

Defendant The Global Asylum, Inc. ("Asylum) is also a film production company. *Thomas Decl.* ¶¶ 11-13. Among other types of films, Asylum produces "mockbusters," which are cheaper parodies of major films that often have titles very similar to major releases. *Bales Decl.* ¶ 7; *Thomas Decl.* ¶¶ 11-12. Asylum is scheduled to release a film entitled "Age of Hobbits" on December 11, 2012, three days before the planned release of New Line's "The Hobbit: An Unexpected Journey." *Id.* ¶¶ 16-17. Asylum began to promote "Age of Hobbits" through various online channels in or around August 2012.[1] *Id.* ¶ 16. "Age of Hobbits" will be released directly to DVD, Blu-ray, and online sources, and is currently available for pre-order for $12.99. *Id.* "Age of Hobbits" is about a recently-discovered species of pre-historic humans that lived in Indonesia. *Bales Suppl. Decl.* ¶ 3. Asylum asserts that it uses the term "Hobbit" in the film title to refer to the species, which was given the nickname "hobbits" by scientists who discovered the species. *Id.*

Plaintiffs contend that "Age of Hobbits" infringes on their trademark rights in the Hobbit Marks in violation of the Lanham Act, 15 U.S.C. § 1051 *et seq. Mot.* 9:12-18. Plaintiffs first contacted Asylum about the film on August 31 by sending a cease-and-desist letter to Asylum requesting that Asylum refrain from using the Hobbit Marks in its film. *Nelson Decl.* ¶ 3, Ex. 1. Plaintiffs continued to communicate with Asylum in September and October, during which time the parties discussed Asylum's asserted fair use defense and possible changes to the title, design, and promotional materials for "Age of Hobbits." *Id.* ¶¶ 4-7, Ex. 2. Pursuant to the discussions, Asylum made several changes to its planned release. Specifically, Asylum changed the design of its promotional materials. The original materials used gold, stylized font in the title, which is similar to the font used in promotional materials for "The Hobbit: An Unexpected Journey" and "The Lord of the Rings Trilogy." *Thomas Decl.* ¶ 10. The artwork now uses a different design that does not include the stylized gold font. *Id.* ¶ 24, Ex. 22. However, Asylum ultimately did not agree to remove the word "Hobbit" from the film title for the domestic release of the film. *Id.* ¶ 21.

On November 7, 2012, Plaintiffs filed a complaint for trademark infringement, false designation of origin, trademark dilution, false advertising, and state law unfair competition. *See* Dkt. # 1. On November 21, 2012, approximately three weeks before the scheduled release of "Age of Hobbits," Plaintiffs filed an ex parte application requesting that this Court enter a temporary restraining order enjoining the December 11 release of Asylum's film under the present title. Specifically, Plaintiffs request a "TRO barring Asylum from releasing its film in

---

[1] All subsequent dates refer to 2012, unless otherwise specified.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12 - 9547 PSG (CWx) | Date | December 10, 2012 |
|---|---|---|---|
| Title | *Warner Brothers Entertainment, et al. v. The Global Asylum, Inc.* | | |

any form under the title "Age of Hobbits." *Mot.* 2:22-23.

II.    Legal Standard

        "The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction." *NML Capital, Ltd. v. Spaceport Sys. Int'l, L.P.*, 788 F. Supp. 2d 1111, 1117 (C.D. Cal. 2011) (quoting *Lockheed Missile & Space Co. v. Hughes Aircraft Co.*, 887 F. Supp. 1320, 1323 (N.D. Cal. 1995); *see also Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (noting that the analysis for a temporary restraining order is "substantially identical" to the analysis for a preliminary injunction).  A party seeking a preliminary injunction must make a showing of each of the following elements: (1) a likelihood of success on the merits, (2) a likelihood of irreparable injury to the plaintiff if injunctive relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) an advancement of the public interest.  *See Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008).  Within this framework, a plaintiff may also succeed by raising "serious questions going to the merits," rather than a likelihood of success, and showing a likelihood of irreparable injury and that "the balance of hardships tips sharply in [its] favor."  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011) (allowing for a post-*Winter* "sliding scale" analysis in preliminary injunction inquiries where "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another").

III.    Discussion

        A.    Likelihood of Success on the Merits

        In order to prevail on a motion for a TRO, a plaintiff must show a likelihood of success on the merits.  *Winter*, 555 U.S. at 20; *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1046-47 (9th Cir. 1999).  Plaintiffs seek a TRO based on their asserted likelihood of success on their trademark infringement claim pursuant to 15 U.S.C. § 1114 and their trademark dilution claim pursuant to 14 U.S.C. § 1125.  *See Mot.* 9:10-18, 18:21-19:10.  Plaintiffs may prevail on their TRO application by showing a likelihood of success on either claim.  For the reasons discussed below, the Court concludes that Plaintiffs have shown a likelihood of success on their trademark infringement claim and so does not address whether they may also be entitled

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12 - 9547 PSG (CWx) | Date | December 10, 2012 |
|----------|------------------------|------|-------------------|
| Title | *Warner Brothers Entertainment, et al. v. The Global Asylum, Inc.* | | |

to a TRO on their trademark dilution claim.[2]

To prevail on a claim of trademark infringement under the Lanham Act, a party "must prove: (1) that it has a protectable ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion." *Dep't of Parks & Recreation v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006).

> i.      *Protectable Interest in the Mark*

A trademark is a "word, phrase or symbol that is used to identify a manufacturer or sponsor of a good or the provider of a service." *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 900 (9th Cir. 2002). "The threshold issue in any action for trademark infringement is whether the words used by a manufacturer in connection with his product are entitled to protection." *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1014 (9th Cir. 1985). Protectable interest can be shown in any one of three ways: (1) the mark is federally registered; (2) the mark is descriptive but has acquired a secondary meaning in the market; or (3) the mark is suggestive, which makes it inherently distinctive and protectable. *See Applied Info. Sci. Corp. v. eBay, Inc.*, 511 F.3d 966, 970 (9th Cir. 2007).

The Hobbit Marks are federally registered on the Principal Register in the Patent and Trademark Office in connection with various uses. *Drotos Decl.* ¶¶ 7-15, Ex. 1. The registration most relevant to the present action is a registration of the word "Hobbit" in "printed

---

[2] Asylum does not contest the merits of Plaintiffs' trademark dilution claim. At oral argument, counsel for Asylum asserted that the First Amendment defense in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), applies to the trademark dilution claim as well as to the trademark infringement claim. However, Asylum has provided the Court with no cases in which a court has applied the *Rogers* defense to a trademark dilution claim. Moreover, in *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894 (9th Cir. 2004), the case in which the Ninth Circuit adopted the *Rogers* defense, the Court applied the *Rogers* defense only to the trademark infringement claim and not to the trademark dilution claim. *Mattel*, 296 F.3d at 900-908. In the absence of any authority holding that the *Rogers* defense applies to trademark dilution, the Court declines to apply the defense to Plaintiffs' trademark dilution claim. Given that Asylum has neither contested the merits of Plaintiffs' trademark dilution claim nor asserted a viable defense to that claim, the Court notes that Plaintiffs would likely succeed on their trademark dilution claim as well.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12 - 9547 PSG (CWx) | Date | December 10, 2012 |
| --- | --- | --- | --- |
| Title | *Warner Brothers Entertainment, et al. v. The Global Asylum, Inc.* | | |

matter, namely posters, art prints, postcards." *Id.*, Ex. 1 at 19-20. This registration covers Asylum's use of the term in its posters promoting "Age of Hobbits" and "constitutes prima facie evidence of the validity of the registered mark and of [the registrant's] exclusive right to use the mark on the goods and services specified in the registration." *See Applied Info. Sci.*, 511 F.3d at 970; *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 928 (9th Cir. 2005) ("[R]egistration discharges the plaintiff's original common law burden of proving validity in an infringement action."). Therefore, the registration alone is sufficient to prove that the use of the mark in the poster is protectable.

However, Plaintiffs are not seeking to enjoin the use of the mark only on the posters promoting "Age of Hobbits" but to enjoin the release of the film itself under that title. *Mot.* 2:22-23. Plaintiffs do not submit evidence that the use of the term "Hobbit" in a movie title is registered in the federal registry. As such, the Court also considers whether the mark is distinctive and has developed a secondary meaning in the marketplace. *See Applied Info. Sci.*, 511 F.3d at 970; *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1254 (9th Cir. 1985) (noting that a showing of secondary meaning was necessary to extend protection to certain tabs on all garments when the federal registration included only tabs on pants).

Secondary meaning is the "association by a substantial segment of customers and potential customers between the alleged mark and the single source of the product." *Id.* (internal quotation marks and citations omitted). "An expert survey of purchasers can provide the most persuasive evidence of secondary meaning." *Id.* at 1358. A plaintiff may also establish that a mark has acquired a secondary meaning with evidence of its use and advertising of the mark over a substantial period of time. *Clamp Mfg. Co., Inc. v. Enco Mfg. Co., Inc.*, 870 F.2d 512, 517 (9th Cir. 1989).

Plaintiffs have submitted evidence both of consumer association and extensive marketing. In connection with an earlier case in the Northern District of California, SCZ commissioned an expert study which found that 47.75 percent of 400 randomly-selected respondents associated the term "Hobbit" with SZC, d.b.a. "Tolkien Enterprises," and Tolkien properties. *Drotos Decl.*, Ex. 3 at 43-44. Asylum does not contest the findings or methodology of the survey. Other courts in this jurisdiction have found that consumer association of approximately 50 percent is sufficient to establish secondary meaning. *See, e.g., PETsMART, Inc. v. Lanrus, Inc.*, No. 91-1721-R(M), 1992 WL 275599, at *10 (S.D. Cal. Mar. 30, 1992) (noting that "figures over 50 [percent] are regarded as clearly sufficient [to demonstrate secondary meaning]" but that "figures of 46 [percent] and 37 [percent] have also been found sufficient" (quoting 2 J. Thomas

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12 - 9547 PSG (CWx) | Date | December 10, 2012 |
| --- | --- | --- | --- |
| Title | *Warner Brothers Entertainment, et al. v. The Global Asylum, Inc.* | | |

McCarthy, *Trademarks and Unfair Competition* § 32.43)); *Sturm, Ruger & Co., Inc. v. Arcadia Mach. & Tool, Inc.*, No. 85-8459 MRP, 1988 WL 391514, at *3 (C.D. Cal. Nov. 8, 1988) (finding that a trademark had "a very strong secondary meaning" based on a showing that 46 percent of respondents associated the product with the trademark holder). The survey results showing that nearly 50 percent of respondents associated the term "Hobbit" with the trademark holder is thus persuasive evidence that the Hobbit Marks have acquired secondary meaning.

