SCOTT A. MEEHAN, ESQ.  Sbn #139314
malibupictures@earthlink.net
2945 Townsgate Road, suite 200
Westlake Village, California 91361
(818) 707-0338
(818) 707-0339 fax

Attorney for Defendant and Counterlaimant
The Global Asylum, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WARNER BROS. ENTERTAINMENT INC., a Delaware corporation; NEW LINE CINEMA LLC, a Delaware limited liability company; NEW LINE PRODUCTIONS, INC., a California corporation; METRO-GOLDWYN-MAYER STUDIOS INC., a Delaware corporation; and THE SAUL ZAENTZ COMPANY, a Delaware corporation, | Case No. 2:12-cv-09547-PSG-CW |
| | DEFENDANT THE GLOBAL ASYLUM, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO ORDER TO SHOW CAUSE RE: ENTRY OF PRELIMINARY INJUNCTION; |
| Plaintiffs, <br> v. | DECLARATION OF MARK KEEGAN (filed under separate cover); |
| THE GLOBAL ASYLUM INC. (aka The Asylum), a California corporation, | DECLARATION OF SCOTT A. MEEHAN (filed under separate cover |
| Defendant. | DECLARATION OF PAUL BALES (filed under a separate cover) |
| AND RELATED COUNTERCLAIM | |
| | DATE: January 28, 2013 <br> TIME: 1:30 p.m. <br> COURTROOM: 880 |
| | Hon. Philip S. Gutierrez |

## TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ..................................................6

II.  FACTS.................................................................................6

     A.   The origin of the term "Hobbit." ........................................7

     B.   Prehistoric "Hobbits" are discovered in Indonesia. .........................7

     C.   Asylum promotes its film, *Age of the Hobbits.* ................................8

     D.   Plaintiffs request changes to the promotion of *Age of the Hobbits.* ..................................................................11

     E.   The Keegan & Donato Report verifies that there is no consumer confusion in the marketplace between the two films. ......................13

III. PLAINTIFFS CANNOT MEET THE LEGAL STANDARD FOR ISSUANCE OF A PRELIMINARY INJUNCTION ....................................14

     A.   THERE IS NO TRADEMARK DILUTION: *AGE OF THE HOBBITS* FALLS UNDER THE NONCOMMERCIAL USE EXEMPTION ..................................................................14

     B.   THERE IS NO TRADEMARK INFRINGEMENT: ASYLUM'S USE OF THE TERM "HOBBITS" IN THE TITLE OF ITS FILM IS A NOMINATIVE FAIR USE. .................16

     C.   THERE IS NO TRADEMARK INFRINGEMENT: *AGE OF THE HOBBITS* IS NOT CONFUSINGLY SIMILAR TO *THE HOBBIT: AN UNEXPECTED JOURNEY* ........................18

          1. Strength of the Mark ................................................24

          2. Proximity of the Goods ............................................24

          3. Similarity of the Marks ...........................................24

          4. Evidence of Actual Confusion ....................................25

          5. Marketing Channels ................................................25

          6. Degree of Care Used ...............................................25

          7. Asylum's Intent .....................................................25

          8. Liklihood of Expansion .............................................25

     D.   FIRST AMENDMENT PRINCIPLES PROVIDE AN ABSOLUTE DEFENSE TO PLAINTIFFS' CLAIMS..................26

          1.   The *Rogers* two-prong test applies to protect Asylum's First Amendment rights. .......................................26

MEMO OF POINTS AND AUTHORITIES IN OPPOSITION TO PRELIMINARY INJUNCTION

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

a.    Applying the first prong of *Rogers:* Asylum's use of "Hobbits" has artistic relevance to the content of the film. ................................................................27

b.    Applying the second prong in *Rogers:* Asylum's Film does not "explicitly mislead" as to source or content. ........................................................................28

MEMO OF POINTS AND AUTHORITIES IN OPPOSITION TO PRELIMINARY INJUNCTION

1

2

3

# TABLE OF AUTHORITIES

**CASES**                                                                                                    **Page**

4

5
*AMF Inc. v. Sleekcraft Boats,*
    599 F.2d 341, 348-49 (9th Cir. 1979)..............................................21, 24

6
*Brookfield Communications, Inc. v. West Coast Entertainment Corp.,*
    174 F.3d 1036 (9th Cir. 1999).................................................22

7
*Cairns v. Franklin Mint Co.,*
    292 F.3d 1139, 1151 (9th Cir. 2002)..............................................17, 18

8

9
*Dep't of Parks &Recreation v. Bazaar Del Mundo Inc.,*
    448 F.3d 1118, 1124 (9th Cir. 2006)................................................21

10
*E.S.S. Entertainment 2000, Inc. v. Rock Star Videos, Inc.,*
    547 F. 3d 1095 (9th Cir. 2008)......................................... 18, 27

11

12
*Films of Distinction, Inc. v. Allegro Film Prods., Inc.,*
    12 F.Supp.2d 1206, 1212, n. 1 (C.D. Cal. 1998) .................................28

13
*Fortune Dynamics, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.,*
    618 F.3d 1025, 1030 (9th Cir. 2010)......................................................22

14

15
*Joseph Burstyn, Inc. V. Wilson,*
    343 U.S. 495, 501-02. ...................................................................15

16
*Hoffman v. Capital Cities/ABC, Inc.,*
    255 F.3d1180, 1184 (9th Cir. 2001)........................................................15

17

18
*Mattel v. MCA Records, Inc.,*
    296 F.3d 894 (9th Cir. 2000)...........................................................14, 27

19
*Mattel, Inc. v. Walking Mountain Productions,*
    353 F.3d 792, 809 .............................................................................17

20

21
*Network Automation Inc. v. Advanced Systems Concepts, Inc.,*
    638 F.3d 1137, 1144 (9th Cir. 2011) .................................................21, 22

22
*New Kids on the Block v. New America Pub., Inc.,*
    971 F.2d 302 (9th Cir. 1992)...................................................... ..16, 18-19

23

24
*Ocean Bio-Chem v. Turner Network Television,*
    741 F.Supp. 1546, 1553, fn. 2 (S.D. Fla. 1990)....................................15

25
*Playboy Enterprises, Inc. v. Netscape Communications Corp.,*
    354 F.3d 1020 (9th Cir. 2004)................................................................22

26

27
*Rogers v. Grimaldi,*
    875 F.2d 994, 998 ...................................................................15, 26-28