The Court views the survey results in connection with Plaintiffs' extensive use and marketing of the Hobbit Marks. *See Clamp*, 870 F.2d at 517. Here, Plaintiffs have submitted evidence of significant sums of money used to advertise the Hobbit Marks and associated marks through many channels over many years. *See Scott Decl.* ¶¶ 2-8; *Scott Conf. Decl.* ¶¶ 3-5. Moreover, the term has been extensively used by Plaintiffs for various products, including books, movies, games, merchandise, and other commercial goods. *See Drotos Decl.* ¶¶ 3-19. This extensive use of the mark provides additional evidence of secondary meaning. *See Clamp*, 870 F.2d at 517.

Given that the Hobbit Marks are federally registered, that Plaintiffs have submitted survey evidence that nearly 50 percent of respondents associated the marks with Tolkien, and that Plaintiffs have undertaken significant, long-term marketing related to the mark, the Court concludes that Plaintiffs have established a protectable interest in the mark. As such, the first element of the likelihood of success prong is satisfied. *See Applied Info. Sci.*, 511 F.3d at 970.

   ii.  *Likelihood of Confusion*

"Likelihood of confusion exists when consumers viewing the mark would probably assume that the goods it represents are associated with the source of a different product identified by a similar mark." *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 608 (9th Cir. 2005). The Ninth Circuit employs an eight-factor test in determining whether a likelihood of confusion exists. *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979). These factors are: (1) the strength of the mark; (2) the proximity or relatedness of the goods; (3) the similarity of the marks; (4) evidence of actual confusion; (5) the marketing channels used; (6) the degree of care customers are likely to exercise in purchasing the goods; (7) the defendant's intent in selecting the mark; and (8) the likelihood of expansion into other markets. *Id.* Although the above factors are all appropriate for consideration in determining whether likelihood of confusion exists, not all of the factors are of equal importance or applicable in every case. *See Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1008 (9th Cir.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12 - 9547 PSG (CWx) | Date | December 10, 2012 |
|----------|------------------------|------|-------------------|
| Title | *Warner Brothers Entertainment, et al. v. The Global Asylum, Inc.* | | |

2001). Specifically, the Ninth Circuit has stated that the three factors most probative of confusion are the similarity of the marks, the relatedness of the goods, and the marketing channels used. *See GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000); *Brookfield*, 174 F.3d at 1054.

In applying the *Sleekcraft* factors, the Ninth Circuit has admonished courts to be "[m]indful that the *sine qua non* of trademark infringement is consumer confusion, and that the *Sleekcraft* factors are but a nonexhaustive list of factors relevant to determining" this dispositive inquiry. *See Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1142 (9th Cir. 2011). The factors, "not surprisingly, tend to overlap and interact." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1141 (9th Cir. 2002). For example, if a finding on one element is weak, courts may require a stronger showing on other factors. *Id.* The assessment of likelihood of confusion is predominately factual in nature. *E&J Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290 (9th Cir. 1992).

>        a.        Strength of the Mark

The strength of a trademark is evaluated in terms of its conceptual strength and its commercial strength. *See GoTo.com*, 202 F.3d at 1207. Trademarks may be classified as generic, descriptive, suggestive, arbitrary, or fanciful. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). "The strongest marks—that is, those which receive the maximum trademark protection—are 'arbitrary' or 'fanciful.'" *Entrepreneur Media*, 279 F.3d at 1141. "The weakest marks, entitled to no trademark protection, are 'generic.'" *Id.* In between lie "suggestive" and "descriptive" marks. *Id.*

The Hobbit Marks are in the category of marks that are fanciful or arbitrary, and are thus entitled to the strongest trademark protection. *See Entrepreneur Media*, 279 F.3d at 1141. Fanciful marks are "made-up words with no discernible meaning—such as Kodak film and Sony electronics that are inherently distinctive." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1033 (9th Cir. 2010). Arbitrary words are "actual words with no connection to the product." *Id.* The word "Hobbit" is a wholly made-up word with no discernible meaning. The term was invented by Tolkien to describe fictional creatures that inhabit the fantasy world he created in his novels. *Drotos Decl.* ¶¶ 3-5. The Hobbit Marks are

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12 - 9547 PSG (CWx) | Date | December 10, 2012 |
|---|---|---|---|
| Title | *Warner Brothers Entertainment, et al. v. The Global Asylum, Inc.* | | |

thus within the category of marks receiving maximum trademark protection.[3]

Moreover, "the more likely a mark is to be remembered and associated in the public mind with the mark's owner, the greater protection the mark is accorded by trademark laws." *GoTo.com*, 202 F.3d at 1207. As such, a mark is strong if it has achieved actual marketplace recognition, as through advertising expenditures and other promotion. *See Brookfield*, 174 F.3d at 1058. As discussed in Section III, A, *i.* above, Plaintiffs have presented evidence of extensive advertising expenditures as well as actual market recognition of the Hobbit Marks. *See Drotos Decl.* ¶ 20, Ex. 3; *Scott Decl.* ¶ 2-8; *Scott Conf. Decl.* ¶¶ 3-5. This evidence provides additional support for the Court's conclusion that the Hobbit Marks are strong. *See GoTo.com*, 202 F.3d at 1207-08 ("The record discloses that GoTo's logo in its entirety has been displayed many billions of times, providing compelling evidence of the strength of GoTo's logo.").

Finally, courts also consider the commercial strength of the mark. *See GoTo.com*, 202 F.3d at 1207-08 ("Disney has cited the tremendous success of GoTo and its rise to the twenty-sixth most visited website on the Internet. Such success only strengthens Go-To's mark."). Here, Plaintiffs have presented evidence of the enormous commercial success of "The Lord of the Rings Trilogy," which grossed billions of dollars worldwide, as well as the high commercial value of related merchandise. *Thomas Decl.* ¶¶ 4-7. The commercial success of "The Lord of the Rings Trilogy" does not add significantly to the strength of the mark, however. Given that

---

[3] At oral argument, counsel for Asylum contended that the term "hobbit" is not fanciful because the word was used in the Middle Ages. Asylum does not present evidence to support this assertion. However, the Court notes that the Oxford English Dictionary contains two definitions of "hobbit." One definition refers to Tolkien's hobbits. The second entry for the word "hobbit," alternatively spelled as "hobbet," defines the term as "seed basket" or a "local measure = 2 1/2 bushels." Oxford English Dictionary. Given this obscure alternate definition, which is absent from many other dictionaries, the term may not be wholly made-up such that it meets the definition of a fanciful term. *See Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1033 (9th Cir. 2010). However, the term used in Tolkien's work may alternatively be classified as arbitrary because the use of the term to refer to the small people who inhabit Tolkien's realm has "no connection" to the use of the term to describe a seed basket or local measure. *Id.* Arbitrary terms, like fanciful terms, are afforded the highest level of trademark protection. *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1141 (9th Cir. 2002). Therefore, the Hobbit Marks are entitled to the strongest trademark protection even though there is some evidence of use of the term prior to Tolkien's works.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12 - 9547 PSG (CWx) | Date | December 10, 2012 |
|---|---|---|---|
| Title | *Warner Brothers Entertainment, et al. v. The Global Asylum, Inc.* | | |

many other factors likely contributed to the high commercial success of the films, the success of the trilogy is not necessarily closely related to the Hobbit Marks. However, the Court's reluctance to connect the commercial success of the trilogy to the Hobbit Marks in no way reduces the strength of the Hobbit Marks. The distinctiveness of the mark and the evidence of its actual recognition by consumers is sufficient to demonstrate to the Court that the strength of the mark is high. As such, this factor weighs in favor of finding a likelihood of confusion.

> *b.      Proximity & Relatedness of the Goods*

Marks are related when they are used to offer similar products to a similar group of consumers. *Brookfield*, 174 F.3d at 1056. "[T]he danger presented is that the public will mistakenly assume there is an association between the producers of the related goods, though no such association exists." *Sleekcraft*, 599 F.2d at 350. The proximity of goods is measured by whether the products are: (1) complementary; (2) sold to the same class of purchasers; and (3) similar in use and function. *Id.* The reference point for this and the remaining *Sleekcraft* factors "is the typical buyer exercising ordinary caution." *Fortune Dynamic*, 618 F.3d at 1038.

In *Brookfield*, for example, the Ninth Circuit held that the competitive proximity and relatedness of the products at issue weighed in favor of finding a likelihood of confusion when both products were websites that offered searchable databases with information on movies. *Brookfield*, 174 F.3d at 1056. Similarly, in *Sleekcraft*, the Ninth Circuit concluded that the goods were related when both companies marketed recreational boats. *Sleekcraft*, 599 F.2d at 348. In neither case was the target audience identical. In *Brookfield*, one database targeted ordinary movie viewers while the other was aimed at aspiring entertainment executives and professionals, *Brookfield*, 174 F.3d at 1056; in *Sleekcraft* one line of boats was marketed for family recreation while the other was designed for consumers interested in high speed racing, *Sleekcraft*, 599 F.2d at 348. Despite these somewhat different groups of consumers, the Ninth Circuit concluded in both cases that the similarity of products was sufficient to demonstrate that the goods were closely related. *See Brookfield*, 174 F.3d at 1056; *Sleekcraft*, 599 F.2d at 348.