28

---

MEMO OF POINTS AND AUTHORITIES IN OPPOSITION TO PRELIMINARY INJUNCTION

*Roxbury Entertainment v. Penthouse Media Group*,
     669 F.Supp.2d 1170, 1175 (C.D.Cal. 2009)..........................................26

*Schad v. Borough of Mount Ephraim*,
     452 U.S. 61, 65 (1981).............................................................................16

*Toyota Motor Sales, U.S.A., Inc. v. Tabari*,
     610 F.3d 1171, 1176.(9th Cir. 2010)..................................................6, 19

*Twin Peaks Productions v. Publications International, Ltd.*,
     996 F. 2d 1366, 1379 (2nd Cir. 1993) ...................................................28

*Winter v. Nat. Res. Def. Council, Inc.*,
     555 U.S. 7, 20 (2008).............................................................................14

*Winters v. New York*,
     333 U.S. 507, 510 (1948)........................................................................16

**STATUTES**

Federal Trademark Dilution Act,
     15 U.S.C. §1125(c )...........................................................17, 21, 26-27

Lanham Act,
     15 U.S.C. §1114..............................................................................14, 26

MEMO OF POINTS AND AUTHORITIES IN OPPOSITION TO PRELIMINARY INJUNCTION

# I.

## PRELIMINARY STATEMENT

Plaintiffs' application for a preliminary injunction must fail since they cannot prevail on the merits. Specifically, their claim for trademark infringement cannot overcome The Global Asylum, Inc.'s ("Asylum") assertion of nominal fair use in its film title, *Age of the Hobbits*. It well-settled that the recently discovered human sub-species *Homo Floresiensis* are commonly referred to as "Hobbits" in a direct comparison to the diminutive creatures featured in the stories of J.R.R. Tolkien. As such, usage of the term "hobbits" in the context of *Homo Floresiensis* is protected under the doctrine of nominal fair use.

The nominal fair use test incorporates three (3) elements. However, if one or more elements is not satisfied, Asylum's usage cannot be enjoined altogether. Instead, the Court may order modifications to satisfy the three (3) elements which will ultimately allow the nominal use of Plaintiffs' mark as set forth in *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171 (9th Cir. 2010).

In addition to nominal fair use, since the entry of the Temporary Restraining Order, Asylum commissioned a consumer survey which proves that there is no consumer confusion between its film *Age of the Hobbits* and Plaintiffs' film *The Hobbit: An Unexpected Journey*. Accordingly, without consumer confusion, there simply is no trademark infringement.

With respect to Plaintiffs' claim of trademark dilution, Asylum's use of Plaintiffs' mark is inextricably entwined with expressive elements protected by the First Amendment. When an otherwise dilative use contains elements protected by free speech principals, the entire use is considered "noncommercial" and is exempted by statute. Therefore, *Age of the Hobbits* is also not subject to a claim for trademark dilution.

MEMO OF POINTS AND AUTHORITIES IN OPPOSITION TO PRELIMINARY INJUNCTION

II.

FACTS

A.      The origin of the term "Hobbit."

        There is some debate over the origin of the term "Hobbit."  The *Denham Tracts* were a series of writings on folklore collected between 1846 and 1859 by Michael Aislabie Denham.  Declaration of Scott A. Meehan ("Meehan Decl."), Exhibit 1, page 3.  These writing were later edited into a two-volume set with volume 2 containing a long list of supernatural creatures, including: "...bogglegoes, bogies, redmen, portunes, grants, **hobbits**, hobgoblins, brown-men, cowies, dunnies..."  *Id.* (emphasis added).  Based thereon, the following passage appears in the *December 2003 Oxford English Dictionary newsletter*:

> "4.  hobbit--J.R.R. Tolkien modestly claimed not to have coined this word, although the Supplement to the OED credited him with the invention of it in the absence of further evidence.  It seems, however, that Tolkien was right to be cautious.  It has since turned up in one of those 19th-century folklore journals, in a list of long-forgotten words for fairy-fold or little people.  It seems likely that Tolkien, with his interest in folklore, read this and subconsciously registered the name, reviving it many years later in his most famous character. [Editor's note: although revision of the OED's entry for hobbit will of course take this evidence for earlier use into account, it does not yet appear in the online version of the entry.]"

*Id.*

B.      Prehistoric "Hobbits" are discovered in Indonesia.

        In 2003, archaeologists digging in the jungles of Indonesia discovered the skeleton of a diminutive human species with the Latin name of *Homo Floresiensis*.  Meehan Decl., Exhibit 2.  The species was immediately dubbed "Hobbits" referring to the diminutive characters featured in the stories of J.R.R. Tolkien.  *Id.*

        The "Hobbit" name stuck.  If one Googles "real hobbit floresiensis," it yields approximately 160,000 hits.  Meehan Decl., para. 6.  Articles about *Homo*

7

*Floresiensis* from three (3) top scientific journals--*Smithsonian*, *Discover*, and *Nature*--all contain "hobbit" or "hobbits" in the title.  *See* Meehan Decl., Exhibits 2, 3, and 4. By contrast, none of those titles contain the term *Homo Floresiensis* in the title.  *Id.*  Indeed, most articles about the real-life hobbits reference "Hobbits" in the title, not *Homo Floresiensis*.  Meehan Decl., para. 6.

C.      Asylum promotes its film, *Age of the Hobbits.*

In February of 2012, at the Berlin Film Festival, Asylum announced the production and upcoming release of its film *Age of the Hobbits*.  Declaration of Paul Bales ("Bales Decl."), para. 2.  At all times, *Age of the Hobbits* was a story about the diminutive human sub-species *Homo Floresiensis*--commonly compared to Tolkien's "Hobbit" characters--and set in the Indonesian jungles of their origin.  *Id.*  The screenwriter engaged to pen the script for *Age of the Hobbits* was instructed to write a story about the prehistoric human sub-species recently discovered in Indonesia and commonly referred to as "hobbits."  *Id.*  From the beginning, potential buyers were informed that the "hobbits" in the film title were a reference to *Homo Floresiensis,* who obtained their commonly-used name in a comparison to J.R.R. Tolkien's smallish characters of the same name.  *Id.*

*Age of the Hobbits* has **always** been about *Homo Floresiensis.*  Bales Decl., para. 3.  **Every** cover for the DVD and blu-ray disc for *Age of the Hobbits* has always described Plaintiffs' trademark as a point of reference and contained the following description of the subject film:

> "In 2003, researchers digging in the remote jungles of Indonesia discovered the bones of a three-foot tall adult female.  This previously unknown human species was quickly dubbed "Hobbits" after the smallish characters from J.R.R. Tolkien's book, "The Hobbit," Unlike Tolkien's fantasy, these "Hobbits" were real."