As in *Brookfield* and *Sleekcraft*, Plaintiffs and Asylum are "companies that compete for the patronage of an overlapping audience." *Brookfield*, 174 F.3d at 1056. Both New Line and Asylum are studios that produce feature-length films. *Thomas Decl.* ¶ 11. Moreover, the products at issue in this case are both feature-length films in the fantasy genre that are scheduled for release within three days of each other, though Plaintiffs' film will be released theatrically while Asylum's film will be released directly to DVD, Blu-ray, and internet sources. *Thomas*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 12 - 9547 PSG (CWx) | Date | December 10, 2012 |
|---|---|---|---|
| Title | *Warner Brothers Entertainment, et al. v. The Global Asylum, Inc.* | | |

*Decl.* ¶¶ 2, 17-19.  The products are of the same type and are marketed to the same audience at nearly exactly the same time.  The relatedness of the products may be even greater here than in *Sleekcraft* and *Brookfield*, as the Court can find no meaningful distinction between the consumers who would be interested in Asylum's products and those who would be interested in Plaintiffs', as both target the general movie-viewing public and specifically viewers interested in fantasy films.  Moreover, the fact that Plaintiffs' film is being released to theaters while Asylum's film is being released directly to DVD, Blu-ray, and internet sources is not a meaningful distinction, as many consumers may not be aware of the different modes and timing of release.  *See Saksa Decl.* ¶ 4 (citing a 2010 survey finding that almost half of customers are not aware of the timing of movie releases).  As such, the competitive proximity and relatedness of the products is high and this factor weighs in favor of Plaintiffs.  *See Brookfield*, 174 F.3d at 1056; *Sleekcraft*, 599 F.2d at 350.

c.      *Similarity of the Marks*

"[T]he greater the similarity between the two marks at issue, the greater the likelihood of confusion."  *GoTo.com*, 202 F.3d at 1206.  There are three axioms that apply to the "similarity" analysis: (1) marks should be considered in their entirety and as they appear in the marketplace; (2) similarity is best adjudged by appearance, sound, and meaning; and (3) similarities weigh more heavily than differences.  *Id.*

Here, the mark at issue is the word "Hobbit."  "Hobbit" is a trademarked word that Asylum uses in its movie title.  The marks are therefore not only similar but identical.  Moreover, the imagery surrounding the use of the mark is similar, thus increasing the possibility of confusion.  Asylum's poster for "Age of Hobbits" shows the word "Hobbit" with an image that features two characters holding weapons in the center, with fire-breathing dragons, a hooded figure, a mountain, and fire in the background, and a battle scene in the foreground.  *See Thomas Decl.*, Ex. 15.  This imagery is similar to several posters produced by New Line for "The Hobbit: An Unexpected Journey" and "The Lord of the Rings Trilogy."  *See Scott Decl.*, Exs. 1-3; *Thomas Decl.*, Exs. 1-4, 7.  The promotional materials for "The Hobbit: An Unexpected Journey" and "The Lord of the Rings Trilogy" feature characters holding mythical weapons, mythical creatures such as dragons, battle scenes, mountains, and fire, among other images that are similar to those used to promote Asylum's film.  *See Scott Decl.*, Exs. 1-3; *Thomas Decl.*, Exs. 1-4, 7.

Plaintiffs cannot claim exclusive rights to the images described above—fantastical images

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12 - 9547 PSG (CWx) | Date | December 10, 2012 |
|---|---|---|---|
| Title | *Warner Brothers Entertainment, et al. v. The Global Asylum, Inc.* | | |

of swords, mythical creatures, and the like. *See Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 616 (9th Cir. 1989) (noting that the plaintiffs could not claim exclusive rights to a particular color scheme). However, the question is whether, viewing the marks in their entirety as they appear in the marketplace, "the total effect of [Asylum's] product and package on the eye of the ordinary purchaser" is likely to cause confusion. *See id.*; *see also GoTo.com*, 202 F.3d at 1206 (finding similarity after noting that "[w]ith a single glance at the two images, one is immediately struck by their similarity"). Here, viewing the imagery in the posters in connection with the use of the term "Hobbit" in the title "one is immediately struck by the[] similarity" between the two images. *See id.* Given the similar overall appearance of the posters and the prominent use of the trademarked term, the Court has "no difficulty concluding that the marks are overwhelmingly similar." *See id.*

Finally, Asylum contends that the titles are not confusingly similar because they are not identical: Asylum's movie is called "Age of Hobbits" while the Studios' film is called "The Hobbit: An Unexpected Journey." *Opp.* 2:16-19. This argument is unpersuasive. Courts have commonly found that titles that are not identical but use similar words are confusingly similar under the Lanham Act. For example, Courts have found similarity in the following cases: any use of the term "River Kwai" was confusingly similar to the movie title "Bridge Over River Kwai," *Tri-Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 339, 358 (S.D.N.Y. 1998); any use of the words "Tarz" or "Tarzan," even when used in conjunction with other words, was confusingly similar to the trademarked term "Tarzan," *Edgar Rice Burroughs, Inc. v. Manns Theatres*, No. 76-3612-RMT, 1976 WL 20994, at *1 (C.D. Cal. Dec. 20, 1976); the record title "Pitbull Starring in Rebelution" was similar to the band name "Rebelution," *Rebelution, LLC v. Perez*, 732 F. Supp. 2d 883, 886, 888 (N.D. Cal. 2010); the book titles "The Children's Audiobook of Virtues" and "The Children's Book of Virtues" was confusingly similar to the title "The Book of Virtues," *Simon & Schuster v. Dove Audio, Inc.*, 970 F. Supp. 279, 301 (S.D.N.Y. 1997). As was found in these cases, the use of the term "Hobbit" in the title of Asylum's film may be confusingly similar to Plaintiffs' use of the trademark in its movie title even though the titles are not identical. This factor too weighs in favor of Plaintiffs.

d.     *Evidence of Actual Confusion*

"[A] showing of actual confusion among significant numbers of consumers provides strong support for the likelihood of confusion," but is not necessary to a finding of likelihood of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12 - 9547 PSG (CWx) | Date | December 10, 2012 |
|---|---|---|---|
| Title | *Warner Brothers Entertainment, et al. v. The Global Asylum, Inc.* | | |

confusion under the Lanham Act.  *Network Automation*, 638 F.3d at 1151 (quoting *Playboy Enter., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1026 (9th Cir. 2004)).  Evidence of actual confusion "constitutes persuasive proof that future confusion is likely."  *Thane Int'l v. Trek Bicycle Corp.*, 305 F.3d 894, 902 (9th Cir. 2002).  Actual confusion may be shown by testimony of consumers who were actually confused or by survey evidence.  *Id.*

Without any supporting evidence, Asylum makes the conclusory assertion that "no one could be confused between the title of Defendant's film *Age of Hobbits* and Plaintiffs' film *The Hobbit: An Unexpected Journey*."  *Opp*. 2:17-19.  This argument is without merit in light of survey evidence presented by Plaintiffs showing that some respondents actually were confused by the titles of the movies.  Plaintiffs present evidence from a weekly tracking study conducted by Nielsen National Research Group ("Nielsen") in which approximately 30 to 40 percent of survey respondents exhibited confusion about the source of "Age of Hobbits" ("The Nielsen Survey").  *Alemi Decl.* ¶ 16.  The survey was conducted over two days, November 18 and 19, and included 1200 respondents divided into two groups.  In the survey, the Test Group was shown an image of the "Age of Hobbits" poster while the Control Group was shown the same poster with an alternative name, "Age of Java Men."  *Id.* ¶ 5.  Respondents who had an opinion about the source of the films were then asked questions about who they believed to have made and produced the film.  Thirty percent of respondents in the Test Group who had an opinion about the source of "Age of Hobbits" (which was approximately 200 respondents) said they believed the movie was made or distributed by Warner Brothers, New Line, MGM, SZC, Tolkien, or "the Makers of 'The Lord of the Rings.'"  *Id.* ¶¶ 10, 12.  In comparison, 6 to 14 percent of the respondents in the Control Group, who were shown the movie under the title "Age of Java Men," associated the film with Warner Brothers, New Line, MGM, SZC, Tolkien, or the Makers of 'The Lord of the Rings,'" depending on how the question was presented.  *Id.* ¶¶ 11, 13.  Thus, the use of the word "Hobbit" in the title appears to be responsible for 15.8 to 23.68 percent of the confusion about the source of the movie.  *Id.* ¶¶ 11-13.  Additionally, slightly over 40 percent of the respondents in the Test Group who said that they knew whether the makers of "Age of Hobbits" had made other films (which was 66 respondents) said that "Age of Hobbits" was by the makers of "The Hobbit: An Unexpected Journey" and "The Lord of the Rings."  In comparison, 20 percent of respondents in the Control Group made the same association when shown the movie by the title "Age of Java Men."  *Id.* ¶ 15.  It appears from the Nielson Survey that the use of the word "Hobbit" in the title was responsible for 20.91 percent of the confusion regarding the makers of the movies.  *Id.*  Thus, the survey shows a 16 to 24 percent confusion rate associated with the use of the Hobbit Mark in the title of Asylum's movie.  *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12 - 9547 PSG (CWx) | Date | December 10, 2012 |
|---|---|---|---|
| Title | *Warner Brothers Entertainment, et al. v. The Global Asylum, Inc.* | | |

In its opposition, Asylum does not contest the methodology or results of the Nielson Survey. At oral argument, counsel for Asylum presented some concerns with the survey, such as that the survey failed to distinguish between people who were knowledgeable about the Tolkien Works and those who were not. However, the Court finds none of Asylum's objections persuasive and so treats the survey results as evidence of the extent to which consumers may be confused by the titles.