Bales Decl., para. 3, and Exhibit 1 attached thereto.

*Age of the Hobbits* is a feature-length, dramatic motion picture

containing humor and moral themes including the classic battle between good and evil. Bales Decl., para. 4. In addition, the film contains commentary of the value of family and the benefits of a cohesive family unit. *Id.* The film also contains themes of racial/ethnic tolerance when diverse groups must work together to face a common foe. *Id.* The film also contains a strong environmental message in that the "hobbit" characters are vegetarian and worship the earth as the provider, always mindful not to do harm to it. *Id.*

Asylum did not direct any public advertising campaign for *Age of the Hobbits*. Bales decl., para. 5. Asylum did not purchase magazine or newspaper ads. *Id.* Asylum did not broadcast any commercials to promote the movie. *Id.* Instead, Asylum directed all of its efforts to distributors, in-person at industry film markets. *Id.* Asylum attends 6 to 7 film markets each year wherein film sales agents (like Asylum) and (mostly) foreign distributors gather to conduct one-on-one sales meetings in hotel suites or booths in convention halls to negotiate the purchase of licensing rights to films for certain media (*i.e.* free television, DVD/blu-ray rental, etc.) in defined territories of one or more countries and/or languages. *Id.*

In or about September of 2012, the Asylum displayed the current artwork for *Age of the Hobbits* on its website. Bales Decl., para. 6. Other than still photographs from the production, no other artwork for *Age of the Hobbits* has appeared on Asylum's website. *Id.* The Asylum website, while available to the public, is not used to generate sales/rentals to the public but is simply a resource for the distribution industry. *Id.* Of the 150 film titles referenced on the website, only approximately 100 DVDs were sold during the entirety of 2012 directly to consumers from the website. *Id.* Not one retail sale for *Age of the Hobbits* was generated on the Asylum website. *Id.*

In August of 2012, Asylum announced the release date of *Age of the Hobbits* as December 11, 2012, on its website with only still photographs from the production set. Bales Decl., para. 7. The release date was within one week of the

theatrical release date for Plaintiffs' film. *Id.* There was never any theatrical release date for *Age of the Hobbits*. *Id.* The proximity to the release date of Plaintiffs' film is not coincidental. *Id.* To the contrary, Asylum sought to benefit from the increased public interest in all things "hobbit" generated in no small part by the release of Plaintiffs' film. *Id.* This common industry practice of releasing films reflecting pop culture generated by or reflected in studio films is known as "drafting." *Id.* An example of drafting include last year's releases of the films *Snow White and the Huntsman, Mirror, Mirror,* and *Snow White*, all films about the character "Snow White." *Id.*

Asylum does not intend to confuse the public with the release of *Age of the Hobbits*. Bales Decl., para. 8. Asylum is an established company that has released over 150 films. *Id.* The success of these films and Asylum is dependent upon retailers like Blockbuster and Wal-Mart stocking these films on their store shelves. *Id.* If consumers buying/renting these films are "tricked" into making a purchase of *Age of the Hobbits* when the consumer intended to buy Plaintiffs' film, they will return the film to the store and seek a refund. *Id.* If any Asylum film caused a statistically significant return rate, retailers would cease doing business with Asylum for all films. *Id.* Confusion would not lead to increased sales, it would put Asylum out of business. *Id.*

Consumers have not been tricked into buying Asylum films with titles similar to Hollywood blockbusters. Bales Decl., para. 9. Defendants have released over 150 films and only approximately 10% could be labeled as "mockbusters." *Id.* "Mockbusters" are low-budget, tongue-in-cheek parodies of big budget films including *Snakes on a Train* and *The Day the Earth Stopped*. *Id.* More to the point however, *Age of the Hobbits* is not a traditional "mockbuster" because, among other reasons, the title is not in any way similar to *The Hobbit: An Unexpected Journey*. *Id.* A mockbuster title for Plaintiffs' film would be something more like *The Hobbit: The Never-Ending Journey*. *Id.* In any event, "mockbusters" have a return rate which

10

1    is actually lower than non-"mockbusters." *Id.*

2

3    D.    Plaintiffs request changes to the promotion of *Age of the Hobbits.*

4          On August 31, 2012, Plaintiffs' counsel, Michael Grow, sent a 7-page

5    letter to Defendant protesting the marketing and advertising for "Age of the Hobbits."

6    Meehan Decl., para. 7.

7          The August 31, 2012, letter of Michael Grow and Plaintiffs' moving

8    papers both claim that Asylum allegedly "promoted its film on Netflix 'based on a

9    reimagined version of J.R.R. Tolkien's mythical universe.'" This allegation is

10   absolutely false.  Bales Decl., para. 10.  First, Asylum does not advertise any film on

11   Netflix.  *Id.*  Second, neither Asylum nor anyone affiliated with the Asylum has ever

12   circulated any such statement or anything similar to such statement to anyone.  *Id.*

13   Third, Asylum was not aware of any such statement until informed of it by Plaintiffs

14   and Asylum immediately instructed Netflix to remove the statement.  *Id.*  Finally, *Age*

15   *of the Hobbits* was never delivered to Netflix nor was it ever available on Netflix.  *Id.*

16         The original artwork for *Age of the Hobbits* did not mimic Plaintiffs'

17   artwork at all and is believed to be created before the artwork advertising Plaintiffs'

18   film was publicly available.  Bales Decl., para. 11.  Of particular note was Plaintiffs'

19   complaint about the use of a "hooded figure" in the artwork.  *Id.*   The hood was

20   actually added to the figure after Asylum received complaints from its industry

21   buyers that the figure from the original artwork was "too ugly."  *Id.*  The original title

22   treatment for *Age of the Hobbits* used a commonly used font known as "Trajan.  *Id.*

23   Indeed, the "Trajan" font bills itself as "the movie font" and has been featured in the

24   artwork of numerous films.  *Id.*   Regardless of its ubiquitous nature, Asylum agreed

25   to change its font and artwork at Plaintiffs' request.  *Id.*

26         On September 14, 2012, Scott Meehan, counsel for Defendant, contacted

27   Plaintiffs' counsel and promised to change the artwork, title treatment, and include a

28   disclaimer.  Meehan Decl., para. 8.   However, Mr. Meehan informed Plaintiffs'

counsel in no uncertain terms that the term "Hobbits" would stay in the title because it accurately described the subject matter of the film, that is, *Homo Floresiensis,* and further, that such usage was protected as "fair use." *Id.*