Generally, confusion levels of 25 to 50 percent provide "solid support" for a finding of likelihood of confusion, while confusion rates below 20 percent support a finding of confusion only in connection with other corroborating evidence. *See Thane*, 305 F.3d at 902-03 (concluding that a survey in which 27.7 percent of respondents were confused about source association could support a jury finding that actual purchasers who encountered the allegedly-infringing products would be confused about their source); *Fiji Water Co. v. Fiji Mineral Water USA, LLC*, 741 F. Supp. 2d 1165, 1179 (C.D. Cal. 2010) (granting a preliminary injunction where survey evidence from over 400 respondents showed a confusion level of 24.2 percent); 6 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 32:188 (noting that confusion levels over 50 percent are treated as "persuasive evidence" of likely confusion, figures in the 25 to 50 percent range are "solid support" for such a finding, and figures below 20 percent may only be viewed in connection with other evidence showing a likelihood of confusion).

The results of the Nielson Survey are slightly below the range that provides "solid support" for a finding of likelihood of confusion. However, the survey results are very close to the level that provides solid support for such a finding. This factor does not weigh particularly strongly in either direction, as the percentages are too low to provide strong support for a finding of likelihood of confusion, but not so low that they undermine such a finding. Moreover, the survey targeted a relatively small sample, as only approximately 200 respondents expressed an opinion about the source of "Age of Hobbits." *Alemi Decl.* ¶¶ 10-13. Therefore, the Court views the survey results in connection with other factors weighing in favor of a likelihood of confusion.

   *e.*  *Marketing Channels*

The likelihood of confusion is exacerbated when the parties promote their products through the same marketing channels. *See Brookfield*, 174 F.3d at 1057. Specifically, the use by both parties of the internet to market the products in question is "a factor 'that courts have consistently recognized as exacerbating the likelihood of confusion.'" *GoTo.com*, 202 F.3d at

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12 - 9547 PSG (CWx) | Date | December 10, 2012 |
|----------|------------------------|------|-------------------|
| Title | *Warner Brothers Entertainment, et al. v. The Global Asylum, Inc.* | | |

1208 (quoting *Brookfield*, 174 F.3d at 1057). Here, both Plaintiffs and Asylum utilize the internet to promote their movies. *Scott Decl.* ¶¶ 5, 7-8, Exs. 2-4; *Thomas Decl.*, ¶ 16, Ex. 15. Therefore, under *Brookfield* and *GoTo.com*, this factor favors a finding of likelihood of confusion. However, the Court is also cognizant that internet advertising is much more ubiquitous now than it was when *Brookfield* and *GoTo.com* were decided, in 1999 and 2000, respectively, which may diminish the relevance of the use of the internet by both parties. As such, this factor favors Plaintiffs, but not particularly strongly.

### f.    Degree of Care Used

The degree of care refers to the amount of thought consumers put into the purchase of the goods or services in question. "When goods are expensive, it is assumed that buyers will exercise greater care in their purchases." *Gallo*, 967 F.2d at 1293. "On the other hand, when dealing with inexpensive products, customers are likely to exercise less care, thus making confusion more likely." *Brookfield*, 174 F.3d 1060. Here, the products in question are movie ticket and DVD purchases, both of which cost a consumer less than $15. *See Welinsky Decl.* ¶ 15. At oral argument, counsel for Asylum asserted that customers do in fact exercise care when purchasing movies. However, counsel did not present the Court with any evidence to support this assertion, and other courts have found that movies fall into the category of products for which customers exercise little care. *See, e.g., Tri-Star*, 14 F. Supp. 2d at 358 ("Motion picture tickets, video rentals and television viewing are relatively inexpensive and thus consumers of such are likely to pay less care and attention when purchasing these products and therefore are inclined to be less sophisticated buyers."); *see also McCarthy on Trademarks* § 23:97 (compiling a list of items deemed to be expensive, all of which cost hundreds to thousands of dollars and are purchases that buyers make on a relatively infrequent basis, such as residential homes, vehicles, and mattresses). Given the low cost of DVDs, Blu-ray discs, and movie tickets—and the absence of evidence on the record to suggest that purchasers exercise more care when buying a movie than when making purchases of similarly-priced items—the Court finds that this factor too favors Plaintiffs.

### g.    Asylum's Intent

When a mark is adopted with "the intent to deceive the public," courts may presume that use of the mark will cause confusion. *Brookfield*, 174 F.3d at 1059; *see also Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*, 457 F.3d 1062, 1076 (9th Cir. 2006) ("When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12 - 9547 PSG (CWx) | Date | December 10, 2012 |
|---|---|---|---|
| Title | *Warner Brothers Entertainment, et al. v. The Global Asylum, Inc.* | | |

defendant can accomplish his purpose: that is, that the public will be deceived." (quoting *Sleekcraft*, 599 F.2d at 354)). "This factor favors the plaintiff where the alleged infringer adopted his mark with knowledge, actual or constructive, that it was another's trademark." *Brookfield*, 174 F.3d at 1059*; see also Entrepreneur Media*, 279 F.3d at 1148.

Plaintiffs argue that Asylum adopted the Hobbit Mark in its title with the intent to confuse consumers and so the likelihood of confusion from the use of the mark should be presumed. *Mot.* 15:11-14. Plaintiffs advance four arguments in support of this contention: first, the use of the trademarked term in a fantasy film, a work similar to Tolkien's work, is bad faith, *Mot.* 15:17-19; second, Asylum describes the film in a manner that associates it with Tolkien's work, such as referring to "peace-loving Hobbits," *id.* 15:19-25; third, the release date three days before the release of "The Hobbit: An Unexpected Journey" demonstrates an intent to capitalize on the publicity surrounding Plaintiffs' film, *id.* 16:1-7; and fourth, the similar artwork and prominent use of the trademarked term demonstrates an intent to deceive, *id.* 16:14-26.

Asylum contends that it did not release the film with the intent to deceive viewers. *Opp.* 2:16-22. Asylum asserts that the term "Hobbits" as used in its film does not refer to the fictional Tolkien creatures, but to a human sub-species that was recently discovered in Indonesia. *Id.* 2:25-27. In 2003, archeologists in Indonesia discovered a human sub-species with the Latin name *Homo Floresiensis*. *Opp.* 3:5-13; *Meehan Decl.* ¶¶ 2-5; *Thomas Decl.* ¶¶ 22-23. Scientists nicknamed the species "hobbits." *Meehan Decl.* ¶¶ 2-4; *Thomas Decl.* ¶ 23. Asylum contends that it is these Hobbits, not the fictional Tolkien characters, to which the title of its movie refers. *Opp.* 3:5-13; *Bales Suppl. Decl.* ¶ 3. Asylum further contends that the film title has always referred to the ancient Indonesian sub-species and was never intended to relate to Tolkien's fantasy realm. *Bales Suppl. Decl.* ¶ 3

Asylum's argument regarding its intent in using the term "Hobbit" in its title is unpersuasive for several reasons. First, Asylum's argument appears to ignore the connection between the term used to describe *Homo Floresiensis* and Tolkien's hobbits. Asylum treats the use of the two terms as completely unrelated, but the terms are in fact closely related: scientists gave *Homo Floresiensis* the nickname "Hobbit" because its appearance resembled Tolkien's hobbits, as described in his novels. *Thomas Decl.* ¶ 23, Exs. 20-21 (citing two articles reporting on the archeological find, one of which noted that "the tiny human [was] dubbed by dig workers as the 'hobbit,' after the tiny creatures from the *Lord of the Rings* books" and the other of which explained that the species was nicknamed "the 'Hobbit,' after the diminutive villagers from J.R.R. Tolkien's *Lord of the Rings* trilogy"); *Thomas Suppl. Decl.*, Exs. 2-3 (citing an additional

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12 - 9547 PSG (CWx) | Date | December 10, 2012 |
|---|---|---|---|
| Title | *Warner Brothers Entertainment, et al. v. The Global Asylum, Inc.* | | |

two articles on *Homo Floresiensis*, one of which chronicles the scientists' decision to nickname the species "hobbit"). Given that *Homo Floresiensis* received the nickname "Hobbit" specifically because of its resemblance to Tolkien's fictional hobbits, the Court finds Asylum's argument that its movie is wholly unrelated to Tolkien's work because it is about *Homo Floresiensis* to be disingenuous.

Asylum has also failed to present any evidence that its film was ever publicly advertised as being about *Homo Floresiensis*, which further demonstrates to the Court that Asylum intended to associate its film with the Hobbit Marks in order to deceive potential viewers. Asylum asserts that the back cover for the DVD "now and has always" contained a description of the film that references the Indonesian human sub-species. *Bales Suppl. Decl.* ¶ 3. However, the description on the back cover of the DVDs—which have not yet been released to consumers—does little to support Asylum's claim that it has not acted with the intent to deceive movie-buyers. Asylum has come forth with no evidence of promotional materials for its movie that reference *Homo Floresiensis* in any way or that it has ever publicly described the film as one about *Homo Floresiensis*. The complete absence of evidence of any advertising and publicity describing the film as being about *Homo Floresiensis* further persuades the Court that Asylum intended to associate its film with Plaintiffs' works and so deceive customers.

In contrast, the evidence of the advertising and promotion for "Age of Hobbits," as well as the media coverage the film has received, provides support for Plaintiffs' contention that Asylum intended to deceive consumers by associating its movie with Plaintiffs' works. Until Plaintiffs informed Asylum of their legal claim, Asylum had been using a font that mimicked the gold, stylized, capitalized font that Plaintiffs' used in promotional materials for "The Hobbit: An Unexpected Journey." *Thomas Decl.* ¶ 10, Ex. 7; *Mot.* 6:1-6. Though Asylum has changed the font, it continues to use the Hobbit Mark in its title and describes the film with works that evoke Tolkien imagery. *Id.* ¶ 10. As recently as November 4, Asylum used the word "Hobbit" and other language that is strikingly similar to language used by Tolkien in its description of the film. For example, the synopsis of the film on Asylum's website described that "[i]n an age long ago . . . peace-loving Hobbits" are enslaved by "dragon-riding cannibals" and "young Hobbit Goben" must embark on a "quest" to free his people. *Id.*, Ex. 18. This language is clearly evocative of the Tolkien universe: "The Hobbit: An Unexpected Journey" is about a group of dwarves who "recruit the timid hobbit Bilbo for a quest to reclaim a dragon's treasure and restore the dwarves' kingdom." *Id.*. Ex. 6 at 44. The use of language that is evocative of the Tolkien universe, in conjunction with the prominent and repeated use of the trademarked term "Hobbit" and lettering that was nearly identical to the font used in Plaintiffs' promotional

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12 - 9547 PSG (CWx) | Date | December 10, 2012 |
|----------|------------------------|------|-------------------|
| Title    | *Warner Brothers Entertainment, et al. v. The Global Asylum, Inc.* | | |

materials, provides the Court with further evidence to support its conclusion that Asylum intended to deceive viewers by making it appear that its film was related to "The Hobbit: An Unexpected Journey."