On September 20, 2012, new artwork, featuring a more distinctive title treatment, pre-historic man in a jungle setting as well as a disclaimer immediately below the title informing the public that this was not Tolkien's Hobbits, was presented to Plaintiffs' counsel. Meehan Decl., para. 9. Mr. Meehan informed Plaintiffs' counsel that they were amenable to further changes to the artwork, title treatment, and disclaimer. *Id.* However, Mr. Meehan told him in no uncertain terms that the term "Hobbits" would remain in the title. *Id.* However, Mr. Meehan never heard back from Mr. Grow. *Id.*

Over four (4) weeks later, on October 19, 2012, Mr. Meehan was contacted by Plaintiffs' new counsel, AJ Thomas. Meehan Decl., para. 10. Again, Mr. Meehan made the same offer to Mr. Thomas, that Asylum would consider changes to the artwork, title treatment, and disclaimer to remove any perceived confusion. *Id.* However, Mr. Meehan informed Mr. Thomas that "Hobbits" would remain in the title as legally-recognized fair use based on the reference to *Homo Floresiensis. Id.* Like its prior counsel, Mr. Thomas said he would check with his client and get back to him. *Id.* However, like prior counsel, Mr. Thomas never came back to Mr. Meehan with any requested changes at any time. *Id.*

Except as set forth above, there was never, nor has there ever been, any negotiations or discussions between the parties prior to the filing of the lawsuit. Meehan Decl., para. 11.

On November 7, 2012, Plaintiffs filed the subject lawsuit.

On November 12, Mr. Meehan contacted Mr. Thomas and informed him that some foreign distributors had requested to change the title of the subject film to *Clash of the Empires.* Meehan Decl., para. 12. Mr. Meehan asked him if his clients would object to the use of that title for the subject film. *Id.* Mr. Thomas responded

MEMO OF POINTS AND AUTHORITIES IN OPPOSITION TO PRELIMINARY INJUNCTION

that there would not be any objection to the use of that title. *Id.* Mr. Thomas inquired as to whether Asylum would change the title on all versions. *Id.* Mr. Meehan responded that his client would not be doing that. *Id.* Mr. Meehan renewed his offer to consider any changes except the use of the term "hobbits" (*i.e.* artwork, title treatment and/or disclaimer). *Id.* Again, Mr. Thomas did not request any such changes. *Id.*

E.   The Keegan & Donato Report verifies that there is no consumer confusion in the marketplace between the two films.

Asylum recently commissioned a consumer research study to determine whether there was any confusion between *Age of the Hobbits* and Plaintiffs' film. The findings and conclusions of that study are contained in the Keegan & Donato Consulting, LLC Report (the "Report") attached to the Declaration of Mark Keegan ("Keegan Decl."). The result of the study showed that there is no confusion in the marketplace between *Age of the Hobbits* and Plaintiffs' film, *The Hobbit: An Unexpected Journey*. Keegan Decl., Exhibit 1, pp. 9-11. When a test group of consumers were shown the artwork for the two films, 20.4 percent believed that the two films were made by the same or an affiliated person, company or organization. Keegan Decl., Exhibit 1, page 9. However, when the control group which was shown the same artwork, but with a re-titled *Age of the Hobbits* to *Clash of the Empires,* there was actually a higher confusion rate of 30.4 percent between the two films. *Id.* The test reveals that the level of "noise"--that is, the population that guesses incorrectly out of ignorance rather than confusion--exceeds the likelihood of confusion measurement for the contested titles, thereby negating any opportunity for likelihood of confusion among consumers between the two films. *Id.* at 10-11.

MEMO OF POINTS AND AUTHORITIES IN OPPOSITION TO PRELIMINARY INJUNCTION

III.

## PLAINTIFFS CANNOT MEET THE LEGAL
## STANDARD FOR ISSUANCE OF A PRELIMINARY INJUNCTION

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest.." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008).

As set forth herein, Plaintiffs are not likely to prevail on the merits because *Age of the Hobbits* is a "noncommercial" use, exempting it from Plaintiff's claim of trademark dilution.  As far as trademark infringement, Asylum usage is subject to the nominal fair use doctrine because *Age of the Hobbits* is about the human sub-species *Homo Floresiensis* which is commonly referred to as "Hobbits" in a direct comparison to the diminutive hobbits of  J.R.R. Tolkien's stories. Additionally, Asylum presents compelling evidence that their is no confusion in the marketplace.  However, even if Plaintiffs can get past the threshold likelihood of confusion, such confusion is insufficient because is does not rise to the level of "particularly compelling" required for competing literary titles.

A.   THERE IS NO TRADEMARK DILUTION: *AGE OF THE HOBBITS* FALLS UNDER THE NONCOMMERCIAL USE EXEMPTION

The Federal Trademark Dilution Act protects "[t]he owner of a famous mark...against another's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark." 15 U.S.C. §1125(c ).  The statute contains three (3) exemptions to liability: (1) comparative advertising; (2) news reporting; and (3) noncommercial use.  15 U.S.C. §1125(c )(4)(B).

In *Mattel v. MCA Records, Inc.*, 296 F.3d 894 (9th Cir. 2000), the Ninth

Circuit discusses the application of the noncommercial use exemption.  In particular, the Court noted that the "noncommercial use" exemption was meant to allay fears of eroding First Amendment concerns.  *Id.*  at 906.  To that end, the Court recognized that "the 'core notion of commercial speech' is that 'it does no more than propose a commercial transaction.'" *Id.* citing *Hoffman v. Capital Cities/ABC, Inc.,* 255 F.3d 1180, 1184 (9th Cir. 2001).  Further, "If speech is not 'purely commercial'--that is, if it does more than propose a commercial transaction--then it is entitled to full First Amendment protection.  *Id.* citing *Hoffman,* 255 F.3d at 1185-86.

As pointed out in *Mattel*, the *Hoffman* case illustrates the commercial/expressive use nexus found in traditional communicative mediums like films, books, newspapers, and in that case, magazines.  In *Hoffman,* a magazine appropriated images of the actor Dustin Hoffman from the movie *Tootsie* without permission and re-cast his image in different wardrobes in an article about current fashion.  Mr. Hoffman sued the magazine alleging violations of the Lanham Act and his right of publicity. The Ninth Circuit had no problem labeling that magazine unauthorized usage as a commercial purpose.  However, it also recognized that in a traditionally communicative medium, there was also an expressive purpose absolutely protected by the First Amendment.   Since the commercial purpose was "inextricably entwined with [these] expressive elements," the entire usage was protected under the First Amendment.  *Hoffman,* 255 F.3d at 1185..