Further, media coverage of "Age of Hobbits" explicitly describes the film as being "a reimagined version of J.R.R. Tolkien's mythical universe" and "a fantasy tale inspired by J.R.R. Tolkien's *The Lord of the Rings*." *Thomas Decl.*, Exs. 17. Though there is no evidence on the record that Asylum itself was responsible for disseminating these statements, Asylum has also presented no evidence that it made any effort to correct the misrepresentations about the film or disassociate itself from Plaintiffs' works—at least not until Plaintiffs threatened legal action against it if it failed to take such steps. Asylum's failure to make any effort to clarify that its film was unrelated to Tolkien's work until it was threatened with legal action if it failed to do so is further evidence that it acted in bad faith.

The release date of December 11—three days before the release of "The Hobbit: An Unexpected Journey"—provides additional evidence that Asylum intended to profit by associating its film with Plaintiffs' work. The close proximity of the release dates demonstrates a clear intent to capitalize on the extensive attention that the Hobbit Marks will receive leading up to the release of "The Hobbit: An Unexpected Journey." At oral argument, counsel for Asylum admitted that the temporal proximity of the release dates was "not a coincidence." He asserted that it is common in the movie industry for multiple studios to produce films or television shows on similar topics at approximately the same time. He asserted that this occurs because the public has a heightened interest in a topic surrounding the release of a major motion picture on that topic. He cited two examples of this phenomenon: several movies related to the "Snow White" fairy tale were produced around the same time earlier in 2012 and several television programs on Abraham Lincoln were aired to coincide with the release of the movie "Lincoln," a major motion picture. This argument, however, does little to contradict Plaintiffs' assertion that the release date suggests that Asylum intended to capitalize on consumer confusion. "Age of Hobbits" is unlike the examples counsel cited, given that Asylum has repeatedly asserted that its film does not relate to Tolkien's hobbits. Asylum's argument that it planned the release of "Age of Hobbits" on December 11 because of "heightened interest" in the topic of Hobbits due to the release of "The Hobbit: An Unexpected Journey" is not particularly credible in light of its repeated assertion that the film is not actually about Tolkien's hobbits. In short, Asylum's argument regarding why its film was scheduled for release three days before Plaintiffs' film does nothing to persuade that Court that its intent was anything other than to capitalize on the media attention the films would receive.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12 - 9547 PSG (CWx) | Date | December 10, 2012 |
|----------|------------------------|------|-------------------|
| Title | *Warner Brothers Entertainment, et al. v. The Global Asylum, Inc.* | | |

Finally, this factor favors Plaintiffs even if Asylum acted only with knowledge, actual or constructive, that it was using Plaintiffs' trademarked term. *See Brookfield*, 174 F.3d at 1059. In other words, in order to prevail on this factor, Plaintiffs need only demonstrate that Asylum used the Hobbit Marks with constructive or actual knowledge of Plaintiffs' ownership of the mark. Plaintiffs have far surpassed this low threshold. Defendant had actual knowledge that the "Hobbit" was Plaintiff's trademark at the latest on August 31 and continued with the distribution of the movie despite this knowledge. *See Nelson Decl.*, Ex. 1. Such knowledge—especially in light of the other evidence that Asylum adopted the Hobbit Mark with "the intent to deceive the public"—is sufficient to persuade the Court that this factor weighs heavily in Plaintiffs' favor. *Brookfield*, 174 F.3d at 1059.[4]

> h.    *Likelihood of Expansion*

This factor is relatively unimportant in the present case, as the parties are already marketing products in the same field. *See id.* at 1060. While the two markets do not overlap entirely, as Asylum does not produce films for theatrical release, the parties have presented no evidence that it is "exceedingly likely nor unlikely that [Asylum] will enter more directly into [Plaintiffs'] principal market, or vice versa." *Id.* As such, this factor is not relevant and so is neutral.

> i.    *Balancing of Factors*

For the reasons discussed above, the majority of factors weigh in favor of a finding of likelihood of confusion and no factor weighs against such a finding. Moreover, the finding is particularly strong on the three factors that courts have found to be the most important, especially in the context of the internet: similarity of the marks, relatedness of the goods, and use of similar marketing channels. *See GoTo.com*, 202 F.3d at 1205; *Brookfield*, 174 F.3d at 1054.

---

[4] Moreover, even a contrary finding would do nothing to tip the balance in Asylum's favor, as the lack of an intent to deceive is "largely irrelevant in determining if customers likely will be confused as to source." *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1069 (9th Cir. 1999) (quoting *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 287 (6th Cir. 1997)).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12 - 9547 PSG (CWx) | Date | December 10, 2012 |
|---|---|---|---|
| Title | *Warner Brothers Entertainment, et al. v. The Global Asylum, Inc.* | | |

As such, the Court concludes that the *Sleekcraft* factors weigh in favor of a finding of likelihood of confusion.

### iii.    Defenses

Asylum assert two defenses to its use of the term "Hobbit" in the title of its film.  First, Asylum asserts that it is entitled to use the trademarked term pursuant to the test articulated in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), which permits a trademarked term to be used in the title of an artistic work if the use of the term has some artistic relevance to the work and does not explicitly mislead consumers as to the source and content of the work.  *Opp.* 7:10-11:14.  Second, Asylum asserts a nominative fair use defense, which permits the use of a trademarked term in some cases in which the use of the term is the only way to refer to a particular product or service.  *Id.* 12:3-5.  As part of its fair use argument, Asylum also asserts that the Hobbit Marks have become generic.  *Id.* 11:17-12:22.  Though Asylum appears to conflate the defense of nominative fair use with genericness, the Court will discuss the two defenses separately.

### a.    *Rogers v. Grimaldi*

In *Rogers,* the Second Circuit stated that because of an artist's significant First Amendment interest in choosing an appropriate title for his artistic work, the Lanham Act "[s]hould be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression."  *Rogers*, 875 F.2d at 999.  *Rogers* involved an action by celebrated dancer and performer Ginger Rogers against the producers and distributors of a motion picture entitled "Ginger and Fred."  *See id.* at 996.  The court phrased the issue presented as the "conflict between Rogers' right to protect her celebrated name and the right of others to express themselves freely in their own artistic work."  *Id.*  The film told the story of two fictional Italian cabaret performers who became known in Italy as "Ginger and Fred."  *See id.* at 996-97.  With respect to the allegedly misleading titles at issue, the court held that the "balance will normally not support application of the [Lanham] act unless the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the title explicitly misleads as to the source or content of the work."  *Id.*  In other words, to succeed on a *Rogers* claim, the defendant must show that (1) the title has artistic relevance to the underlying work and (2) the title does not explicitly mislead as to the source or content of the work.  *Id.*; *see also Mattel,* 296 F.3d at 902.  In *Rogers*, the court found that the purportedly infringing title related to Rogers only obliquely and possessed at least "some artistic

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12 - 9547 PSG (CWx) | Date | December 10, 2012 |
|---|---|---|---|
| Title | *Warner Brothers Entertainment, et al. v. The Global Asylum, Inc.* | | |

relevance to the work." *Rogers*, 875 F.2d at 1000. Because the title did not explicitly mislead as to source or authorship, the defendants' First Amendment rights as authors of an expressive work trumped Rogers' interest in protecting her famous name. *See id.*

The Ninth Circuit has adopted the *Rogers* test and applies it to circumstances in which the mark at issue is "imbue[d] . . . with a meaning beyond its source-identifying function." *Mattel*, 296 F.3d at 900; *see also Rebelution*, 732 F. Supp. 2d at 888 (stating that the *Rogers* test was not applicable because there was no evidence that the word "rebelution" "entered the public discourse, . . . [had] become an integral part of our vocabulary[, or] been imbued by the public with an alternate meaning"). Therefore, pursuant to the Ninth Circuit's formulation of the *Rogers* test, the Court considers (1) whether the mark has acquired meaning beyond its source-identifying function; (2) whether the use of the mark in the title has at least minimal artistic relevance to the underlying work; and (3) whether the title explicitly misleads consumers as to source or function. *Mattel,* 296 F.3d at 901*; Rebelution*, 732 F. Supp. 2d at 887-88.

        1.       Whether the Mark Has Acquired Meaning Beyond Its Source-Identifying Function

The Ninth Circuit has recognized that a trademark owner's right to control the use of his mark is diminished when "the public imbues his mark with a meaning beyond its source-identifying function" or "when we'd find it difficult to describe the product in any other way." *Mattel*, 296 F.3d at 900. The Ninth Circuit used the term "Rolls Royce" and "Band-Aid" to illustrate the first point. The term "Rolls Royce" has acquired an expressive meaning to refer to items of high quality and "Band-Aid" is short-hand for a quick fix. *Id.* The Ninth Circuit used aspirin to illustrate the second point: the average consumer does not know the proper term for aspirin—acetyl salicylic acid—and so uses aspirin as a shorthand. *Id.* Limiting the use of these terms would thus limit the public's ability to express itself. *Id.* Barbie is another example in which the trademark has taken on a role beyond its source-identifying function and is used to express a particular image. *Id.*; *see also Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 807 (9th Cir. 2003).