Using *Hoffman* as its guidepost, the *Mattel* court ruled that since there was an expressive use entwined with the commercial use, the entire use falls under the "noncommercial' exemption and, therefore, the trademark dilution claim was dismissed.  *Mattel,* 296 F.3d at 906-07.  Given the absolute protection to expressive works, it is no wonder there is a dearth of anti-dilution cases regarding artistic works and literary titles.

It is well-established that for-profit movies are not commercial speech and are fully protected expression under the First Amendment.  *Ocean Bio-Chem v.*

*Turner Network Television,* 741 F.Supp. 1546, 1553, fn. 2 (S.D. Fla. 1990) citing *Joseph Burstyn, Inc. V. Wilson*, 343 U.S. 495, 501-02.  *See also*, *Rogers v. Grimaldi*, 875 F.2d 994, 998 ("The expressive elements of titles [of movies] requires more [First Amendment] protection than the labeling of ordinary commercial products." (Fn. omitted)).  Even a work of pure entertainment enjoys some level of First Amendment protection.  *Winters v. New York*, 333 U.S. 507, 510 (1948)("The line between the informing and the entertaining is too elusive for the protection of [the First Amendment]....What is one man's amusement, teaches another's doctrine.").  "Entertainment, as well as political and ideological speech is protected; motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works fall within the First Amendment guarantee.  *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981)(citation omitted).

As more fully set forth in the Declaration of Paul Bales, *Age of the Hobbits* contains humor and moral themes including the classic battle between good and evil.  Further, is contains themes of racial/ethnic tolerance as well protecting the environment.  *Age of the Hobbits* is clearly subject to the noncommercial use exemption.  Therefore, Plaintiffs' claim of trademark dilution must fail.

B.    THERE IS NO TRADEMARK INFRINGEMENT: ASYLUM'S USE OF THE TERM "HOBBITS" IN THE TITLE OF ITS FILM IS A NOMINATIVE FAIR USE.

In *New Kids on the Block v. New America Pub., Inc.* 971 F.2d 302 (9th Cir. 1992), defendants, a teen magazine and newspaper, invited their readers to call in and vote for their favorite member of the singing group, New Kids on the Block.  The call-in number was a 900 number which allowed defendants to profit commercially from the call-in poll.  Plaintiff's New Kids on the Block had trademarked their name and profited from their own 900 number call-in business.  Plaintiff brought suit against defendants alleging, among other claims, trademark infringement under the

Lanham Act.

In affirming summary judgment, the Ninth Circuit reasoned that in a situation where the otherwise-trademarked term describes the particular thing being used, such use lies outside of trademark protection.  The Court referred to such use as "nominative fair use" and described it as follows:

> "Where the defendant uses a trademark to describe the plaintiff's product, rather than his own, we hold that a commercial user is entitled to a nominative fair use defense provided he meets three requirements: First, the product or service in question must be one not readily identifiable without use of the trademark; second, only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and third, the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder."

*Id* at 308: *See also Mattel, Inc. v. Walking Mountain Productions*, 353 F.3d 792, 809 ("The nominative fair use doctrine protects those who deliberately use another's trademark or trade dress 'for purposes of comparison, criticism[,] or point of reference.'")

Nominative fair use occurs when the alleged infringer uses "the [trademark holder's] mark to describe the [trademark holder's] product, *even if the [alleged infringer's] ultimate goal is to describe his own product.*"  *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1151 (9th Cir. 2002)(emphasis in original).

Asylum has always asserted that the characters in its movie are not the fantasy characters of Tolkien's stories.  However, the term "hobbits" when used to describe the prehistoric humans discovered in Indonesia is employed as a direct comparison and reference Tolkien's "hobbits."  Accordingly, Asylum's use to describe the prehistoric humans discovered in Indonesia in its film is necessarily a

1   comparison and reference to Tolkien's "hobbits."

2          In *E.S.S. Entertainment 2000, Inc. v. Rock Star Videos, Inc.*, 547 F. 3d
3   1095 (9th Cir. 2008), the owner of the Play Pen Gentlemen's Club sued the maker of
4   violent video game which used a virtual strip club called the "Pig Pen" alleging that
5   "Pig Pen" infringed his "Play Pen" trademark.  The Ninth Circuit denied application
6   of the nominal fair use because defendant's use was not identical to plaintiff's mark.
7   *Id.* at 1099.  Further, since defendant did not use "Pig Pen" to reference plaintiff's
8   mark, nominative fair use was similarly not available.  *Id.*

9          Asylum's film, *Age of the Hobbits,* uses Plaintiff's identical mark and it
10  is well-settled that "hobbits," as the common name for *Homo Floresiensis,* is a direct
11  reference to the diminutive size of the characters in Tolkien's stories (and Plaintiffs'
12  mark) of the same name.  As such, *Rock Star Videos* is not instructive in this case.

13         In applying the first element of the *New Kids* nominative fair use test to
14  the case at hand, the overwhelmingly popular term of choice to describe *Homo*
15  *Floresiensis* is "Hobbits."  It is impossible to find a publication about *Homo*
16  *Floresiensis*  without the term "Hobbits" contained therein and usually the term
17  "Hobbits" is in the title itself.  The human sub-species discovered in Indonesia can be
18  referenced by either "Hobbits" or *Homo Floresiensis.*  However, it is far less likely to
19  locate any publication about them containing the term *Homo Floresiensis* in the title.
20  Clearly, "Hobbits" has become their commonplace moniker.  It is no more reasonable
21  to refer to *Homo Floresiensis* by its Latin genus and species moniker than to refer to
22  "Princess Diana" as "the former princess of Wales."  *See, e.g.  Cairns,* 292 F.3d at
23  1153 ("[I]t is far simpler (and more likely to be understood) to refer to 'Princess
24  Diana.'").

25         With respect to the second element of the *New Kids* test, Asylum has
26  only used so much of the term "Hobbits" as is reasonably necessary in its title.
27  Asylum uses a font with no resemblance to that used by Plaintiffs.  The size of the
28  term "Hobbits" is the same size as the other words in the title.  There is a disclaimer

MEMO OF POINTS AND AUTHORITIES IN OPPOSITION TO PRELIMINARY INJUNCTION

right below the title stating "They're not Tolkien's Hobbits...They're real."  Further, the description of the film on the cover distinguishes it from Plaintiffs' film with the following explanation:

> "In 2003, researchers digging in the remote jungles of Indonesia discovered the bones of a three-foot tall adult female.  This previously unknown human species was quickly dubbed "Hobbits" after the smallish characters from J.R.R. Tolkien's book, "The Hobbit," Unlike Tolkien's fantasy, these "Hobbits" were real."