Here, the mark at issue has not gained such widespread cultural and linguistic prominence as "Barbie," "Rolls Royce" or "aspirin." However, the Court finds sufficient evidence on the record to conclude that the term "hobbit" has taken on "an expressive meaning apart from its source-identifying function." *See Mattel*, 296 F.3d at 900. The term may not be integral to the public's vocabulary, but it has gained some measure of use as a term to refer to small creatures,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12 - 9547 PSG (CWx) | Date | December 10, 2012 |
|---|---|---|---|
| Title | *Warner Brothers Entertainment, et al. v. The Global Asylum, Inc.* | | |

such as the small human sub-species discovered in Indonesia. *See Thomas Decl.*, Exs. 21-22.
As such, the Court moves to prongs two and three of the *Rogers* test.

> 2.   Whether the Mark Has Artistic Relevance to the Underlying
>       Work

The second prong of the *Rogers* test requires the use of the mark in the title to have at
least some artistic relevance to the underlying work. *Mattel*, 296 F.3d at 901; *Rogers*, 875 F.2d
994. Though not explicitly required by the holding in *Rogers*, courts within the Ninth Circuit
have also required that the "artistic work targets the original and does not merely borrow
another's property to get attention," as in such cases "First Amendment interests weigh more
heavily in the balance." *Mattel*, 296 F.2d at 901. Moreover, Asylum has not pointed the Court
to a single case in which a court in this circuit—or any other circuit, for that matter—has
permitted a defendant to use the *Rogers* defense when the term did not in some way relate to the
original. As such, the use of the mark in the allegedly-infringing title must be in some way
related to the meaning associated with the mark itself, as it is only in these cases where limiting
the use of the term would excessively restrict speech. *See Rogers*, 875 F.2d at 996-97, 1001
(articulating the defense in context of a claim by Ginger Rogers relating to a title that referred to
the fictional characters in the movie, a pair of dancers who were nicknamed "Ginger and Fred"
after the dancers Ginger Rogers and Fred Astaire, and so at least obliquely referenced the
meaning associated with the trademarked term); *Rebelution*, 732 F. Supp. 2d at 889 ("In every
federal court of appeals case addressing the artistic adoption of plaintiff's non-generic mark, the
artistic relevance of defendant's use of the mark related to the meaning associated with
plaintiff's mark."); *see also Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1370
(2d Cir. 1993) (applying *Rogers* to a title that used the trademarked term to reference the
television series that was the subject of the trademark); *Cliffs Notes, Inc. v. Bantam Doubleday
Dell Pub'g Grp., Inc.*, 886 F.2d 490, 491 (2d Cir. 1989) (applying the *Rogers* defense to a
parody); *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 918 (6th Cir. 2003) (applying the test to
a painting referring to Tiger Woods); *Mattel*, 296 F.3d at 899 (applying to test to a song referring
to Barbie). *Cf. E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1097 (9th Cir.
2008) (finding that the defense did not apply because the use of the term did not refer to the
plaintiff's product).

Asylum contends that the use of the Hobbit Mark in the title of its movie has artistic
relevance to the work itself because it refers to the characters that are the subject of the film,
specifically the ancient Indonesian species dubbed "hobbits." *Opp.* 2:27-3:1. However, in order

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12 - 9547 PSG (CWx) | Date | December 10, 2012 |
|----------|------------------------|------|-------------------|
| Title | *Warner Brothers Entertainment, et al. v. The Global Asylum, Inc.* | | |

to succeed on this prong, Asylum must also show that the use of the term in the title in some way relates to or references the trademarked term, such as by using the term "Barbie" to conjure a specific image and associated values.  *See Mattel*, 296 F.3d at 899; *Rebelution*, 732 F. Supp. 2d at 889 ("Defendants must thus show that they used plaintiff's mark to refer to the meaning associated with plaintiff's mark.").  Asylum has made no such showing.  In fact, Asylum asserts just the opposite: that the film title in no way relates to Tolkien's hobbits.  *Opp.* 2:23-28.  In its opposition, Asylum states that its "film title refers to *Homo Floresiensis* and not Plaintiffs' fantasy characters."  *Id.* 2:27-28.  As such, Asylum has not shown that it used Plaintiffs' mark with the intent to reference Plaintiffs' work and the second prong is not satisfied.

3.  Whether the Use of the Mark Is Explicitly Misleading

   Though Asylum has failed to demonstrate that the *Rogers* test applies to its use of the word "Hobbit" in the title of its film and so the defense fails on that ground alone, the Court concludes that the *Rogers* defense would also fail because the title is explicitly misleading.  In determining whether the title explicitly misleads consumers, courts apply the *Sleekcraft* likelihood of confusion factors discussed above.  *Rebelution*, 732 F. Supp. 2d at 888; *Toho Co., Ltd. v. William Morrow & Co., Inc.*, 33 F. Supp. 2d 1206, 1212 n.1 (C.D. Cal. 1998).  To support a finding that a title explicitly misleads consumers, the finding of confusion based on the *Sleekcraft* factors must be "particularly compelling."  *See Twin Peaks,* 996 F.2d at 1379; *Films of Distinction, Inc. v. Allegro Film Prods., Inc.*, 12 F. Supp. 2d 1068, 1077 (C.D. Cal. 1998) ("Under the *Rogers* test, 'the finding of likelihood of confusion must be particularly compelling to outweigh the First Amendment interest [in protection of artistic titles.].'" (quoting *Twin Peaks*, 996 F.2d at 1379)); *Toho*, 33 F. Supp. 2d at 1212 (finding that the defendant was not entitled to a *Rogers* defense when the showing of the likelihood of confusion was "strong").  For the reasons discussed in Section III, A, *ii* above, the showing of likelihood of confusion based on the *Sleekcraft* factors is strong, as all of the factors either are neutral or weigh in favor of Plaintiffs.  Moreover, the three most important factors all strongly favor Plaintiffs.

4.  Conclusion

   In sum, Asylum is not entitled to the *Rogers* defense both because it has failed to show that the use of the trademarked term in the title refers to Plaintiffs' trademarked term and because the title is explicitly misleading based on the application of the *Sleekcraft* factors.

   *b.*  *Fair Use*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12 - 9547 PSG (CWx) | Date | December 10, 2012 |
|---|---|---|---|
| Title | *Warner Brothers Entertainment, et al. v. The Global Asylum, Inc.* | | |

Asylum also asserts a fair use defense. Courts distinguish between two types of fair use: "classic fair use" and "nominative fair use." *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1150 (9th Cir. 2002). Though Asylum does not specifically state that it is asserting a nominative fair use defense, the arguments in its opposition go to nominative fair use, so the Court discusses nominative fair use only. *See Opp.* 2:23-3:1,11:17-12:22.

The nominative fair use defense is available "where the defendant uses a trademark to describe the plaintiff's product, rather than its own [product]." *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 208 (9th Cir. 1992). The problem is similar to one presented by genericness and descriptiveness, but the nominative fair use targets an issue that is distinct from those that arise when a trademark is generic or purely descriptive. Rather than applying to trademarks that are generic or descriptive, the nominative fair use defense applies to situations in which "goods and services are effectively identifiable only by their trademarks." *Id.* at 306. This defense is not available "[i]f the defendant's use of the plaintiff's trademark refers to something other than the plaintiff's product;" in those cases "the traditional fair use inquiry will continue to govern." *Id.* at 308.

When the use of the trademark meets the above criteria, the defendant is entitled to a nominative fair use defense if the following three additional requirements are satisfied: (1) the product or service is not readily identifiable without use of the trademark; (2) the defendant has used only so much of the trademark as is reasonably necessary to identify the product or service; and (3) the defendant has not done anything that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder. *Id.* at 308.

The Ninth Circuit applied the nominative fair use defense to a case in which New Kids on the Block sued two news companies for using their trademarked name in public opinion polls. *Id.* at 304. The defendants in *New Kids* were national newspapers that circulated opinion polls in which they asked specific questions about New Kids on the Block. *Id.* For example, one poll presented the following question: "New Kids on the Block are pop's hottest group. Which of the five is your fave? Or are they a turn off?" *Id.* The Ninth Circuit found that the nominative fair use defense was applicable because "the New Kids trademark [was] used to refer to the New Kids themselves." *Id.* at 308. There was simply no way for the newspapers to refer to the New Kids on the Block without using the band's name. The newspapers were entitled to the nominative fair use defense because there was nothing false or misleading about their use of the mark; the defendants had used only so much of the trademark as was necessary to ask the question, using only the band's name and not their logo; and the presentation did not imply joint

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12 - 9547 PSG (CWx) | Date | December 10, 2012 |
|---|---|---|---|
| Title | *Warner Brothers Entertainment, et al. v. The Global Asylum, Inc.* | | |

sponsorship. *Id.* Similarly, the Ninth Circuit has held that it is permissible for an auto repair shop to use the trademarked name "Volkswagen" in its advertising because using the trademarked word is the only way that a repair shop may inform the public that it services Volkswagens. *Volkswagenwerk Aktiengesselschaft v. Church*, 411 F.2d 350, 352 (9th Cir. 1969).

In contrast, the Ninth Circuit has held the nominative fair use defense inapplicable to cases in which the trademarked term was not used to describe the plaintiff's product. *See Rock Star Videos*, 547 F.3d at 1099. For example, in *Rock Star Videos*, the Ninth Circuit found that the nominative fair use doctrine was not available to defendants who used the trademarked name of a strip club as part of the scenery in a video game depicting Los Angeles because defendants admitted that the name was not used to comment on or identify the strip club whose trademark was at issue. *Id.* Similarly, the Ninth Circuit has held that Abercrombie & Fitch was not entitled to the nominative fair use defense when it used a photograph of the plaintiffs in its catalog for the purpose of selling its own goods rather than in order to refer to the plaintiffs for any purpose. *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1009 (9th Cir. 2001).