The imagery of the artwork in no way resembles the artwork for Plaintiffs' film. The artwork for Plaintiffs' film, featured as Exhibit 7 to the Declaration of Andrew J. Thomas, features only a youngish Caucasian male in a buttoned shirt and collared corduroy jacket holding a sword as though he were posing for a portrait with the English countryside in the background.  By contrast, the artwork for *Age of the Hobbits* contains ethnic tribesman drawing swords in imminent battle.  Yes, they both have swords but the similarities end there.

Finally, with respect to the third element, Asylum has done nothing to imply sponsorship or endorsement by the trademark holder.  Indeed, Asylum presents a readily distinguishable title and artwork along with a disclaimer and explanation to alert consumers to its non-affiliation with Plaintiffs.

"If the nominative use does not satisfy all the *New Kids* factors, the district court may order defendants to modify their use of the mark so that all three factors are satisfied; it may not enjoin nominative use of the mark altogether." *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1176.(9th Cir. 2010).  In *Toyota,* the makers of the Lexus automobile challenged the defendants' use of the domain names "buy-a-lexus.com" and "buyorleaselexus.com" for independent auto broker services specializing in arranging for the sale of Lexus autos.  While the lower court found trademark infringement and ordered defendants to cease all use of the Lexus mark in domain names, the injunction had to be modified to allow defendants to make some use of the Lexus trademark in their domain names.  *Id.* at 1185.  The

MEMO OF POINTS AND AUTHORITIES IN OPPOSITION TO PRELIMINARY INJUNCTION

Ninth Circuit reasoned that an overly-broad injunction involving a nominative use of another's mark can impinge on a merchant's right to engage in truthful advertising. *Id.* at 1171 ("A trademark injunction, particularly one involving nominative fair use, can raise serious First Amendment concerns because it can interfere with truthful communication between buyers and sellers in the marketplace.")

The First Amendment concerns of the Court in *Toyota*, a purely commercial speech case, would be increased in the case at hand where an artistic, communicative work is at issue.  Therefore, if the Court finds one or more of the *New Kids* elements is not satisfied, the Court should not completely enjoin Asylum's usage of "Hobbits" but rather fashion a remedy that allows its usage consistent with the three elements contained in *New Kids*.

Plaintiffs argue that Asylum fails to show that "Hobbit" is widely used or understood to refer to the Indonesian archaeological find.  To the contrary, it cannot be disputed that the creatures in the Indonesia archaeological find are routinely referred to as "Hobbits."  Further, the key is how the prehistoric humans discovered in Indonesia are commonly referred to, not that those prehistoric humans themselves be subject to some threshold level of pop culture relevance.  Plaintiffs do not present any evidence that *Homo Floresiensis* have any more common moniker than "Hobbits."

Plaintiffs also complain that their survey did not associate "Hobbit" with Indonesia, an archaeological find, or a prehistoric human sub-species.  Again, pop culture relevance is not the touchstone.  Instead, it is the common usage of a trademark when referring to the subject matter, in this case *Homo Floresiensis*.  It is not important that the subject matter itself be commonplace.

Plaintiffs suggest that the connection between *Homo Floresiensis* and *Age of the Hobbits* is an afterthought, complaining that "Asylum did not begin offering up its pre-hominid *Homo Floresiensis* justification until mid-October 2012, when *The Hollywood Reporter* published a news story about the infringement

MEMO OF POINTS AND AUTHORITIES IN OPPOSITION TO PRELIMINARY INJUNCTION

dispute."  That may have been when Plaintiffs made the discovery but Asylum made

the connection from the beginning and all potential buyers--film distributors--were

informed of this fact.  Asylum is not a film distributor like Warner Bros., MGM or

New Line, it is only a sales agent and does not direct public advertising or promotion

its films to the public in any material way.

The connection between "Hobbits" and *Homo Floresiensis* is

undisputed.  Accordingly, *Age of the Hobbits* falls within the doctrine of fair use.

C.      THERE IS NO TRADEMARK INFRINGEMENT: *AGE OF THE HOBBITS*

        IS NOT CONFUSINGLY SIMILAR TO *THE HOBBIT: AN UNEXPECTED*

        *JOURNEY*

To prevail on a claim for trademark infringement under the Lanham Act,

15 U.S.C. §1114, a party "must prove: (1) that it has a predictable ownership interest

in the mark; and (2) that the defendant's use of the mark is likely to cause consumer

confusion."  *Network Automation Inc. v. Advanced Systems Concepts, Inc.,* 638 F.3d

1137, 1144 (9th Cir. 2011) citing *Dep't of Parks &Recreation v. Bazaar Del Mundo*

*Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006).  For purposes of this motion, Asylum will

direct its argument to the issue of consumer confusion.

The traditional approach taken by courts in the Ninth Circuit to establish

likelihood of confusion is applying the eight-factor test set forth in *AMF Inc. v.*

*Sleekcraft Boats,* 599 F.2d 341, 348-49 (9th Cir. 1979).  These eight factors are: "[1]

strength of the mark; [2] proximity of the goods; [3] similarity of the marks; [4]

evidence of actual confusion; [5] marketing channels used; [6] type of goods and the

degree of care likely to be exercised by the purchaser; [7] defendant's intent in

selecting the mark; and [8] likelihood of expansion of the product lines."  citing *AMF*

*Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348-49 (9th Cir. 1979).

These eight factors are not exhaustive and "other variables may come

1   into play depending on the particular facts presented." *Id.  See, e.g. Fortune*
2   *Dynamics, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1030
3   (9th Cir. 2010)("This eight factor analysis is 'pliant, illustrative rather than
4   exhaustive, and best understood as simply providing helpful guideposts.")