Asylum asserts that it is entitled to a fair use defense under *New Kids* because the term "'Hobbits' no longer relates exclusively to Plaintiffs' product [and n]ow it is a common term used to describe *Homo Floresiensis.* Accordingly, Plaintiffs' mark has become generic and should no longer be afforded protection." *Opp.* 12:3-5. Asylum's argument appears to miss the point, however. *New Kids* does not apply to trademarks that have become generic, but to a defendant's use of a trademarked term to describe the plaintiff's product when it would be impossible, or at least exceedingly difficult, to describe the product by other means. *New Kids*, 971 F.2d at 306. Asylum has clearly stated that it in no way intended to refer to Plaintiffs' mark by using the trademarked term. *Opp.* 2:27-3:1. As such, the nominative fair use defense simply does not apply. *New Kids*, 971 F.2d at 306; *see also Rock Star Videos*, 547 F.3d at 1099 ("Since Rockstar did not use the trademarked logo to describe [plaintiffs' strip club], the district court correctly held that the nominative fair use defense does not apply in this case.").

          *c.*     *Genericness*

To the extent that Asylum intends to rely instead on a defense based on genericness or descriptiveness, the record does not present evidence to support a finding that the Hobbit Marks have become generic. Genericness is typically discussed in terms of products, where a term is generic when consumers understand a word to refer to the type of goods themselves and not a

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12 - 9547 PSG (CWx) | Date | December 10, 2012 |
|----------|------------------------|------|-------------------|
| Title | *Warner Brothers Entertainment, et al. v. The Global Asylum, Inc.* | | |

particular brand. *See Yellow Cab*, 419 F.3d at 929. When a mark is federally registered, there is a presumption that it is not generic. *Coca-Cola Co. v. Overland, Inc.*, 692 F.2d 1250, 1254 (9th Cir. 1982) ("The general presumption of validity resulting from federal registration includes the specific presumption that the trademark is not generic."). Moreover, the burden is on the party seeking to prove that a mark is generic to overcome the presumption triggered by federal registration. *KP Permanent Make-Up*, 408 F.3d at 604. In order to meet this burden, the defendant must present evidence that consumers associate the term with a general product, not with the product's source: "Without evidence that to the consuming public the primary significance of the term . . . is to denote the service [plaintiff] offers and not its source, [the court is] without a sufficient evidentiary basis to find [the] mark generic." *Id.* at 606 (citation omitted). *Cf. Surgicenters of Am., Inc. v. Med. Dental Surgeries, Co.*, 601 F.2d 1011, 1017-18 (9th Cir. 1979) (finding the term "surgicenter" to be generic based on evidence from statements from medical experts, news articles, and medical publications showing that "the consuming public . . . considered the word a generic term," when there was "nothing in the record to indicate that any potential costumer considered the term "Surgicenter" to mean anything other than a surgical center"); *Classic Foods Int'l Corp. v. Kettle Foods, Inc.*, 468 F. Supp. 2d 1181, 1188-90 (C.D. Cal. 2007) (finding the term "kettle" when used for potato chips to be generic based on evidence of 37 articles using the term "kettle" to refer to potato chips generally and to describe a method of cooking potato chips); *accord Schwan's IP, LLC v. Kraft Pizza Co.*, 460 F.3d 971, 975 (8th Cir. 2006) (finding that the term "brick oven" to refer to pizza was generic based on evidence that the phrase was used by newspapers, restaurants, and retailers to refer to a type of pizza); *Murphy Door Bed Co., Inc. v. Interior Sleep Sys., Inc.*, 874 F.2d 95, 101 (2nd Cir. 1989) (concluding that the term "Murphy bed," once a trademarked term, had become generic because the term was defined in many dictionaries as a standard description of a wall-bed and numerous newspaper and magazine articles used it to describe the type of bed generally).

Here, Asylum has presented no evidence that the consuming public does not associate the trademarked term with the source. Asylum only presents evidence that a few scientists and news outlets have referred to a particular human sub-species as "hobbits." *Meehan Decl.* ¶¶ 2-5; Exs. 1-2. Asylum presents no evidence that the consuming public associates the term with this sub-species rather than with the Tolkien characters. In fact, the survey discussed in Section III, A, *i.* above shows just the opposite: that consumers associate the term "Hobbit" with the Tolkien works. Moreover, all parties agree that the species was dubbed "hobbits" specifically with reference to the Tolkien characters. *See Thomas Decl.* ¶ 23, Exs. 21-22. As such, there is not sufficient evidence on the record from which the Court can conclude that Asylum is likely to be entitled to a genericness defense. *See KP Permanent Make-Up*, 408 F.3d at 604.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12 - 9547 PSG (CWx) | Date | December 10, 2012 |
|---|---|---|---|
| Title | *Warner Brothers Entertainment, et al. v. The Global Asylum, Inc.* | | |

    *iv. Conclusion*

   In sum, Plaintiffs have established a likelihood of success on the merits.  Plaintiffs have presented sufficient evidence to show that they have a proprietary interest in the mark and that Asylum's use creates a likelihood of confusion, thus establishing a likelihood of succeeding on its trademark infringement claim.  Further, Asylum has not persuaded the Court that it is entitled to any defenses to its use of Plaintiffs' mark.  As such, the first element of Plaintiff's TRO application is satisfied.

   **B.** <u>Likelihood of Irreparable Injury to Plaintiff Without a TRO</u>

   A plaintiff seeking injunctive relief must prove that irreparable injury is likely in the absence of an injunction.  *Winter*, 555 U.S. at 20.  The plaintiff must prove that such harm is not only irreparable but imminent.  *Caribbean Marine Servs. Co., Inc. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988).  In trademark infringement actions, irreparable harm is presumed once the plaintiff has established a likelihood of confusion.  *See GoTo.com*, 202 F.3d at 1209.  This is because it is reasonable for a court to assume that continuing infringement will leave the plaintiff with a loss of control of its reputation and a loss of its goodwill.  *Apple Computer, Inc. v. Formula Int'l, Inc.*, 725 F.2d 521, 526 (9th Cir. 1984).  Here, Plaintiffs have demonstrated a likelihood of confusion.  As such, irreparable injury is presumed.

   Asylum claims that Plaintiffs have demonstrated that they will not suffer irreparable harm in the absence of a TRO because they delayed in bringing their TRO application.  *Opp.* 6:10-14.  Asylum announced the making of its film in February 2012 and began promoting it around August.  *Bales Decl.* ¶¶ 2-4.  *Thomas Decl.* ¶ 16.  On August 31, 2012, Plaintiffs sent Asylum a cease-and-desist letter informing Asylum of Plaintiffs' claims regarding Asylum's film.  *Nelson Decl.*, Ex. 1.  In the cease-and-desist letter, Plaintiffs informed Asylum of their belief that Asylum's film infringed upon their intellectual property and stated that they would pursue legal action if Asylum continued with the use of the Hobbit Marks in the film.  *Id.*, Ex. 1 at 11.  Throughout September and October, Plaintiffs engaged in discussions with Asylum regarding changes to the film.  *Nelson Decl.* ¶¶4-7; *Thomas Decl.* ¶¶ 21-24.  The parties engaged in negotiations through late October, but did not come to an agreement that satisfied Plaintiffs.  *Id.*  On November 7, Plaintiffs filed a Complaint against Asylum and then filed this TRO application on November 21.  *See* Dkts. # 1, 9.  The application was thus filed approximately three to four months after Asylum began promoting its film and three weeks before the scheduled December 11 release of "Age of Hobbits."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12 - 9547 PSG (CWx) | Date | December 10, 2012 |
|----------|------------------------|------|-------------------|
| Title | *Warner Brothers Entertainment, et al. v. The Global Asylum, Inc.* | | |

Courts may consider a plaintiff's delay when evaluating whether a temporary restraining order or preliminary injunction is appropriate, as a lengthy or unreasonable delay may be evidence that there is a lack of real urgency or irreparable harm. *See Miller v. Cal. Pac. Med. Ctr.*, 991 F.2d 536, 544 (9th Cir. 1993). However, the delay of Plaintiffs' TRO application was neither lengthy nor unreasonable and does not undercut Plaintiffs' claims of urgency or irreparable harm. Plaintiffs delayed for approximately four months before filing the TRO application, during which time they engaged in negotiations with Asylum in an attempt to resolve the dispute without legal action. *See Thomas Decl.* ¶¶ 21-24. In the Ninth Circuit, a delay of several months that gives the plaintiff an opportunity to investigate its claim and attempt to resolve the dispute out of court is not unreasonable such that injunctive relief should be denied on that ground alone. *See Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 423 (9th Cir. 1991) (finding that a delay of seven months was not unreasonable); *Cybermedia, Inc. v. Symantec Corp.*, 19 F. Supp. 2d 1070, 1078 (N.D. Cal. 1998) ("[A] reasonable delay caused by a plaintiff's good faith efforts to investigate an infringement claim will not rebut the presumption [of irreparable harm] in a copyright infringement case."); *Steinway & Sons v. Demars & Friends*, No 80-04404, 1981 U.S. Dist. LEXIS 15169, at *39 (C.D. Cal. Jan. 28, 1981) ("Plaintiff cannot be charged with delay attributable to efforts, such as those here, to resolve the dispute without the court's intervention."). Therefore, Plaintiffs' four-month delay in filing their TRO application does not undermine the presumption of harm to which Plaintiffs are entitled.