5            Most importantly, the eight-factor test is a merely a proxy for the
6   ultimate question: is there consumer confusion?  *See Network Automation Inc. v.*
7   *Advanced Systems Concepts, Inc.*, 638 F.3d 1137, 1142 (9th Cir. 2011)("[T]he *sin*
8   *qua non* of trademark infringement is consumer confusion, and that the *Sleekcraft*
9   factors are but a nonexhaustive list of factors relevant to determining the likelihood of
10  consumer confusion.").  Not surprisingly, when the information is available, courts
11  have determined that actual confusion is the most important factor.  *See Id.* at 1147
12  ("In [*Playboy Enterprises, Inc. v. Netscape Communications Corp.*, 354 F.3d 1020
13  (9th Cir. 2004)] and [*Brookfield Communications, Inc. v. West Coast Entertainment*
14  *Corp.*, 174 F.3d 1036 (9th Cir. 1999)] we applied the *Sleekcraft* test flexibly,
15  determining that evidence of actual confusion was the most important factor.")
16  (citation omitted).

17           In the case at hand, Asylum commissioned the Keegan & Donato Report
18  which proved that there was no confusion in the marketplace between the two films.
19  *See* Keegan Decl., Exhibit 1.  Indeed, the Keegan & Donato Report showed that there
20  is actually less confusion between the two titles than there would be between
21  Plaintiffs' film and another randomly titled film.  *Id.*  One explanation for this is the
22  heightened awareness of Plaintiffs' film coupled with the obvious distinguishing
23  features of *Age of the Asylum* (*i.e.*  different title, different title font, different artwork,
24  the disclaimer that it is not Tolkien's Hobbits, the description that it is not Tolkien's
25  Hobbits, different actors, etc.)

26           Plaintiffs did not hire a consumer research company but had one of their
27  attorneys, Farnaz Alemi, design and implement her own survey by piggy-backing on
28  a still-unproduced Neilson survey.  While perhaps well-intentioned, the Alemi survey

MEMO OF POINTS AND AUTHORITIES IN OPPOSITION TO PRELIMINARY INJUNCTION

contains many flaws which ultimately leaves her conclusions unsupportable.  *See* Keegan Decl., Exhibit 1, pp. 11-17.

As more fully set forth in the Keegan & Donato Report at pages 11-17, among the many issues with the Alemi survey is the leading nature of the questionnaire design: instead of letting respondent's interpret the stimuli presented to them, it focuses respondents on the title only.  Then, respondents were pressed for an answer thereby encouraging guessing.   Further, it queries past purchasers of theatrical releases, not those who purchase/rent DVDs.  The later group are more likely to be confronted with an opportunity to be confused, not the Alemi survey group.

The Alemi survey is also misleading because it reduces the actual base of respondents to only those that gave an answer, producing a finding that is not reflective of the actual sample size reported.  When corrected, the net difference between the test group and the control group is only 8.6 percent.  Given the other limitations of this survey, the result is meaningless.

The Alemi survey does not classify persons who gave more than one answer.  Accordingly, those respondents that gave more than one answer would be double (or more) counted.

The Alemi survey is overly broad.  A consumer's association between *Age of the Hobbits* and Tolkien does indicate that consumers associate *Age of the Hobbits* with Plaintiffs' film.  Plaintiffs, not Tolkien, are the trademark holder and Tolkien did not make any film.  Indeed, one would expect an association with Tolkien given that Asylum's title is a nominative use of "Hobbits," popularized by Tolkien's stories.

Given the supportable conclusions contained in the Keegan & Donato Report and the lack of supportable conclusion in the Alemi survey, the evidence before this Court is that there is no confusion between these two films in the marketplace.   If the *sin qua non* of trademark infringement is consumer confusion, a

MEMO OF POINTS AND AUTHORITIES IN OPPOSITION TO PRELIMINARY INJUNCTION

lack of consumer confusion yields a result of no trademark infringement.  In any event, given the flexible application of the *Sleekcraft* factors, the weight of the Keegan & Donato Report must loom large over all other factors.

### 1.  Strength of the Mark

Plaintiffs offer the declaration of one of its in-house lawyers to assert, without any foundation whatsoever, that the term "hobbit" was invented by Tolkien to describe his fictional characters.  Such is not the case.

It cannot be disputed that the term "hobbit" was previously published in a list of supernatural creatures in The Denham Tracts prior to Tolkien's alleged invention of the term.  Accordingly, it cannot be classified as "arbitrary" or "fanciful" and thus cannot be afforded the highest level of protection.

.

### 2.      Proximity of the Goods

While Asylum concedes that the products are closely related, in this context, such a relatedness may actually prevent confusion.  The awareness of Plaintiffs' film is high and accordingly, a comparable product, *Age of the Hobbits* would immediately tip itself off as *not* be from the same source as that of Plaintiffs' product.  Indeed, this theory is proven in the Keegan & Donato survey which actually found more source confusion between wholly different titles than it did between Plaintiffs' film and *Age of the Hobbits*.  Remember, the eight-factor test is merely a guidepost and meant to be elastic when the circumstances warrant.

### 3.      Similarity of the Marks

Plaintiffs' film contains the term "Hobbit" within the context of the full title *The Hobbit: An Unexpected Journey.*  By contrast Asylum's film title is *Age of the Hobbits.*  Yes, both film titles use "Hobbit" but the similarities end there.

MEMO OF POINTS AND AUTHORITIES IN OPPOSITION TO PRELIMINARY INJUNCTION

1          *4.      Evidence of Actual Confusion*

2                  As stated above, the Alemi survey is flawed.  By contrast, the Keegan &

3    Donato Report accurately reports a total lack of consumer confusion in the

4    marketplace.

5

6          *5.      Marketing Channels*

7          Asylum concedes that the marketing channels are similar.

8

9          *6.      Degree of Care Used*

10                 While the price of the goods may be low, Asylum submits that

11   consumers do not go to the store to buy the cheapest DVD.  Instead, the go to find the

12   DVD that they want to watch.

13

14         *7.      Asylum's Intent*

15                 For all the reasons stated above, Asylum has no intent to confuse the

16   public.  Indeed, if customers of Asylum's films were deceived, they would return the

17   product to the store they bought it from.  If the return rate of any of Asylum's films

18   were beyond the general return rate, stores would not stock their product and they

19   would no longer be in business.  It is simply not in their interest to trick the

20   consumer.

21

22         *8.      Likelihood of Expansion*

23         Since the type of product is nearly identical, this prong is neutral.

24

25                 The Keegan & Donato Report confirms that there is no confusion

26   between the two titles.  Accordingly, the above factors should be considered in light

27   of the Report since the *sin qua non* is actual confusion, not the rote satisfaction of the

28   eight factors.  As such, there should be no finding of consumer confusion and,

MEMO OF POINTS AND AUTHORITIES IN OPPOSITION TO PRELIMINARY INJUNCTION

1    accordingly, no trademark infringement.

2     evidence indicates that   *Age of the Hobbits*

3

4    D.      FIRST AMENDMENT PRINCIPLES PROVIDE AN ABSOLUTE DEFENSE

5            TO PLAINTIFFS' CLAIMS

6           1.      The *Rogers* two-prong test applies to protect Asylum's First Amendment

7               rights.

8          Trademarks are protected by federal law under the Lanham Act.  Section

9    43(a) of the Lanham Act creates a civil cause of action against any person who

10   identifies his product in such a way that it is likely to cause consumer confusion

11   regarding the product when it "...is likely to cause confusion, or to cause mistake, or

12   to deceive as to the affiliation, connection, or association of such person with another

13   person, or as to the origin, sponsorship, or approval of his or her goods, services, or

14   commercial activities by another person..."  15 U.S.C.§1125.

15         The First Amendment can provide a complete defense to Lanham Act

16   claims involving artistic works.  *E.S.S. Entertainment 2000, Inc. v. Rock Star Videos,*

17   *Inc.* 547 F.3d 1095, 1101 (9th Cir. 2008).  It is well established that films are entitled

18   to First Amendment protection.  *Roxbury Entertainment v. Penthouse Media Group*

19   669 F.Supp.2d 1170, 1175 (C.D.Cal. 2009).

20         Movie titles also warrant First Amendment protection.  *See Rogers v.*

21   *Grimaldi*, 875 F.2d 994, 998 ("the expressive elements of titles requires more

22   protection than the labeling of ordinary commercial products." (Fn. omitted)).  When

23   First Amendment concerns are at stake, the Lanham Act must be construed narrowly.

24   *Rogers v. Grimaldi*, 875 F.2d 994, 998 ("Because overextension of Lanham Act

25   restrictions in the area of titles might intrude on First Amendment values, we must

26   construe the Act narrowly to avoid such a conflict.").

27         In *Rogers,* the famous dancer Ginger Rogers brought suit alleging

28   Lanham Act violations against the producers of a film titled, "Ginger and Fred,"

which was not about Ms. Rogers nor endorsed by her.   While evoking the fame of the dance team of Fred Astaire and Ginger Rogers, the film was actually about two fictitious cabaret performers who imitated the famous dance couple.  The Second Circuit ruled that the use of Ms. Rogers famous name in the film title was not a violation of the Lanham Act because of the defendants' First Amendment rights.  *Id.* at 999.  In particular, if a name used in a title has some "minimal artistic relevance" to the context of the film and the title does not otherwise "explicitly mislead[s] as the source or content of the work," it is protected expression. *Id.*  (emphasis added).

The Ninth Circuit has adopted the *Rogers* two-prong test to apply First Amendment protections in trademark infringement cases.  *Mattel, Inc. v. MCA Records, Inc.* 296 F.3d 894, 902 (9th Cir. 2002)(hereafter "*MCA*")("We agree with the Second Circuit's analysis and adopt the *Rogers* standard as our own.").

      a.   <u>Applying the first prong of *Rogers:* Asylum's use of "Hobbits"</u>
<u>has artistic relevance to the content of the film.</u>

The first prong of the *Rogers* test requires only that the title pass "the appropriately low threshold of *minimal* artistic relevance" to the content of the film. *Rogers,* 875 F.2d at 999 (emphasis added).  In other words, any connection between content and title satisfies this test.. *See E.S.S. Entertainment 200 v. Rock Star Videos* 547 F.3d 1095, 1100 (9th Cir. 2008)("the level of relevance [between title and content] merely must be above zero.").

In *Rock Star Videos*, a video game maker's use of a strip club's trademarked logo was entitled to First Amendment protection even though the video game was not primarily "about" the club, and was instead "about," at most, the club's neighborhood.  *Id.* at 1100.  "In this context, we conclude that to include a strip club that is similar to the look and feel to the Play Pen does indeed have at least 'some artistic relevance.'" *Id.* at 1100.

In *Rogers*, the title of the film did *not* refer directly to Ginger Rogers. Instead, it related to a female character who was nicknamed Ginger in a reference to

MEMO OF POINTS AND AUTHORITIES IN OPPOSITION TO PRELIMINARY INJUNCTION

Ginger Rogers.  Similarly, in the case at hand, the characters in *Age of the Hobbits* were given the nickname of "Hobbits" because of their diminutive size in a direct comparison to the "Hobbits" from Tolkien's stories.

In the case at hand, Plaintiffs cannot dispute that the diminutive characters in the film are referenced as "Hobbits."  As such, the first prong is satisfied.

> b.   Applying the second prong in *Rogers:* Asylum's Film does not "explicitly mislead" as to source or content.

Plaintiffs argue that "Because the title of Asylum's Infringing DVD is confusingly similar to Plaintiffs' *Hobbit* Film title...any attempt by Asylum to assert a First Amendment defense pursuant to *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), must fail."  Plaintiffs' Application, page 21, ll. 14-17.  Plaintiffs correctly point out that the *Rogers* test does not apply to "misleading titles that are confusingly similar to other titles" citing *Rogers*, 875 F.2d at 999.

However, in the case of misleading titles, the finding of confusion mus must be "particularly compelling."  *See Twin Peaks Productions v. Publications International, Ltd.* 996 F. 2d 1366, 1379 (2nd Cir. 1993); *Films of Distinction, Inc. v. Allegro Film Prods., Inc.* , 12 F.Supp.2d 1206, 1212, n. 1 (C.D. Cal. 1998)("Under the *Rogers* test, 'the finding of likelihood of confusion must be particularly compelling to outweigh the First Amendment interest [in protection of artistic titles.],'" (quoting *Twin Peaks*, 996 F.2d at 1379)).

As set forth above, the Keegan & Donato report makes the case that there is no consumer confusion at all between the two titles.  In any event, the evidence of confusion does not even approach the "particularly compelling" standard. Indeed, it could be described as marginal at best.  As such, Asylum satisfies the second prong of *Rogers* and Asylum's use is protected by the First Amendment.

MEMO OF POINTS AND AUTHORITIES IN OPPOSITION TO PRELIMINARY INJUNCTION

1

2   DATED: December 7, 2013                    SCOTT A. MEEHAN, ESQ.

3

4                                             By:___/s/_ Scott A. Meehan_____
                                                       Scott A. Meehan
5                                             Attorney for Defendant The Global
                                              Asylum, Inc.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMO OF POINTS AND AUTHORITIES IN OPPOSITION TO PRELIMINARY INJUNCTION