C.   <u>Balance of Hardships</u>

A court considering injunctive relief must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 542 (1987) (recognizing that a judge is not required to grant an injunction for every violation of the law). There are two potential hardships that Asylum will suffer if the Court enjoins the December 11 release of its movie "Age of Hobbits." First, Asylum has already sent DVDs and Blu-ray discs to retailers and rental outlets, and claims that it will now be impossible (or at least extremely difficult) to prevent their sale. *Bales Suppl. Decl.* ¶ 4. Asylum contends Plaintiffs' delay in filing the TRO application until only three weeks before the scheduled release of "Age of Hobbits" caused this hardship because Plaintiffs waited until after the discs were shipped to file their TRO. *Opp.* 2:5-8, 7:5-7. Second, Asylum will suffer hardship by being unable to release its movie, which it has already produced. However, neither of these hardships demonstrate to the Court that the balance of equities favors Asylum.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12 - 9547 PSG (CWx) | Date | December 10, 2012 |
|---|---|---|---|
| Title | *Warner Brothers Entertainment, et al. v. The Global Asylum, Inc.* | | |

To the extent that Asylum will suffer any hardship due to having already distributed the DVDs and Blu-ray discs, this was a hardship that was of its own making and carries little weight with the Court. Asylum distributed the discs after it was already well-aware that Plaintiffs intended to take legal action to prevent the release of the movie under the title "Age of Hobbits." On August 31, Plaintiffs presented Asylum with a cease-and-desist letter in which it demanded that Asylum, among other things, "cease distributing any products, advertisements or promotional materials containing the mark HOBBIT and destroy same." *Nelson Decl.*, Ex. 1. The cease-and-desist letter further stated that Plaintiffs would "take further legal action" if Asylum failed to cease using the Hobbit Marks. *Id.* On November 7, Plaintiffs filed their Complaint against Asylum. *See* Dkt. # 1. In its Complaint, Plaintiffs stated the following prayer for relief:

> "A.   For a preliminary and permanent injunction, prohibiting The Asylum . . . from committing further infringing acts including:
>
> > (1)   Using any title, name, service mark, trademark, trade name or domain name that includes or is confusingly similar to the HOBBIT Marks or Plaintiffs' *Hobbit* Films' titles or distinctive title design in the advertising or sale of motion pictures, DVDs, video-on-demand offerings or related goods or services; . . .
>
> B.   For an order that The Asylum be directed to deliver up for destruction all DVDs, DVD covers, posters, trailers, advertisements, brochures, labels, signs, prints, packages, wrappers, publications, software, websites, social networking pages and all other material in The Asylum's possession or under its control that bear the *Age of Hobbits* title, or that use the HOBBIT Marks, the *Hobbit* Films' titles or distinctive title design, or images from the *Lord of the Rings* or *Hobbit* films, advertisements, or merchandise . . ."

*Compl.* 32:3-33:1. Asylum was served with this Complaint on November 9. *See* Dkt. # 7. Therefore, Asylum was on notice of Plaintiffs' intention to halt the release of its movie under the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12 - 9547 PSG (CWx) | Date | December 10, 2012 |
|----------|------------------------|------|-------------------|
| Title | *Warner Brothers Entertainment, et al. v. The Global Asylum, Inc.* | | |

title "Age of Hobbits" on November 9 at the latest. Ten days later—knowing that legal action against the release was pending—Plaintiff distributed the DVDs and Blu-ray discs. Admittedly, it may be more difficult and costly for Asylum to halt the sale of its movie now after the discs have been distributed, but the Court considers this burden to be of little weight. Asylum assumed the risk of an injunction when it continued with production and distribution of its film after it received notice of Plaintiffs' legal claims in their August 31 cease-and-desist letter and of Plaintiffs' intent to seek an injunction in its Complaint. As such, the Court gives little weight to the hardship Asylum will suffer due to having already distributed the discs of the movie. *See TravisMathew, LLC v. Leisure Soc'y Unlimited., LLC*, No. 12-213-JST (MLGx), 2012 WL 1463548, at *4 (C.D. Cal. Apr. 26, 2012) ("[A]ny hardship that Defendants would potentially suffer [from a preliminary injunction] is mitigated by the fact that Defendants were on notice that a preliminary injunction may be sought under these circumstances."); *Team Gordon, Inc. v. Specialized Bicycle Components, Inc.*, No. 10-1379 AG (RNBx), 2010 WL 5058624, at *5 (C.D. Cal. Nov. 18, 2010) (finding that the balance of equities favored granting an injunction even though plaintiffs would suffer substantial economic harm because they "took the risk of an injunction when [they] continued planning to manufacture products with the [infringing logo] after receiving a cease-and-desist letter").

Moreover, "[w]here the only hardship that [the] defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense [against a preliminary injunction] merits little equitable consideration." *Cadence Design Sys., Inc. v. Avant! Corp.*, 125 F.3d 824, 830 (9th Cir. 1997); *see also Triad Sys. Corp. v. Se. Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995) ("[A defendant] cannot complain of the harm that will befall it when properly forced to desist from its infringing activities."). Here, the harm Asylum will suffer is the inability to profit from the sale of "Age of Hobbits," which has been shown to be likely infringing, and from the loss it will suffer because it has already shipped the DVDs and Blu-ray discs to distributors. Asylum's harm is thus merely from lost profits and expenses relating to its infringing activity, and the harm to Asylum carries little weight in the balance of equities, especially in comparison to the harm to Plaintiffs if Asylum goes ahead with the release of its film. The Court concludes that the balance of equities favors granting the TRO.

D.    Public Interest

Lastly, the Court considers whether granting the preliminary injunction advances the public interest. *Dollar Rent A Car v. Travelers Indem. Co.*, 774 F.2d 1371, 1374 (9th Cir. 1985). In trademark cases, the public interest is the public's right not to be deceived or confused.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12 - 9547 PSG (CWx) | Date | December 10, 2012 |
|----------|------------------------|------|-------------------|
| Title | *Warner Brothers Entertainment, et al. v. The Global Asylum, Inc.* | | |

Indeed, "the most basic public interest at stake in all Lanham Act cases [is] the interest in prevention of confusion, particularly as it affects the public interest in truth and accuracy." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 730 (3d Cir. 2004). Where "there is a likelihood of consumer confusion created by the use of confusingly similar marks, it follows that if such use continues, the public interest would be damaged. Conversely, a prohibition upon [defendant's] use of [its] mark[] would eliminate that confusion." *Id.* (internal quotation marks omitted) (edits in original). For the reasons discussed in Section III, A, *ii.* above, there is substantial likelihood that consumers will be confused by "Age of Hobbits" and mistakenly purchase the film intending to purchase "The Hobbit: An Unexpected Journey." *See Saksa Decl.* ¶ 4. Indeed, Plaintiffs have presented evidence that Asylum's other films have caused confusion among consumers, who mistakenly purchase Asylum films intending to purchase a different film. *See Thomas Decl.* ¶ 14, Exs. 8-14. The very interest at issue in a trademark infringement case such as this one is avoiding the public from being confused or deceived about a product. As such, a TRO enjoining Asylum's release of "Age of Hobbits" is in the public interest because it will prevent consumer confusion.

IV.    Conclusion

In sum, Plaintiffs have established (1) a likelihood of success on their Lanham Act claim for trademark infringement; (2) that they will suffer irreparable injury in the absence of a temporary restraining order; (3) that the balance of hardships favors Plaintiffs; and (4) that a TRO would advance the public interest. As such, a temporary restraining order enjoining the release of Asylum's film under the present title, "Age of Hobbits," is appropriate. *See Tri-Star*, 14 F. Supp. 2d 339, 359 (S.D.N.Y. 1998) (permanently enjoining defendants' release, distribution, or advertising in the United States of a motion picture, already produced at the time of the injunction, with the title containing the words "River Kwai" or any other confusingly-similar title because the use was trademark infringement under the Lanham Act); *Simon & Schuster*, 970 F. Supp. at 301 (permanently enjoining the defendants from manufacturing, publishing, distributing, or selling audio or print books under titles "The Children's Audiobook of Virtues," "The Children's Book of Virtues," or the like, as they were confusingly-similar to Plaintiff's trademarked title "The Book of Virtues."); *Edgar Rice Burroughs, Inc. v. Manns Theatres*, No. 76-3612-RMT, 1976 WL 20994, at *1 (C.D. Cal. Dec. 20, 1976) (issuing preliminary injunction preventing the defendants from exhibiting, advertising, promoting, or distributing a film entitled "Tarz & Jane & Boy & Cheeta" or using the word "Tarzan" and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12 - 9547 PSG (CWx) | Date | December 10, 2012 |
|----------|------------------------|------|-------------------|
| Title | *Warner Brothers Entertainment, et al. v. The Global Asylum, Inc.* | | |

associated terms in a book title, as the terms were trademarked and the titles created a likelihood of confusion); *see also Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 206-07 (2d Cir. 1979) (upholding district court's grant of preliminary injunction enjoining the distribution and exhibition of a movie that featured characters wearing Dallas Cowboys Cheerleaders' trademarked uniform design).

For the foregoing reasons, the Court GRANTS Plaintiffs' ex parte application for a temporary restraining order. The Court orders that Asylum and its subsidiaries, officers, agents, servants, directors, employees, partners, representatives, assigns, successors, related companies, and attorneys and all persons in active concert or participation with Asylum or with any of the foregoing, during the pendency of a hearing on an order to show cause regarding a preliminary injunction, refrain from advertising, selling or otherwise distributing any film with the title "Age of Hobbits" or using any other title, name, or mark that is confusingly similar to the trademarks "The Hobbit" and "Hobbit" or to the title of Plaintiffs' film "The Hobbit: An Unexpected Journey."

In light of the Court's granting Plaintiffs' temporary restraining order, the Court schedules a hearing on an order to show cause ("OSC") why the TRO should not become a preliminary injunction. The hearing on the OSC is set for **January 28, 2012**, at **1:30 PM** and the parties are ordered to submit their moving and opposing papers accordingly.

Plaintiffs are ordered to post bond in the amount of $50,000. *See* Fed. R. Civ. P. 65(c). The Court notes that the parties did not address the issue of bond and determines an appropriate bond to be 10 percent of the $500,000 reported budget for "Age of Hobbits." *See Thomas Decl.*, Ex. 16, at 97. The parties may address the bond amount in their briefs on the OSC why the TRO should not become a preliminary injunction.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12 - 9547 PSG (CWx) | Date | December 10, 2012 |
|----------|------------------------|------|-------------------|
| Title | *Warner Brothers Entertainment, et al. v. The Global Asylum, Inc.* | | |

_____ : _____

Initials of Deputy Clerk   _____

cc: